# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re

NETBANK INC.,                                    Case No. 3:07-bk-04295-JAF
                                                 Chapter 11

      Debtor.

_____

CLIFFORD ZUCKER, in his                          Adv. Pro. No. 3:08-ap-346-JAF
capacity as Liquidating Supervisor
for NETBANK, INC.,

      Plaintiff,

v.

FEDERAL DEPOSIT
INSURANCE CORPORATION,
as Receiver for NetBank, f.s.b.,

      Defendant.

_____

## DEFENDANT FEDERAL DEPOSIT INSURANCE CORPORATION'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Federal Rules of Civil Procedure made applicable by Rule 7056,

Federal Rules of Bankruptcy Procedure Defendant Federal Deposit Insurance Corporation, as

Receiver for NetBank, f.s.b. ("FDIC") moves for entry of summary judgment on all counts of the

Complaint in its favor and on the FDIC's Counterclaim because there are no genuine issues as to

any material fact and the FDIC is entitled to judgment as a matter of law.

## I.    INTRODUCTION

This proceeding is a dispute between the FDIC and Plaintiff Clifford Zucker in his

capacity of Liquidating Supervisor for NetBank, Inc. ("Zucker") as to the ownership of a refund

of corporate income taxes by the Internal Revenue Service resulting from a carry-back loss.  The

Court must determine whether the tax refund belongs to the FDIC, in its capacity of Receiver for NetBank, fsb (the "Bank") or to Zucker, in his capacity of Liquidating Supervisor of NetBank, Inc., the parent company of the Bank (the "Holding Company"). This question should be resolved in favor of the FDIC because the Bank owns all refunds attributable to its earnings history, and any right to possess such refunds by the Holding Company is not an ownership interest but rather an agent-trustee relationship.

The Bank and the Holding Company, along with the other direct and indirect subsidiaries of the Holding Company and Bank, entered into an Amended and Restated Tax Sharing Agreement effective January 1, 2003 (the "Tax Sharing Agreement") that specifically provided for the allocation of tax refunds among the corporations included in the consolidated tax return. The terms of the Tax Sharing Agreement provide that the Bank is entitled to the entire refund in dispute in this proceeding because the Bank generated all the income and more losses than the amount of the refund. If the Tax Sharing Agreement has no legal effect because the Holding Company subsequently rejected the tax sharing agreement through this bankruptcy case and the FDIC, in its capacity of Receiver for the Bank, repudiated the tax sharing agreement, the Bank still is entitled to the full refund. In the absence of a Tax Sharing Agreement to the contrary, case law on this issue holds that disputed tax refunds belong to the entity that generated the income and loss that resulted in the tax refund. In this case, the Bank generated all of the income and almost all of the loss that generated the tax refund (in excess of the amount of the refund) and is therefore entitled to the refund. Under either scenario, there is no basis in law or fact for the Holding Company to claim the tax refund.

## II.    UNDERSPUTED MATERIAL FACTS

The Holding Company was the common parent of an affiliated group of corporate entities (the "Group") that included the Bank and its subsidiaries, within the meaning of § 1504(a) of the Internal Revenue Code. (Compl. ¶ 8)[1]  The Holding Company filed consolidated federal income tax returns on behalf of all members of the Group.  (Compl. ¶ 9)  The Group entered into the Tax Sharing Agreement on or about January 1, 2003 that defined the methods by which tax liabilities and credits were to be allocated among the Group.  (Compl. ¶ 6)  A true and correct copy of the Tax Sharing Agreement is attached hereto and incorporated herein as **Exhibit A**.   This Tax Sharing Agreement was executed in compliance with the Interagency Policy Statement on Income Tax Allocations in a Holding Company Structure issued by the FDIC, the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency and the Office of Thrift Supervision in 1998.  63 Fed. Reg. 64757.

On or about September 5, 2006, the Debtor filed a consolidated federal income tax return on behalf of the Group for the tax year ending December 31, 2005 (the "2005 Tax Return"). (Compl. ¶ 10)   A true and correct copy of the 2005 Tax Return is attached hereto and incorporated herein as **Exhibit B**.  As shown on the 2005 Tax Return, the Group had a total overall taxable income of $17,987,259 and tax liability of $6,145,415 for the 2005 tax year. (Compl. ¶ 11; Ex. B)

On or about August 31, 2007, the Holding Company filed a consolidated tax return for the Group for the tax year ending December 31, 2006 (the "2006 Tax Return").   (Compl. ¶ 12)  A true and correct copy of the 2006 Tax Return is attached hereto and incorporated herein as **Exhibit C**.  As shown on the 2006 Tax Return, the Group had a total overall net operating loss of

---

[1] Cites to the Complaint all contain allegations that were admitted by the FDIC in its Answer.

$94,128,552 for tax year 2006. (Compl. ¶ 13) As a result, the Group had zero federal income tax liability for the 2006 tax year. (*Id.*)

Pursuant to applicable IRS statutes and regulations, on September 4, 2007 the Holding Company filed a Form 1139 (the "Holding Company's Form 1139") for the 2006 tax year seeking a refund of income taxes in the amount of $5,735,176 attributable to the carryback of the Group's net operating loss incurred for the 2006 tax year to the 2005 tax year (the "Tax Refund"). (Compl. ¶ 14) A true and correct copy of the Holding Company's Form 1139 is attached hereto and incorporated herein as **Exhibit D**.

On September 28, 2007, the Office of Thrift Supervision closed the Bank and appointed the FDIC as its Receiver. (Debtor's Motion for Order Authorizing Sale of Real Property Pursuant to 11 U.S.C. § 363 ¶ 9, Main Case Dkt. # 28). That same day, the Holding Company filed its voluntary petition under Chapter 11 of the bankruptcy code (the "Petition Date"). (Compl. ¶ 1)

On November 26, 2007, the FDIC in its capacity of Receiver for the Bank and pursuant to its authority provided by Treasury Regulation 301.6402-7, filed a Form 1139 with the IRS on behalf of the Bank and its subsidiaries which also sought a refund of income taxes paid in 2005 based upon a carry-back of the loss reported in 2006 (the "FDIC Form 1139"). (Compl. ¶ 21) A true and correct copy of the FDIC's Form 1139 is attached hereto and incorporated herein as **Exhibit E**.

By letter dated February 11, 2008, the FDIC, in its capacity of Receiver for the Bank, repudiated the Tax Sharing Agreement. (Affidavit of Robert C. Schoppe at ¶ 2) A true and correct copy of the FDIC's February 11, 2008 letter is attached hereto and incorporated herein as

**Exhibit F**.  The FDIC is given the authority to repudiate or disaffirm contracts of a bank in receivership that it deems burdensome to the receivership.  12 U.S.C. § 1821(e)

By letter dated March 10, 2008, the Holding Company through its counsel informed the IRS that it believed that the Tax Refund was property of the Debtor's bankruptcy estate and requested that the Tax Refund be paid to the Debtor, rather than to the FDIC.  (Compl. ¶ 22)  A true and correct copy of the Holding Company's letter dated March 10, 2008 is attached hereto and incorporated herein as **Exhibit G**.

On or about April 23, 2008, the IRS notified both the Holding Company and the FDIC that neither the Holding Company's Form 1139 nor the FDIC's Form 1139 could be processed because IRS regulations required that an application for a carryback adjustment be signed by both the Holding Company, as the common parent of the Group, and the FDIC, as the fiduciary for the Bank. (Compl. ¶ 23)

On or about June 11, 2008, the Holding Company filed an amended consolidated tax return on behalf of the Group for the 2005 tax year, which clarified the calculation of the Tax Refund and sought payment of the Tax Refund from the IRS ("Holding Company Form 1120X"). (Compl. ¶ 24) A true and correct copy of the Holding Company Form 1120X is attached hereto and incorporated herein as **Exhibit H**.

On or about June 18, 2008, the FDIC filed an amended tax return on behalf of the Bank and its subsidiaries for the 2005 tax year which sought payment of the Tax Refund from the IRS ("FDIC Form 1120X").  A true and correct copy of the FDIC's Form 1120X is attached hereto and incorporated herein as **Exhibit I**.

