# EXHIBIT O

FEB 28 1995

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Case Number 93-12207-A11 |
| BSD BANCORP, INC., | ) DIST. CT. CASE NO. |
| Debtor. | ) 94-1341-IEG |
| | ) ORDER DENYING PLAINTIFF'S |
| | ) MOTION FOR SUMMARY JUDGMENT |
| BSD BANCORP, INC., | ) AND ORDERING FURTHER |
| Plaintiff, | ) BRIEFING ON DEFENDANT'S |
| | ) MOTION FOR PARTIAL SUMMARY |
| v. | ) JUDGMENT |
| | ) [DOC. # 2] |
| FEDERAL DEPOSIT INSURANCE | ) |
| CORPORATION, as Receiver for | ) |
| the Bank of San Diego, | ) |
| Defendant. | ) |
| | ) |
| FEDERAL DEPOSIT INSURANCE | ) |
| CORPORATION, as Receiver for | ) |
| the Bank of San Diego, | ) |
| Counterclaimant, | ) |
| v. | ) |
| BSD BANCORP, INC., | ) |
| Counterdefendant. | ) |

1

## BACKGROUND

BSD Bancorp Inc. ("Bancorp") was the corporate parent of the Bank of San Diego ("Bank"). On October 29, 1993, the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver for the Bank. On November 3, 1993, Bancorp filed a petition under Chapter 11 of the Bankruptcy Code.

Bancorp and the corporations which it controlled, including the Bank, filed their tax returns as a consolidated group. When a group of affiliated corporations elects to file their tax returns as a consolidated group, the entire group is subject to one annual tax liability. Losses in one company can be offset against profits in another for purposes of computing this tax liability, and many intercompany transfers have no direct effect on tax liability. The group's parent corporation files the return, pays the tax, receives any refunds, and deals with the IRS generally. The corporations in the group are each severally liable for the entire amount of the tax. See generally Boris I. Bittker & James S. Eustice, Federal Taxation of Corporations and Shareholders ¶ 13.43 (6th ed. 1994).

Shortly after its bankruptcy filing, Bancorp received federal and state tax refunds totalling about $2 million. Those refunds are said to be Bancorp's primary asset. The refunds were concededly based on prior tax payments attributable to the Bank's earnings, and have been kept in a segregated account. The FDIC

///

///

///

///

2

1 filed a contingent claim against Bancorp in the bankruptcy
2 court,[1] contending that Bancorp held the tax refunds in trust for
3 the Bank and that they were thus not property of the bankruptcy
4 estate.

5      On March 24, 1994, Bancorp initiated an adversary proceeding
6 in the bankruptcy court against the FDIC as receiver of the Bank,
7 seeking a declaration that the tax refunds are property of the
8 estate and the avoidance of a number of prepetition payments
9 which Bancorp made to the Bank.  This Court withdrew the
10 reference on August 8, 1994.  Bancorp has now filed a motion for
11 summary judgment on its first declaratory judgment claim.  The
12 FDIC has filed a cross-motion for partial summary judgment.

13                          DISCUSSION

14 A.   Debt or Trust?

15      There is no dispute that Bancorp owes all or most of the
16 refund money to the Bank.  The primary issue here is whether this
17 is an ordinary debt or a sum of money which Bancorp holds in
18 trust for the Bank.  If the debt is an ordinary debt, the FDIC
19 has to share the refund money with Bancorp's other creditors in
20 bankruptcy.  If the money is held in trust, on the other hand,
21 ///
22
23 ————————————
24      [1]The FDIC also tried to get the IRS to pay the federal
   refunds directly to it by following the procedure set out in
   Treas. Reg. § 301.6402-7.  That rule establishes a special
25 procedure by which the FDIC and other receivers for insolvent
   financial institutions can arrange to receive the institutions'
26 share of refunds owed to consolidated groups directly.  Bancorp
   contends that by invoking this procedure, the FDIC violated the
27 automatic stay.  At any rate, the FDIC was unsuccessful; the IRS
   paid the refunds to Bancorp.
28

                               3

1    under 11 U.S.C. § 541(d) it is not part of the bankruptcy

2    estate,[2] and Bancorp has to hand it over to the FDIC.

