# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

|  |  |  |
|---|---|---|
| In re: | : |  |
|  | : |  |
| NETBANK, INC., | : | Case No. 3:07-bk-04295-JAF |
|  | : |  |
|  | : | Chapter 11 |
| Debtor. | : |  |
|  | : |  |
|  | : |  |

|  |  |  |
|---|---|---|
| CLIFFORD ZUCKER, in his capacity | : | Adversary Proceeding |
| as Liquidating Supervisor for | : | No. 3:08-ap-00346-JAF |
| NETBANK, INC., | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| FEDERAL DEPOSIT INSURANCE | : |  |
| CORPORATION,[1] | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Clifford Zucker, in his capacity as liquidating supervisor (hereinafter,

"Plaintiff" or "Liquidating Supervisor") for NetBank, Inc. (the "Debtor"), files Plaintiff's

Motion for Summary Judgment (the "Motion"), in accordance with Rule 56 of the

Federal Rules of Civil Procedure, made applicable to the instant adversary proceeding by

Rule 7056 of the Federal Rules of Bankruptcy Procedure, against Defendant, Federal

---

[1] As discussed below, the United States of America has been dismissed from the instant adversary proceeding.

Deposit Insurance Corporation, as receiver for NetBank, FSB (the "FDIC"), and states the following:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this adversary proceeding and the parties pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E) and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**STATEMENT OF UNDISPUTED FACTS**

**I.     Bankruptcy Case**

2.     On September 28, 2007 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code").

3.     On May 20, 2008, the Debtor filed the Debtor's Liquidating Plan of Reorganization [Docket No. 327], and on July 10, 2008 and July 31, 2008, the Debtor amended the proposed plan [Docket Nos. 402 and 420] (as amended, the "Plan").

4.     On September 16, 2008, the Court entered an Order confirming the Plan [Docket No. 475].

5.     Pursuant to the Plan, on the "Effective Date" (as defined therein), Mr. Clifford Zucker of J.H. Cohn LLP was appointed as the Liquidating Supervisor.  The Liquidating Supervisor is the representative of the Debtor's bankruptcy estate, and, as a result, is authorized to investigate and, if necessary, prosecute, any causes of action

2

belonging to the Debtor or its estate. The Effective Date of the Plan was September 29, 2008.

6. The Debtor is the ultimate parent corporation of a number of wholly-owned direct and indirect subsidiaries. Among the subsidiaries owned directly by the Debtor is NetBank, FSB, a federal savings bank (the "Bank"), which, in turn, owns the stock of several subsidiaries. For convenience, the Debtor and its direct and indirect subsidiaries, including the Bank and the Bank's subsidiaries, are referred to in this Motion as the "Consolidated Group." The Bank and its subsidiaries are referred to as the "Bank Affiliated Group."

7. Before its seizure in the fall of 2007, the Bank operated under the oversight of the Office of Thrift Supervision (the "OTS"), the quasi-governmental entity that was charged with regulatory oversight of federal savings banks. On September 28, 2007, the OTS appointed the FDIC receiver for the Bank. That same day, the Debtor filed its Chapter 11 case in this Court.

## II. The Tax Refund

8. The Debtor and the other members of the Consolidated Group, including the Bank and the other members of the Bank Affiliated Group, are parties to an Amended and Restated Tax Sharing Agreement, effective January 1, 2003 (the "Tax Sharing Agreement"), which, in addition to conferring on the Debtor complete control over tax reporting, tax administration and the resolution of disputes with taxing authorities for the Consolidated Group, defines the methods by which tax liabilities and credits are allocated

3

among the members of the Consolidated Group and paid. A true and correct copy of the

Tax Sharing Agreement is attached hereto and incorporated herein as <u>Exhibit A</u>.

9.     The Tax Sharing Agreement is governed by the laws of the State of

Georgia (the "Georgia Code"). Tax Sharing Agreement at p. 8, §10(c).

10.     As stated in the Tax Sharing Agreement, and within the meaning of

section 1504(a) of the Internal Revenue Code, the Debtor is the common parent of the

Consolidated Group, including the Bank Affiliated Group. Tax Sharing Agreement at p.

1. <u>See</u> 26 U.S.C. § 1504(a).

11.     Pursuant to 26 C.F.R. § 1.1502-77(a) (2009), subject to exceptions not

relevant to this case, "the common parent (or a substitute agent described in paragraph

(a)(1)(ii) of this section) for a consolidated return year is the sole agent (agent for the

group) that is authorized to act in its own name with respect to all matters relating to the

tax liability for that consolidated return year, for--(A) Each member in the group . . . ."

26 C.F.R. § 1.1502-77(a) (2009).

12.     Consistent with the foregoing, Section 9 of the Tax Sharing Agreement

provides:

> NetBank[2] shall prepare and file the Consolidated Return and any other
> returns, documents or statement required to be filed with the IRS with
> respect to the determination of the Federal income tax liability of the
> NetBank Group.  **In its sole discretion**, NetBank shall have the right with
> respect to any Consolidated Returns which it has filed or will file:
>
> (a)     to determine (i) the manner in which such returns, documents or
> statements shall be prepared and filed, including, without limitation, the
> manner in which any item of income, gain, loss, deduction or credit shall

---

[2] In the Tax Sharing Agreement, the Debtor NetBank, Inc. is defined as "NetBank." Tax Sharing
Agreement at p. 1, Preamble.

be reported, (ii) whether any extensions may be requested, and (iii) the elections that will be made by any member Affiliate,

(b)     to contest, compromise or settle any adjustment or deficiency proposed (sic) asserted or assessed as a result of an audit of such returns by the IRS,

(c)     to file, prosecute, compromise or settle any claim the NetBank Affiliated Group may be entitled (sic) **shall be paid by the way of refund or credited against the tax liability of the NetBank Group**.[3]

Each Affiliate hereby irrevocably appoints NetBank as its agent and attorney-in-fact to take such action (including execution of documents) as NetBank may deem appropriate to effect the foregoing.

Tax Sharing Agreement at p. 7, §9 (emphasis added).

13.     On or about September 5, 2006, the Debtor filed a consolidated tax return for the tax year ending December 31, 2005 (the "2005 Tax Return"). A true and correct copy of the 2005 Tax Return is attached hereto and incorporated herein as <u>Exhibit B</u>.

14.     As shown on the 2005 Tax Return, the Consolidated Group had taxable income of $17,987,259.00, and tax liability of $6,145,415.00.

15.     On or about August 31, 2007, in accordance with Section 9 of the Tax Sharing Agreement, the Debtor filed a consolidated tax return for the tax year ending December 31, 2006 (the "2006 Tax Return"). A true and correct copy of the 2006 Tax Return is attached hereto and incorporated herein as <u>Exhibit C</u>.

---

[3] The Liquidating Supervisor respectfully submits that words obviously were omitted inadvertently in subsection (c) and that subsection (c) was intended to read substantially as follows: "to file, prosecute, compromise or settle any claim [to which] the NetBank Affiliated Group may be entitled and [determine whether the claim] shall be paid by the way of refund or credited against the tax liability of the NetBank Group."

US2008 927867.13

16.     As shown on the 2006 Tax Return, the Consolidated Group had a net operating loss of $94,128,552.00.  Therefore, the Consolidated Group had zero tax liability for 2006.

17.     In accordance with the Tax Sharing Agreement, on September 4, 2007, the Debtor filed a Form 1139 for the tax year ending December 31, 2006, seeking a refund of $5,735,176.00 attributable to the carryback of the Consolidated Group's net operating loss incurred for its tax year ending December 31, 2006 to its tax year ending December 31, 2005 (the "Tax Refund").  A true and correct copy of the Form 1139 is attached hereto and incorporated herein as <u>Exhibit D</u>.