The parties agree that the figures set forth in the schedule attached to the FDIC Form 1120X are true and correct.  Plaintiff's Responses to Defendant's Requests for Admissions

("Resp. Req. Adm.")  Zucker admitted that the Bank and its direct and indirect subsidiaries generated taxable income of $22,095,685 for the 2005 tax year. (Resp. Req. Adm. No. 4) Zucker admitted that for tax year 2005, the Holding Company and its direct and indirect subsidiaries had a loss of $4,108,426.  (Resp. Req. Adm. No. 5)  Zucker admitted that for tax year 2006, the Bank and its direct and indirect subsidiaries generated a net operating loss of $86,804,020. (Resp. Req. Adm. No. 2)  Zucker admitted that the Holding Company and its direct and indirect subsidiaries generated a net operating loss of $7,324,532 for tax year 2006.  (Exhibit I).

On September 16, 2008 (the "Confirmation Date"), this Court entered its Order Confirming the Debtor's Second Amended Liquidating Plan of Reorganization (the "Plan"). (Main Case Dkt. # 475)  The Plan rejected all executory contracts not specifically assumed as of the Confirmation Date.  (Plan at Section 7.2, Main Case Dkt. # 402)  The Debtor Holding Company did not file a motion to assume the Tax Sharing Agreement prior to the Confirmation Date.  (Main Case Docket)

On October 23, 2008, Zucker initiated this adversary proceeding against the FDIC and the United States Department of Treasury, Internal Revenue Service ("IRS") by filing the Complaint demanding turnover of the Tax Refund pursuant to §§ 541 and 542 of the Bankruptcy Code.  (Adv. Pro. Dkt. # 1)

The FDIC filed an Answer, Affirmative Defenses and Counterclaim.  (Adv. Pro. Dkt. # 15)  The FDIC's Counterclaim seeks a declaratory judgment declaring that the Bank is the owner of the Tax Refund and that, the FDIC in its capacity of Receiver for the Bank, is entitled to the Tax Refund.

The IRS filed a motion to dismiss the Complaint. (Adv. Pro. Dkt. # 24) Zucker, the FDIC and the IRS agreed to the dismissal of the IRS from this case and the Court entered a Consent Order Granting United States of America's Motion to Dismiss on February 19, 2009 (Adv. Pro. Dkt.# 35) The Consent Order on the IRS's Motion to Dismiss provided that the IRS would remit the Tax Refund to the FDIC and the FDIC would hold the Tax Refund in escrow in an interest-bearing account pending entry of a final order resolving this adversary proceeding. (Adv. Pro. Dkt. # 35)

## III. ARGUMENT

Summary judgment must be entered where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The facts in this case are not disputed and therefore entry of summary judgment is appropriate.

### A. Background Information on the Tax Refund

Before reaching the merits of ownership of the Tax Refund, some background on the genesis of the Tax Refund may be helpful to the Court's review of this case.

The Tax Refund was generated as a result of two principles of federal income tax law. First, the tax law permits a taxpayer to carry losses incurred in one year backward (and forward) to offset income earned in certain prior (and later) years, and obtain a refund of the taxes paid in such other years with respect to the income in such years. This loss carry over principle averages out peaks and valleys of income, thereby producing a fairer, more accurate determination of tax

liability, and alleviating the hardship that can otherwise result from the requirement that taxable income be calculated and reported on an annual basis. *See, e.g., Libson Shops, Inc. v. Koehler*, 353 U.S. 382, 386 (1957).

The second principle recognizes that an affiliated group of corporations having a common corporate parent may be viewed as one large corporation having many divisions, for many purposes of federal income tax. Accordingly, the Internal Revenue Code permits certain groups of such commonly controlled corporations to file one so-called consolidated income tax return and, in many ways, be treated as if they were one corporation. *See* 26 U.S.C. § 1502 and Treasury Regulations §§ 1.1502-1 *et. seq.*[2] Significantly, the Treasury Regulations governing consolidated returns provide that the income and losses of the individual members of the group are to be aggregated to produce a net consolidated income. Thus, the loss of one member can be offset against the income of another member. Most importantly, because the affiliated group files one return on behalf of all of its members, Treasury Regulation § 1.1502-77 provides that the parent company is to serve as the agent for the group in all dealings with the IRS, including the filing of tax returns, making of tax payments and receiving of refunds.

The ability to offset the loss of one member against the income of another member to produce net consolidated income is a "benefit of consolidation" because it is only permitted if consolidated returns are filed. When the income and losses of the individual members of a group filing a consolidated return aggregate to a net loss for the year, that loss can then be carried back under the loss carry over principle described above, to offset income reported in a prior year and result in a refund of the taxes previously paid in such year. However, in such cases neither the

---

[2]The Treasury Regulations cited in this Motion appear in Title 26 of the Code of Federal Regulations.

Internal Revenue Code, nor the Treasury Regulations governing the filing of consolidated returns, specifically provides which member of the group is entitled to the ensuing refund.

**B.     The Tax Refund is the Property of the Bank and Thus the FDIC**

**(1)     The Case Law Distinguishes Between Tax Savings Arising as a Benefit of Consolidation and Tax Refunds Arising as a Result of the Earnings History of One Member**

It is important to recognize, and distinguish between, two different factual situations in which disputes over refunds have arisen. The first is the "benefit of consolidation" situation described earlier where one member's loss for the year is offset against another member's income so as to produce a consolidated taxable income and resulting consolidated tax liability that is less than that of the individual income-earning member. For example, assume that A and its subsidiary B file a consolidated return, and that in year 1 A incurs a net loss of $100 and B earns $300 of net income. The consolidated income for the year is $200 and, if the tax rate is 50%, $100 of tax is due. If B had not filed a consolidated return, it would have owed $150 of tax on its $300 of net income. However, by being able to consolidate A's loss with B's income, the group only pays $100 in tax on $200 of consolidated income, thereby saving $50.

Disputes have arisen as to which of A and B is entitled to this $50 benefit of consolidation. Historically, because the benefit was produced equally by the loss of A and the income of B, the courts have been reluctant to interfere with agreements of the parties, absent fraud, unfairness or overreaching, that allocate the benefit to one member or the other. *See, e.g.*, *Western Pacific R.R. Corp. v. Western Pacific R. Co.*, 197 F.2d 994 (9th Cir. 1951), *rehearing denied*, 197 F.2d 1012, *rev'd on other grounds*, 345 U.S. 247, *prior opinion aff'd*, 206 F.2d 495, *cert. denied*, 346 U.S. 910 (1954); *Case v. New York Central R.R. Co.*, 15 N.Y.2d 150, 204 N.E.2d 643 (1965); *Meyerson v. El Paso Natural Gas Company*, 246 A.2d 789 (Del. Chan. 1967). In *Smith v. Tele-*

*Communication, Inc.*, 134 Cal. App. 3d 571 (Cal. Ct. App. 1982), the California Appeals Court distinguished the prior cases and held that, under the facts before it, fairness required the holding company to share the benefit with the subsidiary.

In any event, a consolidated group may also receive a refund that is not attributable to a "benefit of consolidation," but rather results solely from offsetting the losses of one member against the income of the same member. To illustrate, assume in the above example that in year 2 A incurs a loss of $50 and B incurs a loss of $300. The consolidated loss of $350 can be carried back and deducted against the consolidated income reported in year 1 of $200, thereby eliminating taxable income in year 1, and generating a refund of the $100 of tax previously paid in that year. In this instance, A's loss is not needed to obtain the tax savings because if B had filed separate returns, it could have carried $200 of its loss back to offset its $200 of income in year 1, and obtained the refund whether or not it had filed consolidated returns with A. Thus, in this second situation, the tax savings is not a benefit of consolidation because it would have been received by B even if A and B filed on a separate, non-consolidated basis.

### (2)    The Tax Refund is Attributable to the Earnings History of the Bank and Belongs to the FDIC as Receiver for the Bank.