3          In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d 262,

4    265 (9th Cir. 1973), held that the parent of a consolidated group

5    acts as an agent for the rest of the group in collecting taxes

6    and refunds.  The court based this holding on Treas. Reg. §

7    1.1502-77, which provides that the parent corporation is an agent

8    of the remaining corporations for a number of purposes set out in

9    detail in the regulation.  This holding is thus apparently

10   federal common law.

11         Furthermore, because of the agency relationship, the parent

12   corporation holds the money owing to the subsidiaries in trust

13   for them.  473 F.2d at 265.  This accords with the general

14   principle that when an agent "is vested with the title to

15   property that he holds for his principal, he is also a trustee."

16   1 Austin W. Scott & William F. Fratcher, The Law of Trusts § 8,

17   at 95 (4th ed. 1987).[3]

18         The rules of Bob Richards would seem to resolve the issue

19   and lead to the conclusion that Bancorp holds the refunds in

20   trust.  Bancorp argues, however, that because it entered into a

21   
22         [2]Ninth Circuit cases applying 11 U.S.C. § 541(d) have said
     that assets held in trust might nonetheless be property of the
     bankruptcy estate if the state law creating the trust was
23   contrary to federal bankruptcy policy.  See, e.g., In re Unicom,
     13 F.3d 321, 325 & n.6 (9th Cir. 1994).  No case has yet
24   considered whether this "policy override" would apply to a trust
     arising under federal law.
25
         [3]The Third Circuit recently declared a similar federal
26   common law trust over certain refunds that a bankrupt gas
     pipeline held for its customers pursuant to an order of the
27   Federal Energy Regulatory Commission.  In re Columbia Gas Sys.
     Inc., 997 F.2d 1039, 1055-61 (3d Cir. 1993).
28

                                    4

1  tax sharing agreement with the Bank, their relationship was

2  transformed in such a way that it holds the money as a debtor and

3  not in trust.  The FDIC attacks this tax allocation agreement on

4  a number of grounds.

5  B.  The Tax Allocation Agreement

6      Bancorp, the Bank, and other affiliated corporations entered

7  into a tax sharing agreement in 1991.  (Pl.'s Ex. 17.)  Their

8  boards of directors ratified it.  There are also some similar

9  agreements pertaining to earlier time periods.  The agreement

10 provides, in relevant part:

11          Any subsidiary incurring an annual loss on a tax basis that
            results in a tax benefit on the consolidated return shall be
12          reimbursed in cash in an amount determined in a manner
            consistent with the allocation of taxes to profitable
13          subsidiaries.  Refunds due subsidiaries from the Company
            which cannot be fully funded when due then will be carried
14          on the subsidiary's books as a "loan to parent" and will
            accrue interest at not less than the Federal Funds Rate.
15          The occurrence of this event is unusual and its likelihood
            of happening is considered remote.  All loans between parent
16          and subsidiary will be in accordance with applicable federal
            regulations regarding affiliate transactions.

17

18      The parties have proffered no extrinsic evidence bearing on

19 the interpretation of this contract.  The Court consequently

20 interprets it as a matter of law.  Cf. Southland Corp. v. Emerald

21 Oil Co., 789 F.2d 1441, 1443 (9th Cir. 1986).

22      Before interpreting the tax sharing agreement, however, it

23 is necessary to consider the FDIC's contentions that portions or

24 all of it are invalid.  It is convenient for these purposes to

25 consider two relevant aspects of the agreement separately.