18.     Based on the rights, powers and authority conferred on it under the Tax Sharing Agreement, and particularly Section 9 thereof, the Debtor had the right to file the Form 1139 to seek a refund, based on the Consolidated Group's 2006 losses, of taxes paid on behalf of the Consolidated Group for 2005, and to receive the Tax Refund.  The Debtor's right to the Tax Refund accrued no later than December 31, 2005, the end of the year in which the overpayment of tax by the Consolidated Group occurred.  When the Debtor filed its Chapter 11 petition on September 28, 2007, its right to the Tax Refund became property of the Debtor's bankruptcy estate.

19.     In contrast, the Bank had no property interest in the Tax Refund.  Because the Bank had made payments under the Tax Sharing Agreement to the Debtor in respect of profits realized by the Bank in 2005 and had realized losses in 2006, the Bank was entitled, under the Tax Sharing Agreement, to receive a payment from the Debtor.  As more particularly described hereinafter, the Bank's right to the payment was not

6

dependent upon the Debtor's receipt of the Tax Refund from the IRS. For this and other reasons, the relationship between the Debtor and the Bank with respect to the losses incurred by the Bank in 2006 was a relationship of debtor and creditor. The Debtor was not a collection agent or trustee for the Bank under the Tax Sharing Agreement but rather owed an amount calculated in accordance with the terms of the Tax Sharing Agreement to the Bank regardless of whether the Debtor received the Tax Refund from the IRS.

20.     Notwithstanding that the right to the Tax Refund constituted property of the Debtor's estate, in violation of the automatic stay of section 362(a) of the Bankruptcy Code, on or about November 26, 2007, the FDIC, as receiver for the Bank, attempted to lay claim to the Tax Refund by filing its own Form 1139, requesting that the IRS remit the Tax Refund to the FDIC. A true and correct copy of the FDIC's Form 1139 is attached hereto and incorporated herein as <u>Exhibit E</u>.

21.     By letter dated February 11, 2008, in further violation of the automatic stay, the FDIC attempted to repudiate and disaffirm the Tax Sharing Agreement (the "February 2008 Notice"). A true and correct copy of the February 2008 Notice is attached hereto and incorporated herein as <u>Exhibit F</u>.

22.     On or about March 10, 2008, the Debtor sent a letter to the IRS informing the IRS that the Tax Refund was property of the Debtor's estate, which should be paid to the Debtor and not the FDIC. A true and correct copy of the letter is attached hereto and incorporated herein as <u>Exhibit G</u>.

23.     On or about April 23, 2008, the IRS informed the Debtor and the FDIC that neither party's Form 1139 could be processed because, pursuant to IRS regulations,

7

an application for a carryback adjustment was required to be signed by both the Debtor, as the common parent of the Consolidated Group, and the FDIC, as the fiduciary for the Bank.

24.     Subsequently, on or about June 11, 2008, the Debtor filed an amended consolidated tax return on behalf of the Consolidated Group for the tax year ending December 31, 2005, clarifying the calculation of the Tax Refund and seeking payment of the same from the IRS.  A true and correct copy of the Debtor's Form 1120X is attached hereto and incorporated herein as Exhibit H.

25.     Thereafter, on or about June 18, 2008, in further violation of the automatic stay, in an effort to obtain possession of property of the Debtor's estate and to exercise control over property of the estate, the FDIC filed an amended tax return for the tax year ending December 31, 2005, on behalf of the Bank and its subsidiaries, once again erroneously claiming ownership of the Tax Refund.  A true and correct copy of the FDIC's Form 1120X is attached hereto and incorporated herein as Exhibit I.

## III.    The Adversary Proceeding

26.     On October 23, 2008, the Liquidating Supervisor filed his Complaint Under Sections 541 and 542 of the Bankruptcy Code Seeking a Declaratory Judgment Regarding Ownership of a Certain Tax Refund and Turnover of Property of the Bankruptcy Estate [Adv. Pro. Docket No. 1] (the "Complaint"), thereby initiating the instant adversary proceeding against the FDIC and the United States of America, acting through the IRS.

8

27.     In Count I of the Complaint, the Liquidating Supervisor seeks a declaratory judgment that the Tax Refund is property of the Debtor's bankruptcy estate pursuant to section 541(a) of the Bankruptcy Code.  In Count II of the Complaint, the Liquidating Supervisor requests that the Court require the IRS (to the extent it has not remitted the Tax Refund to the Debtor or the FDIC) and the FDIC to turn over the Tax Refund to the Liquidating Supervisor for the benefit of the Debtor's bankruptcy estate in accordance with section 542(a) of the Bankruptcy Code.

28.     On December 11, 2008, the FDIC filed its answer to the Complaint [Adv. Pro. Docket No. 15] (the "Answer"), responding to the Complaint and asserting that the Tax Refund is property of the FDIC's receivership that should be turned over to the FDIC.  The FDIC also asserts two affirmative defenses.  First, the FDIC asserts that the Tax Sharing Agreement is null and void as a result of the February 2008 Notice.  See Answer at p. 6, ¶ 1.  Second, the FDIC asserts that because the Debtor did not specifically assume the Tax Sharing Agreement, the Debtor rejected it, and as a result, the Tax Sharing Agreement is null and void.  See Answer at p. 6, ¶ 2.

29.     On January 14, 2009, the IRS filed its Motion to Dismiss [Adv. Pro. Docket No. 24] and memorandum in support thereof [Adv. Pro. Docket No. 25].  As a result of discussions between the parties, on February 19, 2009, the Court entered a Consent Order Granting the United States of America's Motion to Dismiss [Adv. Pro. Docket 35] (the "Consent Order"), which dismissed the IRS from the instant adversary

proceeding and required the IRS to remit the Tax Refund to the FDIC to be held in escrow.[4]

30.     By check dated March 6, 2009, the IRS remitted the total amount of $6,213,576.86, to the FDIC.[5]  The FDIC placed the amount received from the IRS in an interest-bearing escrow account in accordance with the terms of the Consent Order and a supplemental consent order entered on March 13, 2009 [Adv. Pro. Docket No. 40].

31.     On September 21, 2009, as a result of a pre-trial conference held on September 14, 2009, the Court entered a Scheduling Order [Adv. Pro. Docket No. 44] requiring the parties to file motions for summary judgment on or before December 14, 2009.

## ARGUMENT

### I.     Summary Judgment Standard

32.     The standard for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure.  Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Matsushita Elec.

---

[4] The Consent Order provides that neither the payment by the IRS to the FDIC, nor the deposit of the Tax Refund by the FDIC into escrow, would have any effect on the determination of the ultimate ownership of the Tax Refund.

[5] The difference between the amount of the requested Tax Refund and the amount tendered by the IRS is apparently attributable to the interest earned on the Tax Refund, which the IRS was required to pay for retaining the Tax Refund.

US2008 927867.13

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986); Hyman v. Nationwide Mut. Fire Ins. Co., 304 F.3d 1179 (11th Cir. 2002).

33.     The evidence and all factual inferences therefrom must be viewed in the light most favorable to the party opposing the motion, and all reasonable doubts about the facts must be resolved in favor of the non-moving party.  Andreini & Co. v. Pony Exp. Delivery Servs., Inc. (In re Pony Exp. Delivery Servs., Inc.), 440 F.3d 1296, 1300 (11th Cir. 2006); see also Loren v. Sasser, 309 F.3d 1296, 1301-02 (11th Cir. 2002); Hyman v. Nationwide Mut. Fire Ins. Co., 304 F.3d 1179 (11th Cir. 2002) (citing Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999)).  However, "[w]hen a motion for summary judgment has been made properly, the nonmoving party may not rely solely on the pleadings, but . . . must show that there are specific facts demonstrating that there is a genuine issue for trial."  Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990).

34.     Moreover, the Court may consider evidence only if the evidence can be "reduced to admissible evidence at trial" or "reduced to admissible form."  Macuba v. DeBoer, 193 F.3d 1316, 1323 (11th Cir. 1999).  See also Wright v. Southland Corp., 187 F.3d 1287 (11th Cir. 1999); McMillian v. Johnson, 88 F.3d 1573, 1584-85 (11th Cir. 1996), aff'd sub nom, McMillian v. Monroe Co., 520 U.S. 781 (1997); Pritchard v. S. Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996).  In this Motion, the Liquidating Supervisor establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law on Counts I and II of the Complaint.