In cases involving a dispute between members of an affiliated group over the ownership of a consolidated federal income tax refund that is attributable to the earnings history of one member of the group, at least ten cases have uniformly held that, in the absence of an enforceable agreement to the contrary, a refund that is attributable to the earnings history of one member of an affiliated group is owned by that member. *See In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262 (9th Cir. 1973) *cert. den. sub nom. Western Dealer Mgmt. v. England*, 412 U.S. 919 (1973); *Capital Bancshares, Inc. v. United States*, 957 F.2d 203 (5th Cir. 1992); *Jump* v. *Manchester Life & Casualty Management Corp.*, 438 F.Supp. 185 (E.D. Mo. 1977), *aff'd* 579 F.2d

449 (8th Cir. 1978); *In re TMCI Electronics*, 279 B.R. 552 (Bankr. N.D.Cal. 1999); *In re REVCO D.S., Inc.*, 111 B.R. 631 (Bankr. N.D. Ohio 1990); *In re Florida Park Banks, Inc.*, 110 B.R. 986 (Bankr. M.D. Fla. 1989); *United States v. Bass Financial Corp.*, No. 83 C 706 (N.D. Ill. 1984) (copy attached as **Exhibit J**); *In re First Penn Corp.*, BK-82-01667-B  (Bankr. W.D. Ok. 1986) (copy attached as **Exhibit K**); *In re First Seminole Bancshares, Inc.*, Bk. No. 584-50156 (Bankr. N.D. Tex. 1987) (copy attached as **Exhibit L**); *FDIC v. Security Investment Group, Inc.*, No. 95-6609 (D.N.J. 1997) (copy attached as **Exhibit M**); *Bank One, N.A. (Chicago) v. Federal Deposit Ins. Corp., as Receiver for & Corporate Insurer of Deposits of the First Nat'l Bank of Blanchardville and Blanchardville Fin. Serv., Inc.*, Case No. 04-C-286-S (W.D. Wis. 2005) (copy attached as **Exhibit N**).

In the seminal case of *In re Bob Richards Chrysler-Plymouth Corp*, 473 F.2d 262 (9th Cir. 1973) *cert. den. sub nom. Western Dealer Mgmt. v. England*, 412 U.S. 919 (1973), the trustee of a bankrupt subsidiary corporation that filed a consolidated federal income tax return with its parent corporation, brought an action against the parent to obtain a federal income tax refund which had been received by the parent.  The court held that the refund was the property of the bankrupt subsidiary because it found that the "entire refund .  . was due to the earnings history of the bankrupt." 473 F.2d at 263.  The court first observed that nothing in the Internal Revenue Code dictates to which member of an affiliated group such a refund should inure.  The court then held:

> Normally, where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability.  .  .  .  Absent any differing agreement we feel that a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member.  Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary

chose a procedural device to facilitate their income tax reporting unjustly enriches the parent.

> The only reason the tax refunds are not being paid directly to the subsidiary is because income tax regulations require that the parent act as the sole agent, when duly authorized by the subsidiary, to handle all matters relating to the tax return. . . . But these regulations are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government.

473 F.2d at 264-65 (footnotes omitted). The Ninth Circuit concluded that the parent corporation

"received the refund from the government only in its capacity as agent for the consolidated group."

473 F.2d at 265. Accordingly, the court rejected the parent corporation's contention that it was

entitled to retain the refund, explaining that the parent company,

> received the tax refund only in its capacity as agent for the consolidated group. Since there is no express or implied agreement that the agent had any right to keep the refund, we agree with the referee and the district court that [the parent company] was acting as a trustee of a specific trust and was under a duty to return the tax refund to the estate of the bankrupt.

473 F.2d at 265. In this proceeding, like the *Bob Richards* case, there is no dispute that the refund

is entirely attributable to the income of the subsidiary (the Bank in this proceeding). The facts, are

considerably better, in fact in this proceeding because the Holding Company never even received

or had possession of the Tax Refund.

In a factually similar case involving a dispute between the FDIC, as receiver for a failed

bank, and the trustee of the bankruptcy estate of the bank's holding company, Judge Baynes

followed the Ninth Circuit's opinion in the *Bob Richards* case and held that the bank, via the

FDIC, was entitled to the full amount of the tax refund. In *Federal Deposit Ins. Corp. v. Brandt*

*(In re Florida Park Banks, Inc.)*, 110 B.R. 986 (Bankr. M.D. Fla. 1990), the FDIC was appointed

receiver of the failed bank and the bank's parent holding company filed a bankruptcy case. The

bank and holding company filed consolidated federal income tax returns, reporting income for tax

years 1979, 1980, 1982 and 1983 and reporting a loss for tax year 1985. The consolidated group carried back the loss in 1985 to the previous years, resulting in a refund. The bank was the only member of the consolidated group to have income to offset in the carryback years. The bank also generated 88% of the loss in 1985. In the *Florida Park Banks* case, the bankruptcy trustee acknowledged that the FDIC, as receiver for the bank, was entitled to the lion's share of the tax refund since it was the entity that generated all of the income and most of the loss resulting in the refund. The bankruptcy trustee only sought 12.39% of the tax refund for the bankruptcy estate which was the parent company's portion of the loss for 1985.

Judge Baynes first found that there was no binding agreement between the bank and the parent company dealing with the allocation of tax refunds. In the absence of a binding agreement between the parties, the court held that the FDIC was entitled to 100% of the tax refund because the bank could have generated the same tax refund with or without the debtor parent company's losses. The court explained, "Under the *Bob Richards'* rationale, Park Bank would be entitled to the entire refund because Park Bank's losses are offset against its own income and to allow the Debtor a share of the refund would 'unjustly enrich' the Debtor since it paid <u>none</u> of the refunded taxes." 110 B.R. at 989 (emphasis added). Judge Baynes did not find that the bank was a mere unsecured creditor of the debtor holding company for the amount of the tax refund. The facts of this case are remarkably similar to the facts in the *Florida Park Banks* case. In this case, the Bank group generated 100% of the income in 2005 and most of the consolidated loss in 2006 (92.15%). The loss of the Bank Group was more than sufficient to offset all 2005 income. Further, if the Bank Group filed separate income tax returns, it would be entitled to the full Tax Refund. In contrast, if the Holding Company Group filed separate income tax returns, it would have been entitled to no refund at all.

The cases that have followed the *Bob Richards Chrysler-Plymouth* decision have uniformly adopted the Ninth Circuit's reasoning that the holding company simply received the refund as agent-trustee for the group and therefore had no ownership or other right to retain any portion of a refund generated solely by the "earnings history" of another member of the group. For example, in *Capital Bancshares, Inc. v. Federal Deposit Ins. Corp.*, 957 F.2d 203 (5th Cir. 1992), the court held that a bank holding company was not entitled to a tax refund that was generated solely by the earnings history of its subsidiary bank. In the *Capital Bancshares* case, the FDIC was appointed receiver of the insolvent subsidiary bank. 957 F.2d at 205. The parent company and subsidiary bank filed consolidated tax returns. 957 F.2d at 204. Previously, the parent company filed refund claims for taxes paid in earlier tax years resulting from carry-back losses. 957 F.2d at 205. The IRS failed to pay the refunds for a period of two years at which time the parent company filed suit against the IRS to require the IRS to pay the refund. *Id.* The FDIC was permitted to intervene in the case in its capacity of receiver for the subsidiary bank. *Id.* The issue in the case became whether the parent company or the FDIC was entitled to the tax refund. There was no agreement between the parent company and subsidiary bank with respect to the allocation of tax refunds. 957 F.2d at 208. Following the Ninth Circuit's holding in the *Bob Richards* case, the Fifth Circuit held that, since the loss that generated the refund was entirely attributable to the subsidiary bank, the bank was entitled to payment of the tax refund. *Id. See also Jump v. Manchester Life & Cas. Mgmt. Corp.*, 438 F. Supp. 185 (E.D. Mo. 1977) *aff'd* 579 F.2d 449 (8th Cir. 1978) (holding that the conservator of a bankrupt subsidiary of an insurance holding company was entitled to recover the income tax refund channeled through the parent holding company to the extent that the subsidiary would have had a refund if it had filed individual returns and agreeing with *Bob Richards* that the sum is not debt but was instead held in trust). Again, the facts in this case are

better than the facts in these cases because the Holding Company never received or had a possessory interest in the Tax Refund.

The FDIC's right to the Tax Refund comes squarely within the holdings of the *Bob Richards* line of cases. The Tax Refund is attributable to net operating losses of the Bank that were carried back to offset income of the Bank in earlier years. The entire refund would have been received by the Bank if it had not been part of the consolidated tax return and had filed a separate return. In contrast, if the Bank had not been part of the consolidated return, the Debtor Holding Company would have <u>no</u> refund whatsoever because it had no income in the carryback year with which to offset its loss. The Tax Sharing Agreement recognizes that where the tax refund is a result of the earnings history of the Bank, the Tax Refund is required to be allocated to the Bank in Sections 3(d), 4(e) and 10(a)(iii).