26 First, the agreement appears to establish some guidelines for how

27 tax liabilities and refunds are allocated.  These will be

28 referred to as the "allocation guidelines."  Second, the

5

1   agreement appears to allow Bancorp to defer payment of refunds
2   by, in effect, "borrowing" the refund from the subsidiary.  This
3   will be referred to as the "line of credit."  Separate
4   consideration of these two portions of the agreement is useful
5   because "[t]he California cases take a very loose view of
6   severability, enforcing valid parts of an apparently indivisible
7   contract where the interests of justice or the policy of the law
8   . . . would be furthered."  1 B.E. Witkin, Summary of California
9   Law: Contracts § 432 (9th ed. 1987).

10  C.   Validity of the Tax Allocation Agreement

11       The FDIC argues that the agreement is invalid or not binding
12  on the FDIC for a number of reasons:[4]

13       1)   12 U.S.C. § 1823(e).  That subsection provides that

14       No agreement which tends to diminish or defeat the interest
         of the [FDIC] in any asset acquired by it . . . as receiver
15       of any insured depository institution, shall be valid
         against the [FDIC] unless such agreement--

16       . . .
         (B) was executed by the depository institution and any
17       person claiming an adverse interest thereunder, including
         the obligor, contemporaneously with the acquisition of the
18       asset by the depository institution . . . .

19  The FDIC argues that the agreement violates 12 U.S.C. § 1823(e)
20  because it is not "contemporaneous[] with the acquisition of the
21  asset by the depository institution."

22       If one views the "asset" as the refunds, this view seems
23  literally correct, since the refunds were paid long after the
24  agreement took effect.  However, this reasoning would ban all tax

25  _____

26       [4]Even if the agreement is binding, the FDIC as receiver
    appears to have the power to repudiate it under 12 U.S.C. §
27  1821(e).  The FDIC does not argue this issue, however, so it need
    not be considered further.

28

                                6

1 allocation agreements because such agreements necessarily have to
2 be prospective. "[S]atisfaction of the contemporaneousness
3 requirement should be considered in light of commercial reality."
4 RTC v. Midwest Fed. Sav. Bank, 4 F.3d 1490, 1501 (9th Cir. 1993).
5 In this case, it is consistent with commercial reality, and with
6 the FDIC's own recommendations, for consolidated groups of
7 corporations to enter into prospective tax allocation agreements.
8 It is likewise consistent with commercial reality for banks to
9 approve lines of credit in advance of the actual borrowing.
10 Consequently, the Court finds that § 1823(e) does not prevent the
11 tax allocation agreement from binding the FDIC.[5]

12     2)    The Common Law D'Oench Duhme Doctrine.  The common-law
13 D'Oench Duhme doctrine largely overlaps with 12 U.S.C. § 1823(e).
14 However, "[f]or D'Oench Duhme to apply, there at least must be a
15 showing that the [borrower] lent himself to a scheme or
16 arrangement whereby the banking authority . . . was or was likely
17 to be misled." Murphy v. FDIC, 38 F.3d 1490, 1498 (9th Cir.
18 1994) (en banc) (internal quotation marks omitted).  Here, the
19 agreement was sufficiently explicit that the FDIC could not have
20 been misled as to Bancorp's potential right to "borrow" the
21 refunds.  The FDIC in fact knew in early 1993 that the

22
23     [5]The FDIC also argues that the ratification by the board of
directors is ineffective because the tax portion of the agreement
was an addendum to the agreement as adopted by the board.  The
24 addendum was incorporated by reference, however, and it appears
that an explicit incorporation by reference suffices for §
25 1823(e).  See FDIC v. Kasal, 913 F.2d 486, 491 (8th Cir. 1991);
see also RTC v. Midwest Fed. Sav. Bank, 4 F.3d 1490, 1501 (9th
26 Cir. 1993) (§ 1823(e) "does not require that such agreements be
confined to the face of any one particular lending/borrowing
27 document") (quoting RTC v. Oak Apts. Joint Venture, 966 F.2d 995,
999 (5th Cir. 1992)).
28