US2008 927867.13

**II.** **Count I of the Complaint**

    **A.** **Under section 541(a) of the Bankruptcy Code, the Debtor's bankruptcy estate is comprised of all legal or equitable interests of the Debtor in property.**

35.    Section 541(a)(1) of the Bankruptcy Code states:

The commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held:

(1)    Except as provided in subsection (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541(a)(1).

36.    Accordingly, the filing of the Debtor's chapter 11 petition commenced the underlying bankruptcy case and created, as of September 28, 2007, the Debtor's bankruptcy estate, which is comprised of all legal and equitable interests of the Debtor in property as of the Petition Date.  Thus, the nature of the Debtor's interest in the Tax Refund as of the Petition Date determines whether the right to the refund constitutes property of the Debtor's estate.

37.    Nothing in the Internal Revenue Code or regulations promulgated thereunder purports to determine the relative rights of members of a consolidated group of companies with respect to tax refunds.  Indeed, the Internal Revenue Code (the "IRC") is silent as to whether a tax refund must or should inure to the benefit of the common parent, or the benefit of the company which has sustained the loss that makes the tax refund possible.  Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.), 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001), aff'd, 377 F.3d 209 (2d Cir. 2004); Capital Bancshares, Inc. v. FDIC, 957 F.2d 203, 206 (5th Cir. 1992); Jump v. Manchester

12

<u>Life & Cas. Mgmt. Corp.</u>, 579 F.2d 449, 452 (8th Cir. 1978) (the entity ultimately entitled to the benefit of a consolidated tax refund is not addressed in the Internal Revenue Code); <u>W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.</u>), 473 F.2d 262, 265 (9th Cir. 1973) ("The Internal Revenue Service is not concerned with the subsequent disposition of tax refunds and none of its regulations can be construed to govern this issue.").

38.     The question of the relative rights of the members of a consolidated group with respect to a tax refund having not been addressed in the IRC or the regulations thereunder, the members of such a group may allocate such rights under an agreement, in which case, the agreement will control. <u>First Cent. Fin. Corp.</u>, 269 B.R. at 490 ("As a matter of state corporation law, parties are free to allocate among themselves their ultimate tax liability by an express agreement, or by a clearly implied agreement. **The agreement will control the members' rights** in the absence of overreaching or breach of fiduciary duty.") (citations omitted) (emphasis added). <u>Accord</u> <u>Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.</u>), 159 B.R. 9, 29 (Bankr. D. Kan. 1993), <u>aff'd</u>, 182 B.R. 859 (D. Kan. 1995). No provision of Georgia corporation law prohibits the members of a consolidated group from freely allocating their ultimate tax liability by express agreement.

39.     Because the members of the Consolidated Group entered into the Tax Sharing Agreement and the agreement is not the product of overreaching or breach of fiduciary duty, the Tax Sharing Agreement governs the relative rights of the members with respect to the Tax Refund and determines whether the right to the refund and the

13

refund itself constitute property of the Debtor's estate. As between the Debtor and the Bank, the answer to this question turns on whether the relationship between the Debtor and the Bank under the Tax Sharing Agreement with respect to tax refunds is that of trustee and beneficiary or debtor and creditor. If the relationship is the latter, then the Tax Refund is property of the Debtor's estate, and as of the Petition Date, the FDIC could at best only assert an unsecured claim against the estate for any payments in respect of the refund the Debtor is obligated to make to the Bank under the Tax Sharing Agreement. As discussed hereinafter, under the relevant authorities, the relationship between the Debtor and the Bank under the Tax Sharing Agreement is that of debtor and creditor, not trustee and beneficiary. Accordingly, the right to the Tax Refund and the refund itself constitute property of the estate, and the Tax Refund must be turned over to the estate pursuant to Section 542 of the Bankruptcy Code.

**B.      The Tax Sharing Agreement determines whether the Tax Refund is property of the estate.**

40.      The seminal cases, in the context of tax allocation agreements, regarding the relative rights to a tax refund of members of a consolidated group, the common parent of which becomes the subject of a bankruptcy case, are the <u>First Central Financial Corporation</u> case and the <u>Franklin Savings Corporation</u> case cited above.

41.      In <u>Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)</u>, 377 F.3d 209 (2d Cir. 2004), the Second Circuit Court of Appeals affirmed the bankruptcy court's rulings that (1) the tax allocation agreement at issue in that case did not give rise to a trust or agency relationship between a common parent and its regulated insurance company subsidiary (which had been placed into receivership) with respect to a tax refund, and (2)

14

a constructive trust would not be imposed on the tax refund for the benefit of the subsidiary, even though most of the income and losses had been generated by the subsidiary.  There, the parent ("FCFC") and the subsidiary ("FCIC") had entered into a tax allocation agreement which prescribed how tax payments and refunds were to be apportioned between the two entities.  Id. at 211.  In 1994 and 1995, FCIC was the only member of the consolidated group to earn taxable income, and, as a result, paid the group's entire tax liability for those years.  Id.  In 1996 and 1997, the group as a whole and FCIC, on a stand alone basis, suffered losses, which led to FCFC applying for and receiving tax refunds from the IRS, the amounts of which it paid to FCIC pursuant to the tax allocation agreement.  Id.

    42.    In January 1998, FCIC became insolvent and was placed into receivership. In March 1998, FCFC filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Id.  Subsequently, the trustee for FCFC applied to the IRS for a refund of the remaining taxes paid in 1994 and 1995 based upon the carryback of net operating losses for 1997. Id.  The trustee claimed the $2.5 million refund as property of FCFC's bankruptcy estate. Id.  As the Liquidator of FCIC, the Superintendent of Insurance challenged the trustee's claim to the refund, contending that FCIC owned the beneficial interest in the refund.

    43.    The bankruptcy court framed the issue as whether, under the tax allocation agreement, "FCFC holds the Tax Refund as trustee for FCIC, or otherwise holds only bare legal title to the Tax Refund, such that the beneficial interest in the Tax Refund is not property of the estate."  Superintendent of Ins. v. First Cent. Fin. Corp. (In re First

<u>Cent. Fin. Corp.</u>), 269 B.R. 481, 490 (Bankr. E.D.N.Y. 2001).[6]  In answering the question

in the negative, the court found the following factors to be significant:  (1) under the

terms of the tax allocation agreement, FCIC would only be entitled to a refund in an

amount that it would have received from the IRS had it filed its taxes on a stand-alone

basis.  <u>Id.</u> at 495.  Thus, as is the case with respect to the NetBank Tax Sharing

Agreement, the amount payable to FCIC in respect of a tax refund would not correlate

necessarily to the refund received by FCFC; (2) the tax allocation agreement (like the Tax

Sharing Agreement) did not provide that "[the parent corporation] holds any portion of

the Tax Refund in trust for [the subsidiary] or contain any language even purporting to

create such a trust."  <u>Id.</u> at 496; (3) like the Tax Sharing Agreement, the tax allocation

agreement contained no provision requiring tax refunds received by the parent

corporation to be placed in escrow, no requirement that the parent corporation segregate

any tax refund payment due to the subsidiary, and no restrictions on how the refund

monies might be used or invested.  <u>Id.</u>; (4) the tax allocation agreement simply required,

in connection with a tax refund, that an ultimate settlement payment be made to FCIC.

<u>Id.</u>; and (5) the tax allocation agreement (like the Tax Sharing Agreement) did not

contain any language creating a true agency relationship because "FCFC does not act at

FCIC's direction and control, either in applying for a tax refund, or in the handling of the

refund monies once received."  <u>Id.</u> at 497.

---

[6] The Superintendent of Insurance for the State of New York only appealed the bankruptcy court's decision
not to impose a constructive trust on the refund in favor of the Superintendent.  <u>In re First Cent. Fin. Corp.</u>,
377 F.3d at 212, n.1.  Accordingly, the discussion and analysis in this Motion will focus on the bankruptcy
court's ruling, which, as stated above, was affirmed by the Second Circuit Court of Appeals.