Zucker does not contest that the Tax Refunds are attributable primarily to the earnings history of the Bank; (Compl. ¶ 15; Resp. Req. Adm. Nos. 3, 4 and 5) nor does it dispute that the Tax Sharing Agreement allocates the Tax Refund to the Bank. (Compl. ¶ 15). Thus, there is no dispute that the Tax Refund is allocable to the Bank.

Rather, Zucker takes the position that, because the Holding Company was entitled to receive the Tax Refund from the IRS as agent for the Group, that the Tax Refund is property of the bankruptcy estate and the Bank is relegated to being nothing more than an unsecured creditor. This is simply incorrect. As of the Petition Date, the Debtor Holding Company never received, owned or possessed the Tax Refund. Under the weight of authority and the express provisions of the Tax Sharing Agreement, the Bank is the owner of the Tax Refund. Zucker admits that, but for this bankruptcy case, the Tax Refund would go to the Bank. Therefore, the Debtor had no equitable ownership interest in the Tax Refund on the Petition Date. Likewise, the Debtor had no

possessory interest in the Tax Refund on the Petition Date. The Tax Refund had not yet been paid by the IRS to anyone. This is not a case where the Debtor had possession of the refund and commingled it with other funds. Absent a legal or equitable interest in the Tax Refund, the Tax Refund is not property of the estate.

**C.** **If the Holding Company had Received the Tax Refund, the Tax Sharing Agreement Would Not Change the Status in Which the Holding Company Received the Refund from an Agent-Trustee to an Owner-Debtor.**

**(1)** **The Tax Sharing Agreement is Unenforceable.**

Even though the Bank and Holding Company were parties to a Tax Sharing Agreement, the Agreement is unenforceable because, (a) the FDIC repudiated the Tax Sharing Agreement pursuant to its authority under 12 U.S.C. § 1821(e), and (b) the Tax Sharing Agreement was rejected by the Debtor through its bankruptcy case.

As part of its powers when acting as receiver of a bank, the FDIC is given the authority to "repudiate" contracts entered into by the bank. 12 U.S.C. § 1821(e) provides:

> In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease –
> (A) to which such institution is a party;
> (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
> (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

The FDIC repudiated the Tax Sharing Agreement on February 11, 2008. (Ex. F) As a result of the FDIC's repudiation of the Tax Sharing Agreement, the Agreement is not enforceable.

Additionally, the Debtor holding Company rejected the Tax Sharing Agreement by way of its Second Amended Liquidating Plan of Reorganization. The Plan rejected all executory

contracts not specifically assumed as of the Confirmation Date. (Plan at Section 7.2, Main Case Dkt. # 402) The Holding Company did not file a motion to assume the Tax Sharing Agreement prior to the Confirmation Date. (Main Case Docket). As a result, the Holding Company rejected the Tax Sharing Agreement effective September 16, 2008, the date the Debtor's Plan was confirmed. Accordingly, the Tax Sharing Agreement is no longer in effect.

**(2)**     **FDIC as Receiver of the Bank is Entitled to the Tax Refund Under the Terms of the Tax Sharing Agreement**

Even were the Court to find that the Tax Sharing Agreement is not null and void and is enforceable (which the Bank disputes), the FDIC as Receiver for the Bank is still entitled to the Tax Refund under the express language of the Tax Sharing Agreement, federal regulations, statutes and case law. The existence of the Tax Sharing Agreement would not change the relationship of the Bank and the Holding Company from agent – trustee to debtor – creditor. The Tax Sharing Agreement was intended to be an accommodation to allow the parent to file a consolidated group income tax return without changing any of the property rights of its affiliates. Zucker argues that, because the Holding Company was entitled to receive payment of tax refunds from the IRS as agent of the Group, it had an equitable interest in the Tax Refund on the Petition Date, that the Tax Refund is property of the bankruptcy estate and that the Bank is merely an unsecured creditor in the bankruptcy case for the amount of the Tax Refund. The FDIC is not aware of a reported decision that followed this flawed line of logic.

The fundamental fallacy in Zucker's argument is that it assumes that, under *Bob Richards,* the mere existence of the Tax Sharing Agreement converts the status in which the parent company receives refunds from that of an agent-trustee to an owner-debtor. But what the court in *Bob Richards* actually said was that "where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among

themselves the ultimate tax liability." 473 F.2d at 264-65. Zucker's argument is not about adjustment of the ultimate tax liability. Indeed, Zucker's argument is not about allocation of the Tax Refunds at all because there is no dispute that the Tax Refund is allocable to the Bank under the Tax Sharing Agreement.

Zucker's argument is that the Tax Sharing Agreement, while allocating the Tax Refund to the Bank, also represents an agreement by the Bank to lend to the Holding Company all refunds to which it was entitled, with the result that the Tax Refund would be received by the Holding Company not as agent-trustee for the Bank, but rather as the property of the Holding Company, such that the Bank is simply a general unsecured creditor of the Debtor.

The argument is demonstrably incorrect for several reasons. First, contrary to Zucker's argument, the position that the Tax Sharing Agreement converted the Holding Company's relationship with the Bank with respect to the Tax Refund from agent/trustee – principal/beneficiary to debtor-creditor is not only unsupported by any express language of the Agreement, but is contrary to (i) existing case law, (ii) express language of the Tax Sharing Agreement and (iii) express statutory and regulatory provisions and policies. Second, the *Bob Richards* court noted that an allocation agreement would be respected "absent fraud, unfairness or overreaching." 473 F.2d at 264 n. 4. An agreement purporting to change the agent-trustee status of Debtor in contravention of explicit Federal regulatory provisions and policies is unenforceable because it is contrary to public policy, as well as grossly unfair and overreaching. Accordingly, general rules of contract construction require interpretation of the Tax Sharing Agreement as an expression of the relationship between an agent-trustee and its principal-beneficiaries. Each of these is discussed in detail below.

Again, the other fatal flaw in the argument is that Zucker tries to argue that the right to possess someone else's property, even though the Holding Company never did possess it, is enough to convert someone else's property into property of the estate. This is patently absurd and unsupported by any case law.

Zucker presumably will rely on the decision in *In re Franklin Savings Corp.*, 159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd* 182 B.R. 859 (D. Kan. 1995), to support his position that the Tax Sharing Agreement converts the Holding Company from an agent-trustee to a debtor with respect to the Tax Refund due to the Bank. However, this case has no application here because the Holding Company never possessed the refund like the holding company in *Franklin*. As pointed out below, the *Franklin* decision is incorrect because it is contrary to the court's own findings of fact. Moreover, the language in the Tax Sharing Agreement here is very different from the language in the tax reimbursement agreement upon which the court based its decision in *Franklin* and compels a different result. Most importantly, however, the reasoning in *Franklin*, and therefore the Holding Company's argument here, was expressly rejected by the federal district court in San Diego in *BSD Bancorp, Inc. v. FDIC*, Case No. 93-12207-A11 (S.D. Cal. 1995) (a copy of the opinion is attached as **Exhibit O**). Application of the correct *BSD Bancorp* reasoning here confirms that the Holding Company holds the Tax Refund in trust for the Bank.

> **(a)** **The Decision in *BSD Bancorp, Inc. v. FDIC* Holds that the Mere Existence of a Tax Sharing Agreement Does Not Create a Debtor-Creditor Relationship.**

In *BSD Bancorp*, as in *Franklin*, a tax sharing agreement had been executed by the Bank of San Diego and its holding company, BSD Bancorp, Inc. The holding company, relying upon *Franklin*, argued that the agreement converted the holding company from an agent–trustee to a debtor with respect to federal income tax refunds received by the holding company. The District

Court soundly rejected the argument and expressly held that the tax sharing agreement did not convert the holding company from an agent-trustee into a debtor:

> Bancorp first contends that the very existence of a tax allocation agreement destroys the principal-agent relationship. It bases this contention on the fact that there was no such agreement in *Bob Richards*. However, this is an excessively narrow interpretation of that case. This Court interprets *Bob Richards* as holding that unless the corporations in a consolidated group agree otherwise, the parent acts as their agent for payment of tax and refunds. This rule is like many other gap-filling rules in contract law which provide a default in the absence of applicable agreement by the parties, e.g. U.C.C. § 2-205 (offer by merchant in signed writing irrevocable "during the time stated or if no time is stated for a reasonable time"). **Parties to a contract do not override a gap-filling rule simply by reaching explicit agreement on some other matter. Rather, the terms of their agreement must expressly or impliedly override the gap-filling rule itself.** It is thus necessary to consider whether the terms of the tax allocation agreement expressly or impliedly override the *Bob Richards* principal-agent relationship.