7

1 arrangements for passing tax refunds through Bancorp were a
2 source of potential problems.  (Pl.'s Ex. 19.)
3        3)  Indefiniteness.  The FDIC also contends that the tax
4 allocation agreement is too indefinite to be binding.  It cites
5 In re Florida Park Banks Inc., 110 B.R. 986 (Bankr. M.D. Fla.
6 1989), where the consolidated group had a "policy" regarding tax
7 allocation.  The court there found that the policy did not rise
8 to the level of an agreement that could override the rule of Bob
9 Richards, so the FDIC got the tax refund.
10       The tax allocation guidelines at issue here are extremely
11 vague.  They state that loss-making subsidiaries will receive tax
12 benefits "in an amount determined in a manner consistent with the
13 allocation of taxes to profitable subsidiaries" (emphasis added).
14 The agreement also provides that tax payments by profitable
15 subsidiaries "will be calculated based on the individual
16 subsidiary's stand-alone estimated payment liability" (emphasis
17 added).
18       The line of credit provision in the agreement is not as
19 vague.  However, nothing is said about how long Bancorp may
20 continue to hold on to the borrowed funds.  The interest rate
21 must be "not less than the Federal Funds Rate," but the actual
22 rate is not specified.
23       California courts are tolerant of indefinite terms in
24 contracts.  Thus, for example, courts may fill in an omitted
25 duration term.  1 Witkin, supra, § 152.  The interest rate could
26 be implied from that which comparable borrowers pay.  The
27 allocation guidelines may be seen as setting very broad outer
28 limits to how the tax burdens and benefits are spread, excluding,

8

1   for example, payments utterly unrelated to an individual
2   subsidiary's stand-alone payment liability.  Consequently, the
3   tax allocation guidelines and line of credit provisions of the
4   tax allocation agreement are not so indefinite as to be
5   unenforceable.

6        4)   Lack of Consideration.  The FDIC also contends that the
7   agreement lacked consideration to the Bank.  Consideration may be
8   any benefit however small or contingent.  Consolidated group tax
9   reporting offered the Bank at least the possibility of lower tax
10  burdens as a consequence of the benefits of consolidation
11  discussed extensively in the FDIC's own papers.  This is
12  sufficient consideration for the tax allocation agreement.

13       5)   Illegality.  The FDIC appears to argue that the tax
14  refund line of credit from the Bank to Bancorp is contrary to
15  applicable law and regulations.  However, the tax allocation
16  agreement itself provides that credit will be extended only in a
17  way consistent with applicable regulations, which would seem to
18  cure any possible illegality.

19  D.  Effect of the Agreement on the Agency and Trust Relationship

20       Having concluded that the tax allocation agreement is
21  binding on the FDIC, it is now necessary to consider whether the
22  agreement destroys the principal-agent relationship recognized in
23  Bob Richards, supra.

24       Bancorp first contends that the very existence of a tax
25  allocation agreement destroys the principal-agent relationship.
26  It bases this contention on the fact that there was no such
27  agreement in Bob Richards.  However, this is an excessively
28  ///

                                    9

narrow interpretation of that case.  This Court interprets Bob
Richards as holding that unless the corporations in a
consolidated group agree otherwise, the parent acts as their
agent for payment of tax and refunds.  This rule is like many
other gap-filling rules in contract law which provide a default
in the absence of applicable agreement by the parties, e.g.
U.C.C. § 2-205 (offer by merchant in signed writing irrevocable
"during the time stated or if no time is stated for a reasonable
time").  Parties to a contract do not override a gap-filling rule
simply by reaching explicit agreement on some other matter.
Rather, the terms of their agreement must expressly or impliedly
override the gap-filling rule itself.  It is thus necessary to
consider whether the terms of the tax allocation agreement
expressly or impliedly override the Bob Richards principal-agent
relationship.