US2008 927867.13

44.    In rejecting the position espoused by the Superintendent, the court concluded that the parent corporation's obligations to make payments to the subsidiary under the tax allocation agreement in respect of tax refunds created a debtor-creditor relationship with ordinary contractual obligations between the parties, and not a fiduciary relationship.  Id. at 497-98 ("[A]ny payment due to FCIC under the Tax Allocation Agreement will be made by FCFC.  This provision is consistent with a debtor-creditor relationship, as are the preceding and following sentences, which both provide for 'settlements' between the parties under the Agreement.").

45.    Finally, with respect to the Superintendent's argument that a constructive trust should be imposed on the tax refund to prevent unjust enrichment, the bankruptcy court observed:

> In the absence of a tax allocation agreement, the Superintendent might be correct that retention of the tax refund would unjustly enrich the bankruptcy estate of FCFC.  However, FCFC and FCIC did enter into the Tax Allocation Agreement, which governs their respective rights and responsibilities.  No allegation is made by the Superintendent that FCFC acted unfairly, overreachingly, or unconscionably in the creation or implementation of the Tax Allocation Agreement.

Id. at 500-01 (internal citations omitted) ("Thus, in the absence of overreaching or breach of fiduciary duty in the creation or implementation of the Tax Allocation Agreement, the Agreement will be given effect, and there is no basis for imposing a constructive trust on the Tax Refund.").  The reasoning underlying the court's conclusion in the First Central Financial Corporation case that the tax refund constituted property of FCFC's bankruptcy estate under section 541 of the Bankruptcy Code, is equally

17

applicable in this case and mandates a determination that the Tax Refund is property of the Debtor's estate.

46.    A similar agreement between a parent corporation and its financial institution subsidiary regarding income taxes was analyzed by the court in Franklin Savings Corp. v. Franklin Savings Ass'n (In re Franklin Savings Corp.), 159 B.R. 9 (Bankr. D. Kan. 1993), aff'd, 182 B.R. 859 (D. Kan. 1995).  In Franklin Savings Corp., the debtor was the corporate parent of a stock savings and loan association that failed. The failure of the subsidiary led to the appointment of the Resolution Trust Corporation ("RTC") as its conservator.  Franklin Savings Corp., 159 B.R. at 11.  The tax refund at issue in Franklin Savings Corp.  arose from the carryback of net operating losses that resulted entirely from taxes paid and losses incurred by the operating subsidiary.  Id. at 27-28.  Based on these facts, like the Superintendent of Insurance in the First Central Financial Corporation case, the RTC claimed ownership of the entire tax refund.  Id. at 28.

47.    In rejecting the RTC's claim of ownership of the tax refund at issue, the bankruptcy court focused on the tax agreement's use of the terms "reimbursement" and "credits" in describing payments to the subsidiary in the event that any amounts were due and owing to the subsidiary in respect of tax refunds.  Id. at 29.  With respect to the use of the term "reimbursement," the court found:

> The use of this term is consistent with a "debt" or "receivable," rather than
> with ownership.  If the parties considered the refund to be property of [the
> subsidiary], they could have provided for its "return" to [the subsidiary].
> The parties' selection of terms indicates that they intended the obligation
> to be in the nature of a receivable.

US2008 927867.13

Id. Accordingly, the court held that "under the terms of the agreements, [the subsidiary held] only an unsecured claim, not ownership of the refunds." Id.

48. In addition, consistent with the holding in the First Central Financial Corporation case, because the court found no evidence of any self-dealing or unconscionable conduct of the parent related to the tax agreement, it found no basis to impose a constructive trust on the tax refund for the benefit of the RTC. Id. at 33.

      **C.    Under the Tax Sharing Agreement, the relationship between the Debtor and the Bank with respect to a tax refund attributable to taxes paid and losses incurred by the Bank is a debtor-creditor relationship, and the Bank has no beneficial interest in a refund due from the IRS.**

49. Under the Tax Sharing Agreement, it is even clearer than in the First Central Financial Corporation and Franklin Savings Corporation cases that the relationship between the common parent (the Debtor) and the subsidiary (the Bank) with respect to a tax refund is that of debtor-creditor, not trustee-beneficiary. This is the case because the Bank's right to receive payment from the Debtor in respect of a tax refund is not dependent on receipt by the Debtor of a refund from the IRS or the Debtor even being entitled to receive a refund from the IRS. Rather, regardless of whether the Debtor is entitled to receive a refund from the IRS based on a consolidated return, if the Bank Affiliated Group would have been entitled to a tax benefit if it had filed a separate return, the Debtor is obligated under the Tax Sharing Agreement to pay the amount of such benefit to the Bank.

50. Section 4 of the Tax Sharing Agreement deals with the carryback of, among other things, net operating losses to prior years. With respect to amounts

19

attributable to members of the Consolidated Group, subsection (d) provides, generally,

that:

> [p]ayment [to a member of the Consolidated Group] of any amount due under this paragraph shall be made not later than thirty (30) days after the date on which a credit is allowed or refund is received with respect to the taxable year to which such payment relates and shall include any interest attributable thereto under Section 6611 of the [Internal Revenue] Code.

51.     Payment by the Debtor to the Bank based on losses of the Bank Affiliated

Group, however, is not conditioned or dependent on receipt by the Consolidated Group of

a credit or refund.  In this regard, subsection (e) of Section 4 provides:

> If the Bank Affiliated Group incurs a net operating loss, a net capital loss or is entitled to credits against tax as described above in this Section, **the amount payable to the Bank Affiliated Group by NetBank** shall be no less than the amount the Bank would have received as a separate entity (including its subsidiaries), **regardless of whether the consolidated group is receiving a refund**.

Tax Sharing Agreement at p. 6, §4(e) (emphasis added).

52.     In similar vein, Section 10 of the Tax Sharing Agreement provides in

relevant part:

> Should the Bank Affiliated Group incur a tax loss, it should receive a refund from NetBank in an amount no less than the amount the Bank Affiliated Group would have received as a separate entity, **regardless of whether the NetBank consolidated group is receiving a refund**.

Tax Sharing Agreement at p. 8, §10(a)(iii) (emphasis added).

53.     Further evidence that the relationship between the Debtor and the Bank

with respect to tax refunds is a debtor-creditor relationship, not a trustee-beneficiary

relationship, is found in Section 9 of the Tax Sharing Agreement (quoted in paragraph 12

on pages 4 and 5 of this Motion).  Under that section, the Debtor is afforded complete

discretion, with respect to tax attributes of the Consolidated Group, to determine whether

US2008 927867.13

to seek a refund from the IRS **or instead have applied, as a credit against the tax liability of the Consolidated Group,** the amount to which the Debtor is entitled in respect of such tax attributes.  Tax Sharing Agreement at p. 7, §9(c).  Having the unfettered right, under the Tax Sharing Agreement, to elect to receive a credit rather than a refund from the IRS is completely inconsistent with the notion that the Debtor held rights to refunds in trust for the benefit of the Bank or any other member of the Consolidated Group.  Instead, as evidenced by the provisions of the Tax Sharing Agreement discussed above, the Debtor had a contractual obligation to pay the Bank the amount of any benefits the Bank Affiliated Group would have received if it had filed tax returns separately.  If the Debtor elected to receive a credit rather than a refund, it still had an obligation to pay the Bank.  In short, with respect to payments from the Debtor to which the Bank is entitled under the Tax Sharing Agreement, the relationship between the Debtor and the Bank is a debtor-creditor relationship.  The Bank had no interest, whether equitable or otherwise, in the Tax Refund, and the right to the Tax Refund became property of the Debtor's estate on the Petition Date.  See 15 Myron M. Sheinfeld et al., Collier on Bankruptcy ¶ TX5.04[2][b] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. Vol. 2008) ("In the case of a corporate taxpayer, the proper party to claim any refund due is the common parent of a consolidated group for the taxable period during which the claim arose.  Any refund of prepetition taxes which is found to be due will be property of the estate.") (footnote omitted).