> Bancorp points to the language "[a]ny subsidiary incurring an annual loss on a tax basis that results in a tax benefit on the consolidated return shall be reimbursed in cash" in the tax allocation agreement. It contends that the use of the word "reimbursed" indicates that a debtor-creditor relationship was intended. It also argues that the refunds owing the Bank were recorded as a "receivable" on its books. It cites *In re Franklin Sav. Corp.*, 159 B.R. 9, 29 (Bankr. D. Kan. 1993), where the court relied on the words "reimbursement" and "credits" to conclude that a tax allocation agreement established a Debtor-creditor relationship.

> **In deciding whether a transaction intended to create a debtor-creditor relationship, however, a court must examine the economic reality of the transaction rather than the words used.** [citation omitted] The economic reality here is that, except in the "unusual" circumstances in which the agreement allowed Bancorp to borrow the refund, the agreement required Bancorp to give the Bank its share of the refund in cash and immediately. This strongly suggests an intent to maintain a principal-agent relationship unless Bancorp borrowed the refund pursuant to the terms of the agreement.

> Furthermore, the agreement itself recognizes that any loan from the Bank to Bancorp would be subject to regulations governing loans to

> affiliates. Although the parties do not discuss these regulations in their papers, it appears that 12 U.S.C. § 371(c)(1) applies here. That subsection forbids unsecured loans from a Federal Reserve member bank to its holding company, while § 371c(e) allows the Federal Reserve Board to authorize such loans by regulation or order.

Slip. Op. at 9-11. (emphasis added, footnote omitted). The *BSD Bancorp* decision persuasively supports the conclusion that the mere existence of a tax sharing agreement does not supersede a holding company's obligations as an agent-trustee for members of the consolidated group. The common law, as expressed in *Bob Richards* and its progeny, recognizes that the Treasury Regulations permitting the filing of consolidated returns by an affiliated group of corporations treat the group as one taxpayer, and Treasury Regulation § 1.1502-77 specifically makes the common parent of the group the agent for all of the members of the group. It is axiomatic that an agent acts as a trustee with respect to property for which it has legal title but whose beneficial ownership resides in its principal. As stated in the *Restatement of Agency (Second)* § 14 B (1958):

> One who has title to property which he agrees to hold for the benefit and subject to the control of another is an agent-trustee and is subject to the rules of agency.

Recognizing the agent-trustee status of the parent under Treasury Regulation § 1.1502-77, the purpose of a tax sharing agreement is to set forth procedures to determine the amount and timing of tax payments to be made by the member–principals to the parent–agent to satisfy obligations to the Internal Revenue Service, and the amount and timing of payments to be made by the parent–agent to the member–principals as a result of refunds.

Specifically, the procedures must provide how the tax liability of the group is to be allocated among the members, and paid to the agent–trustee so that it can be paid to the Internal Revenue Service. Similarly, since Treasury Regulation § 1.1502-77 provides that all refunds are paid to the common parent as agent, the agreement should provide for payment of such refunds to

their owner.  As explained by the court in *BSD Bancorp*, explicit agreement on the allocation of the group's tax liability and refunds does not override the basic agent–principal relationship of the parties set forth in Treas. Reg. § 1.1502-77 .  Whether that is changed must be determined from the economic reality of the transaction.

> **(b)** **The Economic Reality of the Transaction Described in the Tax Sharing Agreement Demonstrates that the Agreement Was Not Intended to Convert the Holding Company from an Agent-Trustee to a Debtor.**

The court in *BSD Bancorp* held that because the tax allocation agreement in that case required the holding company to pay to the subsidiary bank its share of the refund immediately in cash except in "unusual circumstances in which the agreement allowed Bancorp to borrow the refund," the economic reality of the transaction was that the holding company was intended to retain its status as an agent–trustee with respect to refunds that it had received.  The Tax Sharing Agreement in this case is even clearer in recognizing the status of the Holding Company as an agent–trustee for its subsidiaries.  Unlike in *BSD Bancorp*, the Tax Sharing Agreement in this case does not permit the Holding Company to borrow the amount of a subsidiary's tax refund **under any circumstances**.  Rather it provides that the Holding Company had to make refunds to the Bank.  Section 3(d) of the Tax Sharing Agreement states,

> If the Bank Affiliated Group's estimated Separate Taxable Income is negative, NetBank will pay to the Bank the greater of (i) the current taxable loss benefit to the Bank utilized by NetBank to reduce its estimated tax payments to the IRS or (ii) the amount the Bank would receive had it filed as a separate entity.

Additionally, section 3(e) states,

> If, after the end of each such taxable year with respect to which [the Holding Company] filed or reasonably anticipates that it will file a Consolidated Return which includes an Affiliate, it is determined that such Affiliate's actual Separate Tax Liability for such taxable period differs from the aggregate amount paid pursuant to

subparagraph (b) above with respect to such taxable period (the "Aggregate Estimated Amount"), then such difference shall be reconciled and paid as follows:

* * *

(ii)  If such Affiliate's Aggregate Estimated Amount exceeds its actual Separate Tax Liability, then [the Holding Company] shall pay any excess to such Affiliate within a reasonable period after the Consolidated Return for such taxable year is filed.

Section 4 of the Tax Sharing Agreement deals with carrybacks from consolidated return years.  It states, in pertinent part,

(b)  If such Consolidated Excess Amount [defined in the agreement as including a consolidated net operating loss] is carried back to a prior taxable year of the NetBank Group during which an Affiliate was a member or was not in existence, then the amounts due under this Agreement for such prior taxable year shall be redetermined by taking into account such Consolidated Excess Amount and any Separate Excess Amounts allocable to such tax years.

* * *

(d)  Payment of any amount due under this paragraph shall be made not later than thirty (30) days after the date on which a credit is allowed or refund is received with respect to the taxable year to which such payment relates and shall include any interest attributable thereto under Section 6611 of the Code.

(e)  If the Bank Affiliated Group incurs a net operating loss, a net capital loss or is entitled to credits against tax as described above in this Section, the amount payable to the Bank Affiliated Group by [the Holding Company] shall be no less than the amount the Bank would have received as a separate entity (including its subsidiaries), regardless of whether the consolidated group is receiving a refund.

Section 10 of the Tax Sharing Agreement states that the Agreement,

is intended to allocate the tax liability in accordance with the Interagency Statement on Income Tax Allocation in a Holding Company Structure [OTS CEO Memo No. 98].[3]  Under this guidance, tax settlements between the Bank Affiliated Group and the [Holding Company] consolidated group should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity.

* * *

---

[3] Discussed *infra*.

(iii)  Should the Bank Affiliated Group incur a tax loss, it should receive a refund from [the Holding Company] in an amount no less than the amount the Bank Affiliated Group would have received as a separate entity, regardless of whether the [Holding Company] consolidated group is receiving a refund.

The Tax Sharing Agreement also makes clear that the Holding Company is acting as the agent of the Bank.  Section 9 provides, "Each Affiliate hereby irrevocably appoints [the Holding Company] as its agent and attorney-in-fact to take such action (including execution of documents) as [the Holding Company] may deem appropriate to effect the foregoing."    It is clear from the various provisions of the Tax Sharing Agreement, that the Holding Company was only acting as the agent for the Bank in filing the consolidated tax returns.  It is also clear that the intent of the Tax Sharing Agreement was to place the Bank in no worse of a position than it would be if it had filed its own separate tax return.

Moreover, as the court in *BSD Bancorp* recognized, if the Tax Sharing Agreement intended to create a loan from Bank to the Holding Company, it would be subject to statutory restrictions and prohibitions governing loans by banks to their affiliates.  *See* 12 U.S.C. § 371c.  Section 371c prohibits banks from making loans to their affiliates and if such a loan were made, it would be considered a "safety and soundness" issue and subject the bank to closure by its governing regulatory authority.  The Tax Sharing Agreement does not even mention loans from the Bank to the Holding Company of amounts received as tax refunds, much less meet the requirements of Section 371c.  Accordingly, nothing in the language of the Tax Sharing Agreement expresses an intention to fundamentally transform the Holding Company from an agent-trustee into a debtor; it does no more than expressly allocate tax liability and refunds, as alluded to by the Ninth Circuit in *Bob Richards*.