Bancorp points to the language "[a]ny subsidiary incurring
an annual loss on a tax basis that results in a tax benefit on
the consolidated return shall be reimbursed in cash" in the tax
allocation agreement.  It contends that the use of the word
"reimbursed" indicates that a debtor-creditor relationship was
intended.  It also argues that the refunds owing the Bank were
recorded as a "receivable" on its books.  It cites In re Franklin
Sav. Corp., 159 B.R. 9, 29 (Bankr. D. Kan. 1993), where the court
relied on the words "reimbursement" and "credits" to conclude
that a tax allocation agreement established a debtor-creditor
relationship.

In deciding whether a transaction intended to create a
debtor-creditor relationship, however, a court must examine the

1  economic reality of the transaction rather than the words used.
2  See In re Woodson Co., 813 F.2d 266, 272 (9th Cir. 1987).  The
3  economic reality here is that, except in the "unusual"
4  circumstances in which the agreement allowed Bancorp to borrow
5  the refund, the agreement required Bancorp to give the Bank its
6  share of the refund in cash and immediately.  This strongly
7  suggests an intent to maintain a principal-agent relationship
8  unless Bancorp borrowed the refund pursuant to the terms of the
9  agreement.
10      Furthermore, the agreement itself recognizes that any loan
11 from the Bank to Bancorp would be subject to regulations
12 governing loans to affiliates.  Although the parties do not
13 discuss these regulations in their papers,[6] it appears that 12
14 U.S.C. § 371c(c)(1) applies here.  That subsection forbids
15 unsecured loans from a Federal Reserve member bank to its holding
16 company, while § 371c(e) allows the Federal Reserve Board to
17 authorize such loans by regulation or order.  12 U.S.C.
18 § 1828(j)(1) extends the restrictions of § 371c to all federally
19 insured banks.  For a debtor-creditor relationship to arise

20      [6]Bancorp does attach as an exhibit to its complaint some
21 excerpts from an FDIC examination manual containing an extensive
   discussion of § 371c.  (Pl.'s Ex. 4, at 8-11.)  The FDIC cites
22 Lincoln Savings & Loan Association v. Wall, 743 F. Supp. 901
   (D.D.C. 1990), where the court upheld the Federal Home Loan Bank
23 Board's decision to put Charles Keating's thrift into
   receivership.  In doing so, the court found that an agreement
24 requiring the thrift to make large payments to its parent,
   ostensibly for the purpose of paying the consolidated group's tax
25 liability, fell afoul of the then-existing regulatory
   restrictions on a thrift's lending to its parent.  Lincoln
26 Savings, 743 F. Supp. at 908-11.  Those restrictions (then
   codified at 12 C.F.R. § 583.4 (1986), and since repealed) were
27 similar to those in 12 U.S.C. § 371c.

28

                                11

1 between Bancorp and Bank, then, there would presumably have to be
2 some further agreement through which Bancorp supplied collateral
3 meeting the requirements of § 371c(c)(1).

4     The Court consequently holds that the tax allocation
5 agreement intended to abrogate the principal-agent relationship
6 between Bank and Bancorp only when Bancorp borrowed the refunds
7 from Bank under the terms of the agreement. Bancorp holds Bank's
8 share of the refunds in trust, as the Bank's agent, unless and
9 until Bancorp borrows them under the terms of the agreement.

10     There remains the question whether Bancorp could properly
11 borrow the refunds at issue here under the terms of the
12 agreement. The language of the agreement itself provides the
13 answer. Bancorp is allowed to borrow "[r]efunds . . . which
14 cannot be fully funded when due." Bancorp received the refunds
15 at issue here in cash and placed them in a segregated account.
16 Therefore, it had the wherewithal to pay the refunds immediately
17 to the Bank. The requirement that the refunds "cannot be fully
18 funded" was thus not met here. Bancorp had no right to borrow
19 the refunds under the tax allocation agreement, and it therefore
20 continued to hold them in trust.[7] Bancorp's motion for summary
21 judgment is thus DENIED.

22 E.  Funds in the Segregated Tax Refund Account

23     The FDIC's cross-motion for summary judgment seeks an order
24 directing that the whole of Bancorp's segregated tax refund
25 account be turned over to it. To decide this motion, it is

26 _____

27 [7]It is also possible that Bancorp had no right to borrow the
refunds from the Bank because its doing so would be inconsistent
28 with applicable regulations.