**D. The Interagency Policy Statement does not affect the status of the Tax Refund as property of the Debtor's estate.**

54.     In the apparent belief that it supports the FDIC's position, the FDIC attached as Exhibit A to its Answer, the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure issued by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the OTS effective November 23, 1998 (the "Policy Statement").  It is apparent from the face of the Policy Statement, however, that it does not constitute a rule or regulation or have the force of law, but rather was issued "to provide guidance to banking organizations and savings associations regarding the allocation and payment of taxes among a holding company and its subsidiaries", when a holding company and its subsidiaries, including one or more depository institution subsidiaries, file consolidated group income tax returns.  Policy Statement at p. 64758.  The Policy Statement simply states that practices inconsistent with the statement may be viewed as unsafe and unsound practices.  Policy Statement at p. 64758.  Thus, it in no way undermines the principle espoused in the cases previously discussed that the nature of the relationship, with respect to tax refunds, between a common parent corporation and a regulated financial institution subsidiary (that are members of a consolidated income tax filing group operating under a tax allocation agreement) is determined by the terms of the tax allocation agreement.

55.     Notably, the Policy Statement encourages bank holding companies and their bank subsidiaries to enter into written tax allocation agreements but does not recommend or suggest that such agreements provide for the escrow or other segregation of tax refunds from the assets of the holding company or contain other provisions

22

signifying the existence of a trust relationship with respect to tax refunds. Quite to the

contrary, the very structure envisioned by the Policy Statement for the treatment of tax

refunds in tax allocation agreements fosters the creation of debtor-creditor relationships

between the holding company and its bank subsidiaries, not trust relationships. In this

regard, the Policy Statement provides:

> An institution incurring a loss for tax purposes should record a current
> income tax benefit and receive a refund from its parent in an amount no
> less than the amount the institution would have been entitled to receive as
> a separate entity. The refund should be made to the institution within a
> reasonable period following the date the institution would have filed its
> own return, **regardless of whether the consolidated group is receiving a
> refund**. If a refund is not made to the institution within this period, the
> institution's primary federal regulator may **consider the receivable** as
> either an extension of credit or a dividend from the subsidiary to the
> parent.

Policy Statement, at p. 64758 (emphasis added).

56.     It could not be clearer that, under the structure envisioned in the Policy

Statement for tax allocation agreements, with respect to tax refunds due bank

subsidiaries, the obligor is the holding company, not the IRS. The holding company does

not function as a collection agent or trustee, but rather is independently liable to its bank

subsidiary for the amount to which the subsidiary would have been entitled had it filed

separately. This quintessential debtor-creditor relationship was incorporated into the Tax

Sharing Agreement, as suggested in the Policy Statement, and, under the principles

enunciated in the First Central Financial Corporation and Franklin Savings Corporation

cases, belies any argument that the Tax Refund is not property of the Debtor's estate.

23

**E.** **There is no basis to depart from the terms and effect of the Tax Sharing Agreement.**

57.     Like the agreements at issue in the <u>First Central Financial Corporation</u> and <u>Franklin Savings Corporation</u> cases, the Tax Sharing Agreement was not the product of overreaching or breach of fiduciary duty.  Under the Tax Sharing Agreement, the Bank Affiliated Group was required to contribute to the payment of the Consolidated Group's tax liability only the amount the Bank Affiliated Group would have been required to pay the IRS if it had filed a separate tax return.  Tax Sharing Agreement at p. 3, §2(c).  Moreover, as described above and consistent with the guidance provided in the Policy Statement, the agreement obligated the Debtor to pay the Bank the amount of any refund to which the Bank Affiliated Group would have been entitled if it had filed separately, regardless of whether the Consolidated Group was receiving a refund from the IRS.  All of the collection risk was borne by the Debtor under the agreement.  There is, therefore, no basis to depart from the terms of the Tax Sharing Agreement, which created a debtor-creditor relationship between the Debtor and the Bank with respect to amounts payable to the Bank as a consequence of the carryback of losses to prior years.  <u>First Cent. Fin. Corp.</u>, 269 B.R. at 500-501 (holding that "in the absence of overreaching or breach of fiduciary duty in the creation or implementation of the Tax Allocation Agreement, the Agreement will be given effect"); <u>accord</u> <u>Franklin Sav. Corp.</u>, 159 B.R. at 32-33.

**F.** **The FDIC's actions in attempting to obtain possession and control of the Tax Refund and purporting to disaffirm the Tax Sharing Agreement violated the automatic stay under section 362(a) of the Bankruptcy Code.**

58.     Because the Tax Refund is property of the Debtor's bankruptcy estate, the

actions of the FDIC in seeking to have the Tax Refund paid to it, including its purported disaffirmance of the Tax Sharing Agreement, violated the automatic stay and are void and ineffective. Under sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code, the filing of a bankruptcy petition operates as a stay of:

> (3)    any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> **. . .**
>
> (6)    any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. §§ 362(a)(3) and (a)(6).

59.    Under the terms of the Tax Sharing Agreement, on the Petition Date the Debtor had the right to obtain possession and control of the Tax Refund (which right the Debtor asserted on September 4, 2007, by filing a Form 1139 seeking the Tax Refund, and again on or about June 11, 2008, by filing a Form 1120X). Accordingly, the Debtor had a legal and equitable interest in the Tax Refund on the Petition Date. Therefore, the Tax Refund constitutes property of the Debtor's bankruptcy estate. By attempting to obtain possession of the Tax Refund, the FDIC violated section 362(a)(3) of the Bankruptcy Code. The Tax Sharing Agreement and the Debtor's right thereunder to obtain the Tax Refund from the IRS clearly were in existence as of the Petition Date. Therefore, both the Tax Sharing Agreement and the right to obtain the Tax Refund became property of the estate on the Petition Date. The filing by the FDIC of its Form 1139 on November 26, 2007, and its Form 1120X on June 18, 2008, constituted acts to

obtain possession of property of the estate and to exercise control over property of the estate, namely, the Tax Refund or the right of the Debtor to receive the Tax Refund.

60.     Furthermore, because the Bank's rights under the Tax Sharing Agreement with respect to the Tax Refund were limited to a right to be paid a certain amount by the Debtor, the FDIC's actions amount to an effort to collect or recover a claim against the Debtor by end-running the bankruptcy claims process to obtain payment directly from the IRS.  Accordingly, the FDIC also violated the provisions of section 362(a)(6) of the Bankruptcy Code.

61.     In addition, the law is clear that contracts to which the Debtor is a party are property of the Debtor's bankruptcy estate.  3 Collier ¶ 362.03[5][a] ("Executory contracts and leases are considered a form of property of the estate.").  Therefore, the FDIC's February 2008 Notice, in addition to constituting a further attempt to obtain possession of and to exercise control over the Tax Refund and the Debtor's right to receive the Tax Refund, constituted an act to exercise control over the Tax Sharing Agreement.  Accordingly, the February 2008 Notice further violated the automatic stay and section 362(a)(3) of the Bankruptcy Code.

62.     Section 362(b) of the Bankruptcy Code provides various exceptions to the operation of the automatic stay.  The only arguably applicable exception in this case is contained in section 362(b)(4) of the Bankruptcy Code.  Among other things, that section excepts from the operation of sections 362(a)(1), (2), (3) and (6) of the Bankruptcy Code "the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power . . . ."  In light of

26

this provision, the FDIC may assert that, in taking the actions identified above, it was enforcing its regulatory power under 12 U.S.C. § 1821(e) and IRC Reg. § 301.6402-7. Such an argument would be flawed, however, because the FDIC was not acting to enforce its regulatory power when it engaged in the conduct described above, which was aimed at obtaining possession and control of the Tax Refund in its capacity as receiver for the Bank. The FDIC has taken the position that, under the "separate capacities" doctrine, it is treated as two separate persons when acting as a regulator and when acting as a receiver. See, e.g., Howell v. FDIC, 986 F.2d 569, 574 (1st Cir. 1993). Thus, as observed in Collier:

> [W]hen the FDIC acts as a receiver or conservator, rather than in its capacity as a regulatory agency, it does not exercise regulatory power within the meaning of subsection (b)(4) [of section 362].