### (c)    The *Franklin* Decision Is Incorrect on Its Own Facts.

As explained by the district court in *BSD Bancorp*, the analytical approach of *Franklin* in looking at isolated words in the agreement to determine the status in which the holding company received refunds is incorrect. However, even if that approach were correct, the court reached the wrong conclusion.

The *Franklin* decision is based on the bankruptcy court's conclusion that the use of the word "reimbursement" in the tax reimbursement agreement in that case evidenced an intent that the refunds were to be the property of the holding company. *Franklin's* tax reimbursement agreement provided for the bank to pay to the holding company the current tax liability of itself and its subsidiaries at the time that it would otherwise pay such amounts to the Internal Revenue Service. It also provided that if the bank had a net operating loss or excess credits, then the bank would be "entitled to (a) reimbursement by Parent at the time prescribed in paragraph 2, to the extent of amounts previously paid to Parent, or (b) if such recovery exceeds amounts previously paid to Parent, Franklin shall be entitled to credits against future amounts to be paid by Franklin to Parent pursuant to paragraph 2." 159 B.R. at 15.

After acknowledging that in the absence of an agreement, *Bob Richards* and its progeny would result in the refunds being the property of the bank, the bankruptcy court held that the language of the tax reimbursement agreement changed that result by causing the refunds to be the property of the holding company and the bank to be only a creditor of the holding company. However, its entire analytical support for this conclusion was as follows:

> The Tax Reimbursement Agreement ("TRA") provides for "reimbursement and "credits" to FSA. These terms are inconsistent with the argument that FSA "owns" the refunds. "Reimburse" means "to pay back." Black's Law Dictionary at 1157 (5th ed. 1979). The use of this term is consistent with a "debt" or "receivable," rather than with ownership. If the parties considered the refund to be property of FSA, they could have provided for its "return"

to FSA. The parties' selection of terms indicates that they intended the obligation to be in the nature of a receivable. So goes FSC's argument on the meaning of the agreements. In short, under the terms of the agreements, FSA holds only an unsecured claim, not ownership of the refunds. The Court agrees with this construction of the language of the tax agreements.

159 B.R. at 29. Thus, the bankruptcy court's entire analysis rests on its interpretation of the single word "reimburse" rather than the word "return."

The district court simply approved the reasoning of the bankruptcy court:

The bankruptcy court held that the language of the Tax Reimbursement Agreement evidenced the parties' intent to create an obligation in the nature of a receivable. [citation omitted] The agreement provides that the subsidiary is entitled to "reimbursement" by the holding company or "credits" against future amounts to be paid by the subsidiary to the holding company. The bankruptcy court concluded that the subsidiary holds only an unsecured claim to the funds, not ownership of the refunds.

The court agrees that the bankruptcy court's holding is correct. The agreement speaks specifically to the allocation of any tax refunds received by the holding company. Under the terms of the agreement, the taxes were not held in trust for the benefit of the subsidiary to be automatically turned over to it. Certain amounts would be "reimbursed" under certain conditions.

182 B.R. at 863.

The bankruptcy court's conclusion is incorrect for a number of reasons inherent in the opinion itself. First and most directly, its legal conclusion that the word "reimburse" means that the parties intended to convert the bank from a beneficiary of a trust to a general creditor of the holding company is directly contrary to its own finding of fact number 27:

27. To the extent that FSC filed claims and received payments of income tax refunds attributable to the Consolidated Group under Treasury Regulation § 1.1502-77(a) **(and under the Tax Agreements), it did so as agent for the members of the Consolidated Group.**

159 B.R. at 19 (emphasis added). Thus, the bankruptcy court expressly found that the holding company received the refunds under the tax reimbursement agreement as agent for the group. As

*Bob Richards* and all of its progeny held, the receipt of refunds as an agent for the consolidated group does not make the refunds the property of the parent. The bankruptcy court's decision in *Franklin* cannot be supported in light of this finding.

Second, the plain language of the tax reimbursement agreement in the *Franklin* case evidences that the finding of fact is correct. The second "Whereas" clause of the tax reimbursement agreement expressly provides that the parent serves as the agent for the group with respect to the reporting of federal taxable income. If the parties had intended the operative provisions of the agreement to supersede this statement of the holding company's agency relationship, it is inconceivable that they would have done so through an inference to be drawn from the single word "reimbursement," as opposed to setting forth the contrary agreement expressly, at least in the recitals to the agreement.

Finally, the dispositive significance that the *Franklin* courts placed on the use of the single word "reimburse" instead of "return" is simply incorrect. At least one thesaurus (Thesaurus.com) states that "return" is a synonym for "reimburse." Thus, use of the term "reimburse" is equally consistent with use of the term "return" to evidence ownership of the refunds by the bank. More importantly, as the *BSD Bancorp* court pointed out, it is wrong to interpret the intent of an agreement from one word. If the court found use of the word "reimburse" to be ambiguous, it should have resolved that ambiguity by looking to its finding of fact that the holding company received such refunds under the agreement as agent for the other members, and the backdrop of the underlying case law. But there was no ambiguity. Like the court in *BSD Bancorp*, the court in *In re Florida Park Banks, Inc.*, 110 B.R. 986 (Bankr. M.D. Fla. 1989) also dealt with the same "reimbursement" language and equally accorded it no special significance. It did not deprive Park

Bank of ownership of its refund any more than it deprived Bank of San Diego of ownership of its refund, or should have deprived FSA of ownership of its refund.

In short, the reasoning of the bankruptcy court in *Franklin* is incorrect. FDIC submits that this court should follow the analytical approach adopted by the court in *BSD Bancorp* and look to the economic reality of the Tax Sharing Agreement. However, even if this Court were to follow the approach of the *Franklin* bankruptcy court, the language of the agreement relied upon by the court in that case is very different from the language of the Tax Sharing Agreement here, and the difference compels the opposite result.

> **(d)** **The Language of the Tax Sharing Agreement is Very Different from the Language of the *Franklin* Agreement and Compels an Opposite Result.**

Nothing in the Tax Sharing Agreement states that the Holding Company shall not be an agent–trustee with respect to tax refunds paid to it by the Internal Revenue Service. Any such intent would have to be implied from the language of the Agreement, as it was in *Franklin*. However, the language of the Tax Sharing Agreement is very different from the language of the tax reimbursement agreement in *Franklin*. In fact, section 9 specifically provides that each affiliate appoints the Holding Company as its agent and attorney-in-fact with respect to federal tax matters.

Nowhere does the Tax Sharing Agreement authorize a loan to the Holding Company of the Tax Refund owned by the Bank. If it did, as recognized by the court in *BSD Bancorp*, it would have been in violation of the affiliate lending rules set forth in 12 U.S.C. § 371c, which prohibit such a loan. Moreover, the Tax Sharing Agreement does not provide that the Holding Company shall "reimburse" subsidiaries when tax refunds are received from the IRS. The word "reimburse," which was the entire basis for the *Franklin* court's decision, is not used to describe the Holding Company's obligation to its subsidiaries. Instead, the Tax Sharing Agreement provides that when

tax refunds are attributable to a particular subsidiary, the amount of the refund shall be paid ". . . not later than thirty (30) days after the date on which a credit is allowed or refund is received . . . ." Tax Sharing Agreement, Section 4(d). The language is completely consistent with the Holding Company's status as an agent-trustee. It certainly does not convert the Holding Company from an agent–trustee into a debtor; nor does it authorize the Holding Company to retain a subsidiary's tax refund as a loan from the subsidiary.

The facts of the *Franklin* case are also very different than this case because the holding company in the *Franklin* case actually received possession of the tax refund at issue. 159 B.R. at 11. In this case, the Debtor Holding Company has never had possession of the Tax Refund.

> **(3)** **Zucker's Interpretation of the Tax Sharing Agreement Is Contrary to the Interagency Policy Statement Issued by the Four Federal Banking Regulators as Well as the Explicit Federal Statutory Restrictions Set Forth in 12 U.S.C. § 371c**

Zucker's argument that the mere existence of the Tax Sharing Agreement converts the Holding Company from an agent–trustee to a debtor is also directly contrary to the underlying principles set forth in the Interagency Policy Statement on Income Tax Allocations in a Holding Company Structure issued by the FDIC, the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency and the Office of Thrift Supervision in 1998, 63 Fed. Reg. 64757, a copy of which is attached as **Exhibit P**. The Tax Sharing Agreement is consistent with the Policy Statement in its allocation of refunds and specifically states in section 10(a) that it is intended to comply with the Policy Statement.