12

1   necessary to determine what portion of that money represents
2   refunds owed to the Bank.

3        The Court does not believe that the parties have adequately
4   briefed the issue of what share of the refunds belongs to the
5   Bank.  The resolution of that issue depends on how refunds
6   received by Bancorp are supposed to be allocated to other members
7   of the consolidated group.  The tax allocation agreement may shed
8   some light on this question.  Background rules of law, such as
9   those stated in Bob Richards, may also shed light on this
10  question.  The Court consequently directs the parties to provide
11  further briefing on what share of the refunds belongs to the
12  Bank.  The FDIC is to file an additional brief, no longer than 25
13  pages, by March 13, 1995.  Bancorp may file an opposition by
14  March 27, 1995.  The FDIC may file a 10-page reply by April 3,
15  1995.  At that point, the Court may decide the FDIC's motion for
16  partial summary judgment on the papers, or it may schedule an
17  additional hearing.

18  F.   Objections to Evidence

19       Bancorp objects extensively to the declaration of Carol
20  Turner filed by FDIC.  The primary objection is that Ms. Turner
21  is rendering inadmissible lay opinion.  Ms. Turner states that
22  she has worked for over fourteen years as a tax accountant for
23  the FDIC.  This would normally justify her testifying as an
24  expert on tax accounting.  The objections on the ground of
25  inadmissible lay opinion are thus overruled.

26       Ms. Turner's declaration appears to rely on tax records of
27  the Bank of San Diego.  Such documents are admissible hearsay
28  under Fed. R. Evid. 803(6).  Expert witnesses are also permitted

                                13

1   to rely on inadmissible evidence if "of a type reasonably relied

2   on by experts in the particular field." Fed. R. Evid. 703.

3   Hearsay objections to Ms. Turner's declaration are thus

4   overruled.

5       Ms. Turner's declaration contains expert opinion on pure

6   questions of law. The declaration of Diane L. Gilabert filed by

7   Bancorp also contains expert opinion on questions of law. Expert

8   opinion on questions of law is inappropriate. United States v.

9   Brodie, 858 F.2d 492, 496 (9th Cir. 1988). The Court has reached

10  an independent conclusion on all questions of law and has not

11  taken expert opinion as authoritative on such issues.

12      Bancorp has also filed evidentiary objections to the FDIC's

13  memorandum of points and authorities. A memorandum of points and

14  authorities is not evidence and evidentiary objections to it are

15  inappropriate.

16  G.   Conclusion

17      Bancorp's motion for summary judgment on its first claim is

18  DENIED. The FDIC's motion for partial summary judgment is

19  continued pending further briefing as directed by this order.

20      IT IS SO ORDERED.

21

22  Dated:  _Feb. 28, 1995_          _Irma E. Gonzalez_
                                     IRMA E. GONZALES
23                                   United States District Judge

24

25

26

27

28

14

1   Copies distributed/mailed to:

2   JEFFREY ISAACS ESQ
    GERALD P KENNEDY ESQ
3   MARTINA MENDE ESQ
    PROCOPIO CORY HARGREAVES AND SAVITCH
4   530 B ST STE 2100
    SAN DIEGO CA 92101

5
    SCOTT HUGHES ESQ
6   FEDERAL DEPOSIT INSURANCE CORPORATION
    LEGAL DIVISION
7   4 PARK PLAZA
    IRVINE CA 92715

8
    ANTHONY J DAIN ESQ
9   DAIN & LI
    555 WEST BEECH ST STE 222
10  SAN DIEGO CA 92101

11  MICHAEL F DUHL ESQ
    JOHN L ROGERS ESQ
12  HOPKINS & SUTTER
    THREE FIRST NATIONAL PLAZA STE 4100
13  CHICAGO IL 60602

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EEGebre
94-1341.ORD
82/34/95