3 Collier ¶ 362.05[5][b]. Because the FDIC was acting in its capacity as receiver for the Bank, and not in its corporate capacity as a regulator, when it filed its Form 1139 and Form 1120X, and sent the February 2008 Notice to the Debtor (all without seeking relief from the automatic stay), the FDIC cannot fit within the exception set forth in section 362(b)(4) of the Bankruptcy Code.[7]

     63.    Accordingly, the FDIC's efforts as described herein to obtain the Tax Refund and disaffirm the Tax Sharing Agreement violated the automatic stay, were void

---

[7] Section 362(b)(4) of the Bankruptcy Code also would not apply because it only excepts the commencement or continuation of "an action or proceeding" by a governmental unit to enforce its regulatory power. In view of other language in section 362, including language in section 362(b)(4) itself, the term "action" in section 362(b)(4) should not be equated with "act" and should be found to denote actions brought before judicial, administrative or other adjudicative bodies, not any act whatsoever to enforce the governmental unit's regulatory power. Thus, even if the FDIC were deemed to have been acting in a regulatory capacity (which the Liquidating Supervisor vigorously denies), Section 362(b)(4) would afford it no safe haven.

US2008 927867.13

and of no effect, and cannot have undermined in any way the estate's claim to the Tax

Refund.  See  Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 976 (1st Cir.

1997) (holding that action taken in violation of the automatic stay is void, not simply

voidable).

**G.      The February 2008 Notice did not affect the status of the Tax Refund
         as property of the Debtor's estate.**

64.      Even if the FDIC had not violated the automatic stay and its actions in

attempting to obtain the Tax Refund were not void and ineffective, the FDIC's attempt to

disaffirm the Tax Sharing Agreement would not impair the status of the Tax Refund as

property of the Debtor's estate.  Through the February 2008 Notice, the FDIC gave notice

to the Debtor that, pursuant to 12 U.S.C. § 1821(e), the FDIC had elected to disaffirm the

Tax Sharing Agreement.[8]  The letter states in part:

> The [Bank's] records indicate that you may be a party to the [Tax Sharing
> Agreement].   The Receiver has determined that the above-described
> contract(s) are burdensome and that disaffirmance of said contract(s) will
> promote the orderly administration of the Institution's affairs.   The
> purpose of this letter is to inform you that the Receiver has elected to
> disaffirm the above-referenced contract(s) to the full extent, if any, that it
> represents an enforceable obligation of the Institution, the Receiver, or the
> Receiver's subsidiaries.   This disaffirmance shall only effect (sic) an
> obligation of the Institution, the Receiver, or the Receiver's subsidiaries
> and is not a disaffirmance on behalf of other parties if any.

February 2008 Notice at p. 1 (emphasis added).

65.      The above-quoted language shows how the FDIC, as receiver for the

Bank, interprets the effect of repudiation or disaffirmance of a contract under 12 U.S.C.

§ 1821(e).  The notice does not state simply that the FDIC has elected to repudiate or

---

[8] 12 U.S.C. § 1821(e) gives the FDIC the right to "disaffirm or repudiate" certain contracts or leases that
have been entered into by the financial institution for which the FDIC has been appointed receiver.

disaffirm the Tax Sharing Agreement. Instead, it states that the FDIC has elected to disaffirm the Tax Sharing Agreement "to the full extent, if any, that it represents an enforceable obligation of the [Bank], the Receiver, or the Receiver's subsidiaries." It then goes on to state that the disaffirmance shall only affect an obligation of the Bank, the Receiver, or the Receiver's subsidiaries.

66.     Thus, the February 2008 Notice does not purport to affect property interests that have vested under the Tax Sharing Agreement before repudiation or disaffirmance under 12 U.S.C. § 1821(e). The February 2008 Notice simply purports to relieve the Bank and the FDIC of any further obligation to perform under the Tax Sharing Agreement (under which the FDIC had no further obligations as of the date it became receiver for the Bank). Pursuant to the terms of the Tax Sharing Agreement, the Debtor is the owner of the Tax Refund. The disaffirmance of the Tax Sharing Agreement cannot change that result. Furthermore, a declaration by the Court that, under the terms of the Tax Sharing Agreement, the Tax Refund is property of the Debtor's estate will not constitute the enforcement of an obligation of the Bank, the FDIC or the FDIC's subsidiaries under the Tax Sharing Agreement. Thus, even if the purported disaffirmance were not void as a violation of the automatic stay, by its very terms, it would not affect the status of the Tax Refund as property of the Debtor's estate.

67.     Even if the February 2008 Notice had purported to rescind the Tax Sharing Agreement and eradicate the Debtor's vested rights, under the agreement, to the Tax Refund rather than simply to relieve the Bank, the FDIC and the FDIC's subsidiaries from having to specifically perform any remaining affirmative obligations under the

agreement, it would have been ineffective to do so for the following reasons. First, the

FDIC's right to disaffirm or repudiate a contract pursuant to 12 U.S.C. § 1821(e) does not

apply to contracts that are non-executory; i.e., contracts under which no further material

performance is required on the FDIC side. At the time the FDIC purported to disaffirm

the Tax Sharing Agreement, it had no affirmative performance obligations under the

agreement. Second, even if the Tax Sharing Agreement was subject to disaffirmance

notwithstanding its non-executory nature, disaffirmance would not affect rights of the

Debtor under the Tax Sharing Agreement that had vested before the Bank was placed into

receivership.

      68.     That the FDIC's right to disaffirm or repudiate agreements applies only to

contracts that are executory (in the sense that affirmative performance obligations remain

on the FDIC side) is apparent from the face of 12 U.S.C. § 1821(e)(1), which provides:

> In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease —
>
> (A)     to which such institution is a party;
>
> (B)     the **performance** of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
>
> (C)     the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

12 U.S.C. § 1821(e)(1) (emphasis added).

      69.     Subsection (A), (B) and (C) of 12 U.S.C. § 1821(e)(1) are stated in the

conjunctive. Therefore, the FDIC can disaffirm or repudiate a contract only if it qualifies

under each of the subsections. If no performance obligations remain on the FDIC's side,

then the contract cannot qualify under subsection (B) and is not eligible for disaffirmance or repudiation.

70.     Courts have recognized that 12 U.S.C. §1821(e)(1) should be read as applying only to executory contracts.  In <u>Marsa v. Metrobank For Savings, F.S.B.</u>, 825 F. Supp. 658 (D.N.J. 1993), <u>aff'd</u> <u>sub</u> <u>nom.</u>  <u>Marsa v. Metrobank Fin. Group, Inc.</u>, 26 F.3d 122 (3d Cir. 1994), the court observed:

> It appears, therefore, that a proper reading of [12 U.S.C. § 1821(e)(1)] is that a receiver is precluded from disaffirming a non-executory contract. See also *First National Bank v. Unisys Finance Corp.*, 779 F. Supp. 85, 87 (N.D. Ill. 1991) (stating, without further discussion, "12 U.S.C. § 1821(e). . . gives RTC the right to repudiate executory contracts.").  To interpret [12 U.S.C. § 1821(e)(1)] as applicable to non-executory contracts could yield "draconian" results.  *See Fresca*, 818 F. Supp. at 668.[9]

<u>Id</u>. at 666. (footnote added)

71.     Because no affirmative performance obligation under the Tax Sharing Agreement remained on the FDIC side when it became receiver for the Bank, the Tax Sharing Agreement was not subject to disaffirmance or repudiation under 12 U.S.C. § 1821(e)(1).