As explained in its preamble, the Policy Statement was adopted pursuant to the directive to the Agencies in section 303 of the Reigle Community Development and Regulatory Improvement Act of 1994 to work jointly to make uniform their regulations and guidelines implementing common statutory or supervisory policies. Each of the Agencies had adopted separate policies on

this subject in 1978.  Significantly, the preamble notes that the Policy Statement "does not materially change any of the guidance previously issued by any of the Agencies."  Rather, the Policy Statement incorporates and reiterates policies intended to protect banks against adverse intercorporate tax remittance or sharing policies and agreements issued long before the *Franklin* and *BSD Bancorp* decisions.   In reiterating those policies in the Policy Statement, the Agencies necessarily rejected the decision in *Franklin*, and mandated that all institutions follow the decision in *BSD Bancorp*.  Thus the Policy Statement expressly provides:

> [T]he amount and timing of payments or refunds should be no less favorable to the subsidiary than if it were a separate taxpayer.  Any practice that is not consistent with this policy statement may be viewed as an unsafe and unsound practice prompting either informal or formal corrective action.

63 Fed. Reg. at 64758.  Most relevant here, the Policy Statement has a specific paragraph about tax refunds that expressly prohibits the characterization of a tax sharing agreement as creating a debtor-creditor relationship with respect to refunds received by the parent as agent for the subsidiary bank:

> Regardless of the treatment of an institution's tax loss for regulatory reporting and supervisory purposes, a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members.  Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

63 Fed. Reg. at 64759.

The allocation principles set forth in the Tax Sharing Agreement are consistent with the Policy Statement and treat the Bank equitably.  The Tax Sharing Agreement expressly states it is intended to comply with the Policy Statement.  At section 10(a) the Tax Sharing Agreement states, "This Agreement is intended to allocate the tax liability in accordance with the Interagency

Statement on Income Tax Allocation in a Holding Company Structure [OTS CEO Memo No. 98].

Under this guidance, tax settlements between the Bank Affiliated Group and the NetBank consolidated group should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity." Given this express statement in the Tax Sharing Agreement it is clear that the Holding Company was intended to act only as an agent–trustee.

Due to the express prohibition in the Policy Statement and the requirements in 12 U.S.C. § 371c regarding affiliate loans by banks discussed above, no reasonable person would understand from reading the Tax Sharing Agreement that the parties intended to change the status of the Holding Company from that of an agent–trustee to a debtor. Had the Holding Company expressed that position to the banking regulators during examinations, because it would have been directly contrary to the Policy Statement and 12 U.S.C. § 371c, it would have constituted an unsafe and unsound practice and prompted corrective action. Having failed to express that interpretation in the past, Zucker, as successor to the Holding Company, cannot reasonably do so now, and this Court should reject the attempt to do so. It is well-settled that in interpreting agreements, an interpretation which produces a reasonable, lawful and effective meaning to the agreement should prevail over one that is unreasonable or unlawful. *NAACP, Jacksonville Branch v. Duval School Board*, 273 F.3d 960, 979 (11th Cir. 2001); *see also* 2 *Restatement of the Law Second, Contracts 2d,* § 203 (1981). The Bank's interpretation meets this standard. Zucker's does not.

> **(4)      Provisions Implying a Debtor-Creditor Relationship Would Be Unenforceable Because They Would Be Contrary to Public Policy and Inherently Unfair and Overreaching.**

Finally, as a conceptual matter, the argument that the Tax Sharing Agreement was intended to convert Holding Company's relationship with the Bank from agent/trustee–

principal/beneficiary to debtor-creditor is not the type of agreement to which the court in *Bob Richards* was referring when it stated that "normally" an agreement of the parties would be respected. *Bob Richards* was referring to an agreement providing for "allocation" of a tax refund, (i.e., which party was ultimately entitled to the refund); not to the status by which the parent receives the refund and not to the conversion of the refund into a loan. This is evidenced by its footnote which explained "normally" by referring to its prior holding in *Western Pacific R.R. Corp. v. Western Pacific R. Co.*, 206 F.2d 495 (9th Cir. 1954), *cert. denied*, 346 U.S. 10 that an agreement allocating tax liability "would not be overturned absent fraud, unfairness or overreaching." 473 F.2d at 264 n.4.

The Tax Sharing Agreement here allocates tax liability. It expressly provides which members are to make tax payments, and allocate tax refunds to those members that would have received them if they had filed separate tax returns. Such an allocation is fair and should be enforced.

The Holding Company's argument has nothing to do with allocation. Its essence is that the Tax Sharing Agreement characterizes all payments received by the Holding Company, whether from members as tax payments or from the taxing authority as refunds, as the Holding Company's property and simply creates loans from members to the Holding Company for amounts that the Agreement provides are to be paid by the Holding Company to such members. As explained above, the language of the Tax Sharing Agreement does not support such a claim and, if the Agreement was intended to produce such a result, it is directly contrary to the mandate of the Policy Statement and is inconsistent with the requirements of 12 U.S.C. § 371c. Accordingly, if the Tax Sharing Agreement accomplished this result, it is unfair and overreaching as determined by the federal regulators charged with the direct supervision of the industry, and contrary to federal

statutory requirements. It is thus unenforceable to that extent under *Bob Richards* and general contract principles. *See* 2 *Restatement of the Law Second, Contracts 2d,* Sections 178 and 193. comment a (1981) ("A . . . term of an agreement is unenforceable on grounds of public policy if . . . the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.") ("A fiduciary is expected to refrain from acting for his private advantage or otherwise contrary to the interests of his beneficiary or principal in matters affecting the fiduciary relation. . . .")

As pointed out, the Tax Sharing Agreement allocates to the Bank the tax savings that it would have obtained if it had filed separately. Zucker's position on behalf of the Holding Company is that the mere existence of the Tax Sharing Agreement demonstrates a dispositive intent to treat all tax refunds allocated to the Bank as a loan. Accordingly, Zucker has misconstrued the *Bob Richards* holding that a fair agreement allocating tax refunds will be respected, into a holding that an agreement which allocates refunds, but changes the status in which the parent receives the refunds under the Treasury Regulations from agent-trustee to owner-debtor of such refunds, is fair and will be respected. None of the cases support such a conclusion.

An agreement purporting to allocate to a subsidiary, refunds solely attributable to the earnings history of the subsidiary, but only as a creditor, is very different than an agreement allocating refunds. If, in fact, the subsidiary is allocated the refund in the agreement, but only as a creditor, then the only time that such an agreement would make a difference is if, as here, the holding company is in bankruptcy. Were the Holding Company not in bankruptcy, sections 3(d), 4(e) and 10(a)(iii) of the Tax Sharing Agreement, and the banking regulators' Policy Statement, clearly require that the refunds be paid immediately to the Bank. There is no rational reason why a subsidiary, or a regulator, would ever agree to permit the subsidiary to condition its right to

refunds, which it would have received if it had filed separately from the group, upon the solvency of the parent. Indeed, the very purpose of the Policy Statement is to prohibit such a result. Moreover, there seems to be no legitimate interest on the part of the Holding Company to seek such an agreement. This is the essence of *BSD Bancorp's* holding that the economic reality of the agreement there demonstrated that such a result was not intended.

What Zucker's argument would do is permit it to keep refunds that are solely attributable to the Bank, and that would have redounded to Bank if it had filed separate tax returns, so as to benefit Debtor's creditors in a bankruptcy at the expense of the Bank's creditors. Surely, given that a parent has a fiduciary obligation to pay such refunds to its subsidiary and would be unjustly enriched if it did not do so, the regulatory conclusion in the Policy Statement that an agreement that deprived the subsidiary of its ownership interest in the refunds would be unfair and overreaching is correct, absent some strong consideration flowing to the subsidiary for giving up its rights. No consideration was provided. Moreover, the Tax Sharing Agreement fails to even mention, much less meet the affiliate loan requirements set forth in 12 U.S.C. § 371c. Like the Policy Statement, those requirements are also intended to protect the Bank against disadvantageous actions of its parent. Accordingly, if the Tax Sharing Agreement were intended to convert Bank from a principal-beneficiary into a creditor, the Agreement, to that extent, is unenforceable because it is both contrary to express federal law, and unfair and overreaching, and the *Bob Richards* common law principles should be applied.