72.     Even if the Tax Sharing Agreement were eligible for disaffirmance or repudiation, disaffirmance or repudiation would not nullify rights that had vested under the agreement before disaffirmance or repudiation was effected.  Pursuant to the Tax Sharing Agreement, under the principles enunciated in the <u>First Central Financial Corporation</u> and <u>Federal Savings Corporation</u> cases, the Tax Refund already belonged to the Debtor at the time the Bank was placed into receivership and the Debtor filed its

---

[9] <u>Fresca v. FDIC</u>, 818 F. Supp. 664 (S.D.N.Y. 1993)

US2008 927867.13

Chapter 11 case (having vested in the Debtor at the close of the Debtor's taxable year for which the Debtor overpaid the tax). See Segal v. Rochelle, 382 U.S. 375 (1966); S.Rep. No. 989, 95th Cong., 2d Sess. 82; In re Glenn, 207 B.R. 418 (E.D. Pa. 1997); United States v. Johnson, 71A AFTR 2d ¶ 93-4703. Disaffirmance or repudiation of the Tax Sharing Agreement could not divest the Debtor's estate of rights that had vested in the Debtor before the FDIC was appointed receiver for the Bank. See Marsa v. Metrobank For Savings, F.S.B., 825 F. Supp. 658 (D.N.J. 1993).

73.     In the Marsa case, the court considered the effect on a settlement agreement between a savings bank and a former officer, director and employee of the bank of repudiation of the agreement by the RTC after its appointment as receiver for the bank. Pursuant to the settlement agreement, Marsa, who had been an officer, director and employee of the bank, had resigned and waived all future salary and benefits under his employment agreement in return for an immediate cash payment and a further payout in monthly installments over the succeeding four years. Thirteen months after the settlement agreement was executed, the bank went into receivership. Id. at 661. The RTC took the position that it was authorized to repudiate the Settlement Agreement pursuant to both 12 U.S.C. § 1821(e) and 12 C.F.R. § 563.39, a regulation dealing specifically with employment agreements, and that such repudiation eliminated Marsa's rights under the settlement agreement. Id. at 662. The court determined that the settlement agreement did not constitute an employment agreement and that the regulation, therefore, was not applicable. Id. at 663. With respect to the effect of repudiation of the settlement agreement by the RTC, the court stated: "I find that

32

Marsa's rights to payment [under the settlement agreement] were vested at the time the RTC was appointed receiver and therefore **could not be impaired** by any purported disaffirmance." Id. (emphasis added).  Similarly, the Debtor's rights with respect to the Tax Refund were vested at the time the FDIC was appointed receiver for the Bank. Therefore, even if the purported disaffirmance by the FDIC of the Tax Sharing Agreement was not a nullity, notwithstanding the fact that it violated the automatic stay and the fact that the Tax Sharing Agreement was non-executory, it could not divest the Debtor or the estate of its rights to the Tax Refund.

74.     In an analogous situation, namely, the determination of the effect of rejection of an executory contract in bankruptcy, it has been recognized that rejection is not the equivalent of rescission and that the already executed portions of a contract that continues to be executory in some respects on the date of bankruptcy are not affected by rejection.  In short, rights in property that have passed to a non-debtor party pursuant to a contract before bankruptcy cannot be divested by rejection in bankruptcy, even though the contract remains executory at the time of bankruptcy.  Rudaw/Empirical Software Prods. Ltd. v. Elgar Elecs. Corp. (In re Rudaw/Empirical Software Prods. Ltd)., 83 B.R. 241 (Bankr. S.D.N.Y. 1988).

75.     In the Rudaw case, before bankruptcy, the debtor entered into a "Software Purchase Agreement" pursuant to which it sold and transferred to the buyer the copyright and all associated rights in a software program.  Under the purchase agreement, the debtor and the buyer had continuing obligations to one another after the transfer, and the purchase agreement constituted an executory contract at the time the debtor filed for

33

relief under Chapter 11.  Id. at 243.  The debtor filed a motion to reject the purchase

agreement, and the motion was granted by the bankruptcy court.  Id. at 245.  The Debtor

then contended that the rights in the software program had reverted to it because, among

other things, the purchase agreement had been rejected.  In rejecting the debtor's

contention, the bankruptcy court explained:

> Pursuant to 11 U.S.C. § 365, a debtor in possession may assume or reject
> an executory contract or unexpired lease.  Rejection denies the right of the
> contracting creditor to require the debtor to perform the executory portions
> of the contract, limits the creditor's claim to damages for breach of
> contract, and prohibits a rejecting debtor from compelling the contracting
> creditor to perform its executory obligations.  However, the rejection of an
> executory contract pursuant to 11 U.S.C. § 365 **is not the equivalent of
> rescission**; the rejection does not obligate [the buyer] to return the Failsafe
> property it acquired as a result of the purchase which was not executory
> and therefore not subject to the debtor's rejection power.

Id. at 246 (emphasis added).

76.     The logic underpinning the decision in the Rudaw case is equally

applicable in the context of disaffirmance or repudiation of a contract by the FDIC.  Even

if this Court finds that the FDIC's purported disaffirmance was effective, it should find

that disaffirmance is not the equivalent of rescission and the disaffirmance did not impair

the Debtor's interest under the Tax Sharing Agreement in the Tax Refund (that interest

having vested in the Debtor at the close of the Debtor's taxable year for which the Debtor

overpaid the tax).  See Segal v. Rochelle, 382 U.S. 375 (1966); S.Rep. No. 989, 95th

Cong., 2d Sess. 82; In re Glenn, 207 B.R. 418 (E.D. Pa. 1997); United States v. Johnson,

71A AFTR 2d ¶ 93-4703.

US2008 927867.13

**H.** **The Tax Refund is property of the Debtor's estate whether or not the Tax Sharing Agreement was rejected under the Plan.**

77. The FDIC alleges that the Tax Sharing Agreement was rejected by the Debtor pursuant to the terms of the Plan and the confirmation thereof. The Plan provides that, except for insurance policies, all executory contracts and unexpired leases other than those set forth on Exhibit C to the amended disclosure statement [Docket No. 398] (as amended, the "Disclosure Statement"), or assumed or rejected prior to the effective date of the Plan pursuant to a final order of the bankruptcy court, shall be deemed rejected as of the confirmation date of the Plan (the "Confirmation Date"). See Plan at p. 30, §7.2. The Tax Sharing Agreement was not included on Exhibit C to the Disclosure Statement, and it was not assumed or rejected otherwise pursuant to a court order.[10] Thus, to the extent, if any, the Tax Sharing Agreement was an executory contract and remained in effect as of the Effective Date, it would have been rejected as of the Confirmation Date.

78. In deciding whether an agreement constitutes an executory contract, some courts apply the definition proposed by Professor Countryman in an article in the Minnesota Law Review. Countryman, Executory Contracts and Bankruptcy, Part I, 57 Minn. L. Rev. 439 (1963) (the "Countryman Approach"). Under the Countryman Approach, an executory contract is defined as:

> A contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

---

[10] Exhibit C to the Disclosure Statement states "None" and contains no executory contracts or unexpired leases.

US2008 927867.13

3 <u>Collier</u> ¶ 365.02[1] at 365-17 n.1.  Other courts, however, have eschewed the

Countryman Approach in favor of the so-called "functional approach," under which the

question of whether a contract is executory is determined by the benefits that assumption

or rejection would produce for the estate.  <u>See, e.g., Sipes v. Gen. Dev. Corp. (In re Gen.</u>

<u>Dev. Corp.)</u>, 177 B.R. 1000, 1012 (S. D. Fla. 1995), <u>aff'd sub nom.</u> <u>Sipes v. Atl. Gulf</u>

<u>Cmtys. Corp. (In re Gen. Dev. Corp.)</u>, 84 F.3d 1364, 1375 (11th Cir. 1996).  Though the

Eleventh Circuit does not appear to have adopted the functional approach over the

Countryman Approach, it appears more inclined to embrace the functional approach.  <u>Id</u>.

at 1013 (citing <u>In re Martin Bros. Toolmakers, Inc.</u>, 796 F.2d 1435 (11th Cir. 1986)).

79.     Under either approach, the Tax Sharing Agreement would not appear to

have been an executory contract on the Petition Date (September 28, 2007) or thereafter.