However, the court need not reach this conclusion. As noted above, Section 203 of the Restatement 2d of Contracts sets forth the general rule of construction that an interpretation that produces an unreasonable and unlawful result should give way to an alternative that results in no illegality or inequity. Thus, the court should hold, as the court in *BSD Bancorp* did, that an

agreement allocating refunds does not change the general rule that a parent receives such refunds as an agent-trustee.  The consequence of changing the general agent/trustee - principal/beneficiary relationship to debtor - creditor is so adverse to the subsidiary, that if such an intent is to be found, it must be stated in express provisions of the Tax Sharing Agreement, and not implied from the mere existence of the Agreement.

**D.      Even if the Holding Company Received the Tax Refund, Which It Did Not, the Holding Company Agreed to Hold the Tax Proceeds as an Agent-Trustee and, Therefore, the Tax Proceeds are Not Part of the Bankruptcy Estate.**

The Holding Company's status as an agent-trustee is not only evidenced in the language of the Tax Sharing Agreement, but is explicitly manifested by its decision to file a consolidated tax return with the Internal Revenue Service and mandated by the applicable Treasury Regulations.

Federal Income Tax Regulations set forth the requirements for filing consolidated income tax returns.  Treasury Regulation §1.1502-75 provides that each of the members of a group that elects to file a consolidated return must consent to all of the consolidated return regulations.  Under Treasury Regulation §1.1502-77, the parent for a group of corporations filing a consolidated return is the agent for the group with respect to the payment of refunds.  The Court in *In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262 (9th Cir. 1973) applied these regulations and concluded that the parent of a consolidated group received tax refunds as an agent-trustee.  473 F.2d at 265.

When the Holding Company and the Bank elected to file a consolidated federal income tax return, they agreed that the Holding Company would act as agent-trustee with respect to any tax refunds that were received.  As discussed above, there is nothing in the Tax Sharing Agreement that evidences an agreement to change (i) the Holding Company's status from that of an agent-trustee to a debtor, or (ii) the Bank's status from a principal-beneficiary to a creditor.  Thus, there is no need to point to a provision in the Tax Sharing Agreement that creates an express agency-

trustee relationship because that relationship was already established by the parties' consent to express Treasury Regulation § 1.1502-77 before the Tax Sharing Agreement was executed. Accordingly, as *BSD Bancorp* recognizes, it is incumbent upon the Debtor to show that the Tax Sharing Agreement affirmatively changed that relationship. Against the backdrop of the Policy Statement, it is apparent that no such language exists.

**(1)    Property Held by a Debtor as Agent or Trustee Is Not Part of the Bankruptcy Estate**

It is well-settled in the bankruptcy law that a principal's or beneficiary's ownership of property is not vitiated by the fact that its agent or trustee may become bankrupt. 11. U.S.C. § 541(d); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205n.10 (1983) ("We do not now decide the outer boundaries of the bankruptcy estate. We note only that Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.") Thus, in *In re Crouthamel Potato Chip Co.*, 6 B.R. 501 (Bankr. E.D. Pa. 1980), the debtor had transferred property that it held as an agent to its principal shortly before the debtor entered bankruptcy. The debtor argued that the transfer constituted a voidable preference under the bankruptcy law. The bankruptcy court rejected the argument, explaining that property held as an agent is **not** property of the estate:

> Nor do we agree with Crouthamel's contention that the transfer of title to the equipment from it to Jensen-McLean was a voidable preference. It has been consistently held that where there exists a true agency relationship, . . . a transfer by the agent of agency property to the principal is not a voidable preference. [citation omitted]. **The reason is that the transfer is not of property of the debtor but of property of the principal.** *See also* 4A Collier on Bankruptcy par. 70.18[4] at 199-200 (14th ed. 1977) which, in a discussion of the trustee's title to property held by a bankrupt states:
>
> > * * * [T]he agent holds the property under the . . . agency for the owner's benefit. Consequently, it is well-settled that absent state statutory enactment to the contrary,

> **if property is in a bankrupt's hands as . . . agent, the trustee holds it as such, and the . . . principal may recover the property or its proceeds.** (6 B.R. at 507; emphasis added).

The Debtor Holding Company is the agent for the Bank. Even if the Holding Company had received the Tax Refund, remitting the Tax Refund to the Bank is not a transfer of the Debtor's property. It is merely a delivery to Debtor's principal of property that belongs to the principal.

Similarly, in *In re Penn Central Transportation Company*, 486 F.2d 519 (3rd Cir. 1973) (en banc), *cert. denied* 415 U.S. 990 (1974), the court held that amounts collected by Penn Central, as agent for other railroads, were held in trust for such railroads and therefore were not part of its bankruptcy estate. The issue before the court, relating to amounts collected by one railroad on behalf of others as a result of their consolidated operating methods, bears striking similarity to the tax refunds collected here as a result of the consolidated filing of federal income tax returns.

As explained by the court, the nation's railroads function in many ways as a single system. Thus, a shipper pays one railroad, either the originating or destination carrier, for carriage services for the entire shipment, even though the shipment may travel over many railroads. The railroads have created a system of accounting and periodic settlement of accounts to facilitate this manner of operation, whereby the railroad that collected the payments appropriately allocates those amounts among the railroads over which the shipment traveled.

The court concluded that the amounts collected by debtor, prior to its entry into bankruptcy, for services provided by other railroads were collected as agent for such other railroads, and were held by the debtor in trust for them. Accordingly, such amounts were not part of the debtor's bankruptcy estate, and the other railroads were not creditors of that estate. Rather, the Debtor held such funds as agent-trustee for the other railroads, which were principal-beneficiaries, entitled to receive such funds in full:

The AAR interline accounting system is in essence, therefore, a system by which one railroad collects monies owed by shippers to both itself and other railroads. The monies collected belong only in part to the collecting railroad; as to monies owed other railroads, **the collecting railroad serves merely as a receiving and transmitting agent**. A common sense interpretation of this system would indicate that funds collected by one railroad for and in behalf of another railroad are held in trust by the collecting railroad until the monies are transmitted. Whether the money is held in trust must be determined, however, not merely by reliance on common sense, but also by application of traditional legal doctrines. We therefore turn to the law of trusts to make that determination. In applying the law of trusts, it will be necessary to examine the manifestation of intent of the parties, not only in terms of written documents, but also in terms of the conduct of the parties.

* * *

Accommodating and applying traditional common law trust principles to the unique regulatory scheme and accounting policies used by the nation's railroads, we have concluded that transportation and freight charges, *when collected,* **are held in trust** for the Interlines. They are therefore entitled to have their monies.

486 F.2d at 523-24 (emphasis added). Thus, like the Ninth Circuit in *Bob Richards*, and all of the cases following it, the court recognizes, in another context, that an entity that collects monies due others is simply a collection agent and, accordingly, holds such monies in trust for the owners, absent an agreement to the contrary. Moreover, like the court in *BSD Bancorp*, it holds that to conclude otherwise requires an express contrary manifestation of the parties, which was absent there, and is even more clearly absent here.

## IV.  CONCLUSION

Zucker requests that this Court convert equitable ownership of the Tax Refund from the FDIC as receiver for the Bank to the Debtor's estate, thus depriving the creditors of the Bank in the receivership from receiving their rightful distribution of the Tax Refund. However, for the reasons shown herein, the Tax Refund is clearly owned by the FDIC under the relevant case law, federal

regulations and statutes, and the Tax Sharing Agreement. Accordingly, the Tax Refund is not property of the bankruptcy estate. FDIC respectfully requests that the Court enter final summary judgment in its favor on all counts of the Complaint and on the Counterclaim.

Dated December 14, 2009

Respectfully Submitted,

AKERMAN SENTERFITT

By: _/s/ Raye Curry Elliott_
    David E. Otero
    Florida Bar No.: 651370
    Email: david.otero@akerman.com
    Raye Curry Elliott
    Florida Bar No.: 018732
    Email: raye.curryelliott@akerman.com
    50 North Laura Street, Suite 2500
    Jacksonville, FL 32202
    Telephone: (904) 798-3700
    Facsimile: (904) 798-3730

    Attorneys for Federal Deposit Insurance Corporation
    as Receiver for NetBank, f.s.b.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document was filed electronically with the Clerk of Court on December 14, 2009 using CM/ECF, which will send a Notice of Electronic Filing to the following counsel of record:

Todd C. Meyers, Esq.
Sameer Kapoor, Esq.
Shane G. Ramsey, Esq.
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530

        _/s/ Raye Curry Elliott_
          Attorney