On or about August 31, 2007, almost a month before the Petition Date, the Debtor had

filed the 2006 Tax Return, evidencing the losses that entitled the Debtor to receive the

Tax Refund.  On September 4, 2007, the Debtor filed a Form 1139 for the tax year ending

December 31, 2006, seeking payment from the IRS of the Tax Refund.  Thus, the only

obligation remaining on the Debtor's side under the Tax Sharing Agreement on the

Petition Date was the pre-petition obligation to pay the Bank the amount of any benefits

the Bank Affiliated Group would have received as a consequence of the Bank Affiliated

Group's 2006 net operating losses if the Bank Affiliated Group had filed tax returns

separately.  The Bank meanwhile had no remaining performance obligations under the

Tax Sharing Agreement on the Petition Date.  Because the Bank had no remaining

obligations on the Petition Date under the Tax Sharing Agreement and the Debtor's only

US2008 927867.13

remaining obligation on that date was the payment of a pre-petition debt to the Bank, under the Countryman Approach, the Tax Sharing Agreement was not an executory contract on the Petition Date. Moreover, because the Debtor's estate would not be benefited by finding that the Tax Sharing Agreement was executory on the Petition Date, application of the functional approach also would lead to the conclusion that the Tax Sharing Agreement was no longer an executory contract on that date. Because the Tax Sharing Agreement was no longer executory on the Petition Date and, consequently, was not an executory contract on the date the Plan was confirmed or the Effective Date, it was neither assumed nor rejected under the Plan.[11]

80. Even if the Tax Sharing Agreement was an executory contract at the time the Plan was confirmed, and was therefore rejected as of the Confirmation Date, rejection of an executory contract is not tantamount to extinguishment, rescission, cancellation or termination and would not affect the bankruptcy estate's ownership of the Tax Refund, which was established before the Petition Date. Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294, 1307 (11th Cir. 2007) ("The rejection of a pre-petition executory contract pursuant to which the debtor acquired property does not obligate the debtor to return the property."); In re Executive Tech. Data Sys., 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987) ("Property acquired prior to the filing of a petition in bankruptcy remains property of the estate regardless of whether the trustee or debtor in possession assumes or rejects the unperformed obligations of the contract pursuant to which the property was acquired."). Because the right to the Tax Refund vested in the Debtor pursuant to the Tax Sharing

---

[11]  If the Court reaches the contrary conclusion and finds that the Tax Sharing Agreement was an executory contract on the Confirmation Date, then the Tax Sharing Agreement was rejected pursuant to the Plan.

US2008 927867.13

Agreement before the Petition Date, the Tax Refund constitutes property of the Debtor's estate whether or not the Tax Sharing Agreement was rejected pursuant to the Plan.

81.     In light of the foregoing, and pursuant to section 541 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure, the Liquidating Supervisor has established that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law declaring that the Tax Refund is property of the Debtor's bankruptcy estate.

**III.    Count II of the Complaint**

**A.    Pursuant to section 542(a) of the Bankruptcy Code, the FDIC should be required to turn over the Tax Refund to the Liquidating Supervisor for the benefit of the Debtor's bankruptcy estate.**

82.     As stated above, the IRS remitted the Tax Refund to the FDIC, who placed the Tax Refund in an interest-bearing escrow account in accordance with the terms of the supplemental consent order entered on March 13, 2009.  Section 542(a) of the Bankruptcy Code provides that an entity in possession, custody, or control of property that the debtor may use under section 363 of the Bankruptcy Code, shall turn such property over to the debtor, unless such property is of inconsequential value or benefit to the estate.  See 11 U.S.C. § 542(a).

83.     As explained above, the Tax Refund constitutes valuable, beneficial property of the Debtor's estate that the Liquidating Supervisor may use in accordance with the Plan and section 363 of the Bankruptcy Code.  No exception to the requirement under section 542(a) of the Bankruptcy Code that such property be turned over to the estate is applicable in this case.  Therefore, the Liquidating Supervisor has established

US2008 927867.13

that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law on Count II of the Complaint. Accordingly, pursuant to section 542(a) of the Bankruptcy Code, the FDIC should be required to turn over the Tax Refund to the Liquidating Supervisor for the benefit of the Debtor's estate.

**IV.** **Conclusion**

84. The members of the Consolidated Group entered into the Tax Sharing Agreement to allocate their respective rights and obligations with respect to the reporting and payment of taxes and to establish the relationships among themselves with respect to tax attributes such as net operating losses. Under the Tax Sharing Agreement, the Debtor did not function as a collection agent under the direction and control of any other member of the Consolidated Group, including the Bank, with respect to tax refunds. Indeed, the Debtor had unfettered discretion to determine whether a refund would be sought in the case of an overpayment or whether the overpayment would be credited against future tax liability. By the same token, however, the Debtor had an obligation under the Tax Sharing Agreement to pay the Bank the amount of any benefits to which the Bank Affiliated Group would have been entitled based on their tax attributes if the Bank Affiliated Group had filed separate tax returns. This obligation was not conditioned upon receipt by the Debtor of a refund from the IRS but instead was an independent contractual commitment. The Debtor had an obligation to pay regardless of whether a refund was forthcoming from the IRS, and this contractual arrangement resulted in the creation of a debtor-creditor relationship between the Debtor and the Bank.

85.     Under the Tax Sharing Agreement, the Debtor had unfettered dominion and control over refunds received from the IRS.  It was not required to segregate tax refunds from its other assets or otherwise hold the refunds in trust for other members of the Consolidated Group.  Based on these facts and the indisputable debtor-creditor relationship between the Debtor and the Bank created under the Tax Sharing Agreement regarding the tax attributes of the Bank Affiliated Group, the rights to tax refunds from the IRS belonged to the Debtor.  The right to the refund in respect of the 2005 overpayment belonged to the Debtor on the Petition Date and became property of the estate on that date.

86.     For the reasons discussed in Part I(F) of the "Argument" section of this Motion, the FDIC's efforts to appropriate the Tax Refund violated the automatic stay and are null and void.  The FDIC can derive no benefit from having violated the stay and prevented the Debtor from obtaining possession of the Tax Refund.  Furthermore, even if the purported disaffirmance of the Tax Sharing Agreement was not nullified as a violation of the automatic stay, the disaffirmance would not impair the Debtor's right to the Tax Refund, which vested in the Debtor before the FDIC became the receiver for the Bank.  Similarly, even if the Tax Sharing Agreement were deemed to have been rejected under the Plan, rejection is not the equivalent of rescission and would not impair the Debtor's rights in property acquired in accordance with the terms of the Tax Sharing Agreement before rejection occurred.

WHEREFORE, the Plaintiff respectfully requests that (1) judgment be entered in favor of the Plaintiff under Counts I and II of this Complaint and the Court declare that

the Tax Refund is property of the Debtor's bankruptcy estate, (2) judgment be entered

directing JPMorgan Chase Bank, and directing the FDIC to cause JPMorgan Chase Bank,

to release all amounts in respect of the Tax Refund currently held in escrow to the

Plaintiff for the benefit of the Debtor's bankruptcy estate, and (3) the Court grant the

Plaintiff such other and further relief as is just and proper under the circumstances.

Dated: December 14, 2009.

KILPATRICK STOCKTON LLP

By:    /s/ Todd C. Meyers

        Todd C. Meyers
        Georgia Bar No. 503756
        Alfred S. Lurey
        Georgia Bar No. 461500
        Sameer K. Kapoor
        Georgia Bar No. 407525
        1100 Peachtree Street, Suite 2800
        Atlanta, GA 30309
        (404) 815-6500 (Telephone)
        (404) 815-6555 (Facsimile)
        tmeyers@kilpatrickstockton.com

and

ROGERS TOWERS, P.A.
        Betsy C. Cox
        Florida Bar No. 307033
        1301 Riverplace Blvd., Ste. 1500
        Jacksonville, FL 32207
        (904) 398-3911 (Telephone)
        (904) 396-0663 (Facsimile)
        bcox@rtlaw.com

Attorneys for Plaintiff, Clifford Zucker, in
his capacity as the Liquidating Supervisor
for NetBank, Inc.