# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re

NETBANK INC.,                                    Case No. 3:07-bk-04295-JAF
                                                 Chapter 11

       Debtor.

_____

CLIFFORD ZUCKER, in his                          Adv. Pro. No. 3:08-ap-346-JAF
capacity as Liquidating Supervisor
for NETBANK, INC.,

       Plaintiff,

v.

FEDERAL DEPOSIT
INSURANCE CORPORATION,
as Receiver for NetBank, f.s.b.,

       Defendant.

_____

### DEFENDANT FEDERAL DEPOSIT INSURANCE CORPORATION'S
### RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant, Federal Deposit Insurance Corporation, as Receiver for NetBank, f.s.b.,

("FDIC") responds to Plaintiff's Motion for Summary Judgment as follows:

This proceeding is a dispute between the FDIC and Plaintiff Clifford Zucker in his

capacity of Liquidating Supervisor for NetBank, Inc. ("Zucker") as to the ownership of a refund

of corporate income taxes to be received from the Internal Revenue Service resulting from a net

operating loss carry-back.  NetBank, Inc., the Debtor in this case and as the bank holding

company of the consolidated group (the "Holding Company"), NetBank, f.s.b. (the "Bank"), and

all of the other direct and indirect subsidiaries of the Holding Company and the Bank (together,

the "Consolidated Group" and each company a "member"), entered into an Amended and

Restated Tax Sharing Agreement effective January 1, 2003 (the "Tax Sharing Agreement").[1] The Tax Sharing Agreement specifically provided for the allocation of tax obligations and tax refunds among the members of the Consolidated Group as a result of filing a consolidated federal income tax return. The Court must determine whether the Tax Sharing Agreement, in addition to allocating tax obligations and refunds, also somehow converted the Debtor/Holding Company from an agent-trustee for the members of the Consolidated Group with respect to tax refunds into an owner-debtor. If it did not, as asserted by the FDIC, then the Tax Refund[2] at issue in this proceeding is the property of the FDIC and not property of the Holding Company's bankruptcy estate.

Zucker's Motion for Summary Judgment argues that the Tax Refund is property of the Debtor's bankruptcy estate. However, Zucker does not dispute that, in the absence of the Tax Sharing Agreement, the Holding Company receives any Federal income tax refund solely as agent-trustee for the consolidated group. (See the discussion of *In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262 (9th Cir. 1973), *cert. den. Sub nom. Western Dealer Management v. England*, 412 U.S. 919 (1973) and the cases uniformly following it in FDIC's Motion for Summary Judgment, pp. 9-15) Nor does Zucker deny in his Motion that, under the legal principles stated in the *Bob Richards* line of cases, in the absence of a tax sharing agreement to the contrary, the Tax Refund is owned by the Bank and is not property of the bankruptcy estate.

Zucker's sole argument is that the Tax Sharing Agreement somehow converts the Holding Company's relationship with the Consolidated Group from that of agent-trustee (the Holding Company) and principal-beneficiary (the Members) to that of debtor-creditor, so that the

---

[1] A copy of the Tax Sharing Agreement is attached as Ex. A to the Plaintiff's Motion for Summary Judgment.
[2] Defined terms in the Plaintiff's Motion for Summary Judgment will continue to be so used in this Response.

Bank's right to the Tax Refund is merely a creditor claim against the Holding Company's estate. This argument is simply wrong.

Nothing in the Tax Sharing Agreement changes the status of the Holding Company from that of an agent-trustee to that of an owner-debtor. Although the Tax Sharing Agreement gives the Holding Company the right to file for and receive the Tax Refund, and gives the Bank the right to receive payment of the Tax Refund from the Holding Company, the Holding Company's right to receive the Tax Refund, and its obligation to pay the Tax Refund to the Bank, is solely in its capacity as agent for the members of the Consolidated Group. Thus, the statements in paragraphs 18 and 19 of Plaintiff's Motion for Summary Judgment are not correct in implying that the Tax Sharing Agreement also gives the Holding Company a beneficial ownership right in the Tax Refund.

In addition, even if the Tax Sharing Agreement had changed the status of the Debtor/Holding Company from an agent-trustee to an owner-debtor, the Tax Sharing Agreement has no legal effect because the Holding Company subsequently rejected the Tax Sharing Agreement through this bankruptcy case and the FDIC, in its capacity of receiver for the Bank, repudiated and withdrew from the Tax Sharing Agreement. Thus, the Bank still is entitled to the full Tax Refund under the principles of *Bob Richards* because the Bank generated all of the income and more losses than needed to carry back and generate the entire Tax Refund.

Accordingly, under either scenario, there is no basis in law or fact for the Debtor/Holding Company to claim the Tax Refund. In fact, the Holding Company never received the Tax Refund and thus never even had a possessory interest in it. Thus, the Tax Refund is property of the Bank and belongs to the FDIC as successor to the Bank.

# I. Response to Plaintiff's Statement of Undisputed Facts.

The FDIC does not take issue with any of the facts recited in Plaintiff's "Statement of Undisputed Facts," but does object to several statements of "undisputed facts" that are, in reality, erroneous legal conclusions masquerading as "undisputed facts." For example, in paragraph 18 of his Motion, Zucker states, "The Debtor's right to the Tax Refund accrued no later than December 31, 2005, the end of the year in which the overpayment of tax by the Consolidated Group occurred. When the Debtor filed its Chapter 11 petition on September 28, 2007, its right to the Tax Refund became property of the Debtor's bankruptcy estate." (Plaintiff's Motion at 6) First, the ultimate legal question in this proceeding is whether the Tax Refund is, or is not, property of the Debtor's bankruptcy estate. It certainly is not an "undisputed fact" that the Tax Refund is property of the Debtor's estate. Moreover, the statement that the ". . . Tax Refund accrued no later than December 31, 2005 . . ." (1) is not a fact, (2) is disputed, and (3) is inaccurate. Under relevant tax law, the Tax Refund does not accrue until the loss is audited and carryback approved. 26 U.S.C. § 6411(d)(2). The Form 1139 filed with regard to the Tax Refund is simply a request for a tentative carryback adjustment that permits the taxpayer to get cash earlier but gives no ownership rights.

Additionally, at paragraph 19 of his Motion, Zucker states,

"In contrast, the Bank had no property interest in the Tax Refund. Because the Bank had made payments under the Tax Sharing Agreement to the Debtor in respect of profits realized by the Bank in 2005 and had realized losses in 2006, the Bank was entitled, under the Tax Sharing Agreement, to receive a payment from the Debtor. As more particularly described hereinafter, the Bank's right to the payment was not dependent upon the Debtor's receipt of the Tax Refund from the IRS. For this and other reasons, the relationship between the Debtor and the Bank with respect to losses incurred by the Bank in 2006 was a relationship of debtor and creditor. The Debtor was not a collection agent or trustee for the Bank under the Tax Sharing Agreement to the Bank regardless of whether the Debtor received the Tax Refund from the IRS." (Plaintiff's Motion at 6-7)

Again, Zucker mischaracterizes erroneous legal conclusions as a Statement of Undisputed Facts in claiming that the Bank had no property interest in the Tax Refund and that the relationship between the Bank and the Debtor was that of debtor and creditor, not principal and agent.

Finally, in paragraphs 20, 21 and 25 of his Motion, Zucker states as an "undisputed fact" that the FDIC violated the automatic stay by filing the Bank's Form 1139 and tax return with the IRS and sending the letter by which the FDIC repudiated and withdrew from the Tax Sharing Agreement. (Plaintiff's Motion at 7-8) Yet again, the FDIC contends that, as a matter of law, its actions did not violate the automatic stay (*see infra* section III) – this is not an "undisputed fact." The Court should ignore these misguided legal conclusions when considering the "undisputed facts" relevant to Plaintiff's Motion.

## II. The Tax Sharing Agreement, If Enforceable, Provides that the Bank, and thus the FDIC, Owns the Tax Refund.

### A. The Holding Company Paid Taxes and Received Refunds as Agent-Trustee for Members of the Consolidated Group.

Zucker argues that the Tax Sharing Agreement makes the Tax Refund property of the bankruptcy estate. (*See* Plaintiff's Motion at 14) The FDIC disputes Zucker's assertion that the Tax Sharing Agreement applies at all because the FDIC validly repudiated and withdrew from the Tax Sharing Agreement and it was rejected by the Debtor (*see infra* section IV). In any event, the provisions of the Tax Sharing Agreement do not convert the Holding Company from an agent-trustee to an owner-debtor and, therefore, ownership of the Tax Refund is vested in the Bank and is not property of the Holding Company's bankruptcy estate.

A bank holding company receives all refunds as an agent for the members of the consolidated group under Treasury Regulation § 1.1502-77. As discussed in the FDIC's Motion

for Summary Judgment, the case law is universal in applying the holding first articulated by the Ninth Circuit in *In re Bob Richards Chrysler-Plymouth Corp.*, 473 F.2d 262 (9th Cir. 1973), *cert. den. sub nom. Western Dealer Mgmt. v. England*, 412 U.S. 919 (1973) that the parent company "received the tax refund from the government only in its capacity as agent for the consolidated group." 473 F.2d at 265.

The FDIC agrees that the parent's agency status, by itself, is not determinative of who ultimately owns any refunds attributable to the Bank. This is the exact point of *Bob Richards* and all of its progeny. The cases make clear that the question as to the capacity in which the parent receives the refunds, and the question as to who is entitled to such refunds, are two separate questions. The critical point is that there is no disagreement among the cases as to the answer to the first question. In agreeing to file consolidated returns, all members of the affiliated group must consent to the consolidated return regulations and the filing of the consolidated return constitutes that consent. *See In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 423 (Bankr. S.D.N.Y. 1998). Thus, the agreement to file consolidated returns constitutes a contract between the members of the group, one of the terms of which is that the parent will act as the agent for the group. The Court in *In re White Metal Rolling and Stamping Corp.*, like the court in *Bob Richards* and the other cases, properly recognized that the parent's status as an agent does not answer the second question of who owns the refunds. As the court held, although the treasury regulations require the parties to agree that the parent shall act as the agent for the group, "[t]he consolidation provisions in the tax law do not otherwise affect the substantive rights of the members." *Id.*

The Ninth Circuit in *Bob Richards* first articulated these separate questions in expressly holding that the mere fact that the parent company received the refund did not give it ownership

rights therein. Accordingly, the court went on to determine who owned the refund in the absence

of an express agreement allocating it:

> [T]here is no evidence that the [subsidiary] at any time voluntarily assigned its rights in the refund to [parent.] It is true that the [subsidiary] consented to the filing of a consolidated tax return, but such consent cannot be construed to include the transfer of a valuable asset without further consideration.
>
> * * *
>
> Absent any differing agreement we feel that a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member. Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent.
>
> * * *
>
> [Parent] received the tax refund from the government **only in its capacity as agent for the consolidated group.** Since there is no express or implied agreement that the agent had any right to keep the refund, we agree with the referee and the district court that [parent] was acting as a trustee of a specific trust and was under a duty to return the tax refund to the [subsidiary].

473 F.2d at 264, 265 (emphasis added).

There can be no question that in this proceeding, the Debtor/Holding Company would

receive the Tax Refund as agent for the group under Treasury Regulation § 1.502-77. Nothing in

the Tax Sharing Agreement purports to change this. Zucker does not dispute that the Tax

Sharing Agreement allocates the Tax Refund to the Bank, and nothing in the Tax Sharing

Agreement goes on to either assign or lend the Tax Refund from the Bank to the Holding

Company. Thus, as in *Bob Richards* and the other cases, there can be no dispute that the

Holding Company would be acting as an agent in receiving any refund on behalf of the Bank.

However, Zucker argues that the Tax Sharing Agreement somehow operates to supersede

the agency agreement of the members of the Consolidated Group, and conveys ownership of any

refund attributable to the Bank to the Holding Company, i.e., the Tax Sharing Agreement operates to cause the Bank to lend the Tax Refund to the Holding Company, thereby transforming the relationship to that of debtor-creditor, from agent-principal. As a result, Zucker argues that the FDIC, as successor to the Bank, only has an unsecured claim against the Holding Company for any such refund. The error in the argument is demonstrated by the facts that a debtor-creditor relationship (i) does not exist outside of the Tax Sharing Agreement per *Bob Richards* and its progeny, (ii) is not reflected in any explicit language in the Agreement and is, in fact contrary to the explicit language in the Agreement, (iii) would provide no consideration or benefit to the members of the group, (iv) would be avoidable as a fraudulent conveyance under 12 U.S.C. § 1821(d)(17), (v) is directly contrary to explicit language of the Interagency Policy Statement expressly referenced in the Tax Sharing Agreement, thereby implying that, if the parties intended a debtor-creditor relationship, they were intentionally misleading the regulators and engaging in an unsafe and unsound banking practice, and (vi) results in the unjust enrichment of the creditors of the Holding Company at the expense of the creditors of the Bank.

      B.     <u>The Decision in *BSD Bancorp, Inc. v. FDIC* Correctly Recognizes that a Tax Allocation Agreement Does Not Automatically Convert the Parent from an Agent-Trustee to an Owner-Debtor</u>.

The United States District Court in *BSD Bancorp, Inc. v. FDIC*, Case No. 93-12201-A11 (S.D. Cal. 1995)[3] correctly recognized that the mere existence of a tax sharing agreement does not automatically override the holding in *Bob Richards* and its progeny that the parent acts as agent for the group in the payment of taxes and receipt of refunds. Rather, recognizing that the resulting unjust enrichment of concern to the court in *Bob Richards* would equally occur if the parent were treated as a debtor of the consolidated group, the District Court held that whether the agreement intended to create a debtor-creditor relationship must be determined from the

_____

[3] A copy of this opinion was attached as Exhibit "O" to the FDIC's Motion for Summary Judgment.

economic reality of the transaction as expressed in the terms of the agreement. *BSD Bancorp*, Slip Op. at 10-11. As discussed in FDIC's Motion (pp. 19-24), here as in *BSD Bancorp*, the economic reality of the transaction dispositively demonstrates that the parties did not intend to abrogate the agent-trustee status of the Debtor/Holding Company.

The terms of this Tax Sharing Agreement evidence that the economic reality of the Agreement, like virtually all tax sharing agreements, is to recognize the parent's agent-trustee status resulting from the members' contract to file a consolidated return, and to set forth the substantive rights and obligations of the members of the group with respect to taxes payable and refunds receivable. Given that the consolidated return regulations permit the income and losses of the members of the group to be offset against each other to compute a consolidated income for the group, a sharing agreement is necessary to determine who is to get the benefit of consolidation arising from such offset, both when a tax payment is due and when a refund is receivable. The holding company, as the agent for the members, including itself, facilitates the implementation of those rights. That is the economic reality of the transaction in general and in particular in this proceeding. Characterization of the Tax Sharing Agreement as conveying a loan or ownership of the refund to the Holding Company, and thus establishing a debtor-creditor relationship, simply ignores or misunderstands that economic reality.

C.     Neither *First Central Financial* Nor *Franklin Savings* Are Applicable, and Should Not Be Followed

Zucker cites to the bankruptcy court's decision in *Superintendent of Ins. v. First Central Fin. Corp. (In re First Central Fin. Corp.)*, 269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd* 377 F.3d 209 (2d Cir. 2004) in support of his argument that the existence of the Tax Sharing Agreement somehow transforms the relationship between the Bank and the Holding Company from agent-principal to debtor-creditor. The bankruptcy court in *First Central Financial Corporation* and

Zucker in his Motion for Summary Judgment correctly reiterate the *Bob Richards* line of cases that recognize, as stated by *In re White Metal Rolling and Stamping Corp.* (*supra*. p, 4), although the treasury regulations require the parties to agree that the parent shall act as the agent for the group, "[t]he consolidation provisions in the tax law do not otherwise affect the substantive rights of the members." In other words, the cases recognize that the parties are free, absent fraud or overreaching, to allocate the tax liability to be paid by the members of the group to the parent who forwards payment to the IRS, and to allocate among the members of the group a refund received by the parent from the IRS. But the status of the parent as agent for the group was uniformly accepted in all of those cases.

The agency status is the critical foundation of the ensuing legal principle that the parent has no beneficial interest in a tax refund unless an agreement gives it one. It appears that the bankruptcy court in *First Central Financial Corporation* did not make this critical distinction and that may be why the Second Circuit Court of Appeals went out of its way to expressly note that it was not asked to review the bankruptcy court's decision regarding the effects of the parent's status as an agent-trustee. *See* 377 F.3d at 212, n.1. In fact, Zucker seems to recognize this in paragraphs 37- 39 of his Motion when he says that any substantive right of the Holding Company to the Tax Refund must come from the Tax Sharing Agreement. FDIC agrees. The parent is simply an agent and any substantive right it has to a refund must come from an allocation agreement. The Tax Sharing Agreement here gives no rights to the Debtor/Holding Company to "own" or "borrow" a refund due another member of the Consolidated Group.

Zucker is clearly wrong in asserting (paragraph 41 of his Motion) that "[i]n *Superintendent of Ins. V. Ochs (In re First Cent. Fin. Corp.),* 377 F.3d 209 (2d Cir. 2004), the Second Circuit Court of Appeals affirmed the bankruptcy court's rulings that (1) the tax

allocation agreement at issue in that case did not give rise to a trust or agency relationship between a common parent and its regulated insurance company subsidiary (which had been placed in receivership) with respect to a tax refund. . . ."  As noted above, the Second Circuit expressly did **not** affirm that ruling.  Rather, it explicitly stated that it reviewed only the question of whether a constructive trust should be imposed, expressly holding that "since the Superintendent only appeals the Bankruptcy Court's decision not to impose a constructive trust, we do not reach the question of whether any trust apart from a constructive trust exists."  *Id.* at 212.  Because the agency status of the Holding Company here creates either an express trust, or a resulting trust, the Second Circuit opinion expressly does not address the facts or issue in this proceeding.

Although the *First Central* bankruptcy court acknowledged the *Bob Richards* line of cases, it incorrectly viewed the law established by those cases as irrelevant because of the existence of a tax sharing agreement.  But as held in *BSD Bancorp Inc.,* it is clear that the mere existence of a tax sharing agreement does not automatically override the holding in *Bob Richards* and its progeny that the parent acts as agent for the group in the payment of taxes and receipt of refunds, unless a tax sharing agreement expressly provides otherwise. As discussed in more detail below and in FDIC's Motion for Summary Judgment (*infra* section II D.; FDIC's Motion for Summary Judgment at pp. 22-35), the Tax Sharing Agreement in this proceeding gives no rights to the Debtor/Holding Company to "own" or "borrow" a refund due another Member of the Consolidated Group.

Moreover, the *BSD Bancorp Inc.* rationale evidences that the factors relied upon by the bankruptcy court in *First Central* to support its decision do not, in fact, show an intent to supersede the holding company's agency status and create a debtor-creditor relationship.  The

fact that the bank is only entitled to an amount that it would have received if it had filed on a stand-alone basis in no way vitiates that such amount is received by the parent as an agent. This simply expresses the amount that the parent receives for the bank as agent. If the refund exceeds that amount, then it is due to another principal; it does not redound to the agent.

Similarly, the facts that the agreement in *First Central* did not provide for the refund to be held in trust, and provided for an "ultimate settlement" payment are irrelevant because they also are consistent with agency status. Since an agent is, by definition, a trustee, as the *BSD Bancorp* court held, the agreement must change that status. There is no need to express it. Further, the bankruptcy court was incorrect in asserting that it is not a "true agency relationship" because "FCFC does not act at FCIC's direction and control, either in applying for a tax refund, or in the handling of the refund monies once received." *First Central*, 269 B.R. at 497. In agreeing to serve as agent in the filing of consolidated returns, and to distribute any refunds pursuant to the direction of the tax sharing agreement, the parent is in fact acting at the direction and control of the members of the consolidated group, as expressed in that agreement. That is the same capacity that the Debtor/Holding Company agreed to serve in this proceeding.

Nor is it significant that the agreement in *First Central* did not provide for the refund to be placed in escrow, segregated or restricted. The agreement clearly provided for allocations to be determined and paid within 30 days. *First Central*, 269 B.R. at 491. The 30-day delay in payment is administratively justified and does not imply that such funds are loaned to the parent for the 30-day period. As stated by the Third Circuit in *In re Penn Central Transportation Company*, 486 F. 2d 519, 524 (3rd Cir. 1973) (en banc), *cert. denied* 415 990 (1974), "[w]hile generally commingling indicates a debtor-creditor relationship and not a trust, it is only one indicium and it too is not necessarily conclusive." At least as significant as whether commingling

and delay in payment is permitted is whether the payment of interest is required. As stated by the *Penn Central* Court: "A significant fact in the instant case warranting careful consideration is the absence of any provision for the payment of interest by the collecting carrier. Although not conclusive, its absence indicates the presence of a trust relationship. [citations omitted.] A debtor-creditor relationship entails the right to use another's money, the usual quid pro quo for which is the obligation to pay interest. [citations omitted.] Conversely, the collection by Penn Central as an agent of money due and owing the other railroads suggests a trust. [citations omitted.]" *Id.* The subject Tax Sharing Agreement also did not provide for payment of interest to the Members, in harmony with the agent-trustee role of the Debtor/Holding Company and the principal-beneficiary status of the Members.

Furthermore, and perhaps most importantly, the bankruptcy court in *First Central Financial Corporation* was not dealing with a bank holding company and did not have to consider the effects of 12 U.S.C. § 371c, or the express prohibition in the Interagency Policy Statement on Income Tax Allocations in a Holding Company Structure,[4] 63 Fed. Reg. 64757 that,

> A parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members. Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

In this proceeding, because of the Debtor/Holding Company's status as a bank holding company, this law applies and, as expressed in FDIC's Motion for Summary Judgment, compels a different answer.

---

[4] A copy of the Interagency Policy Statement is attached as Exhibit "P" to the FDIC's Motion for Summary Judgment.

Zucker also cites to *Franklin Savings Corp. v. Franklin Savings Ass'n (In re Franklin Savings Corp.)*, 159 B.R. 9 (Bankr. D. Kan. 1993), *aff'd* 182 B.R. 859 (D. Kan. 1995) in support of his erroneous belief that the Tax Sharing Agreement vests ownership of the Tax Refund in the Holding Company. As discussed extensively in the FDIC's Motion for Summary Judgment, *Franklin* has no application to this case because the Holding Company never possessed the Tax Refund like the holding company in *Franklin*, and because the bankruptcy court's decision was wrong based on its own factual findings. (*See* Plaintiff's Motion for Summary Judgment at 19, 25-28) Zucker offers no reason to reject that conclusion. It is clear from the *Franklin* opinion that the entire rationale of the court was based on its interpretation of the word "reimburse." For all of the reasons stated in the FDIC's Motion for Summary Judgment, the *Franklin* opinion is unconvincing. It not only misinterpreted the word "reimburse," but it also involved very different "economic realities" designed to increase the subsidiary's bank's capital through the treatment of its deferred taxes. In short, the reasoning of the bankruptcy court was incorrect and the facts are not the same because the holding company in *Franklin* actually received possession of the tax refund at issue. 159 B.R. at 11. In this case, the Debtor/Holding Company has never had possession of the Tax Refund.

> D.  The Language of the Tax Sharing Agreement Does Not Create a Debtor-Creditor Relationship Between the Bank and the Holding Company, and Thus the FDIC Owns the Tax Refund.

As explained in *BSD Bancorp,* the critical fact is that the agent-trust relationship set forth in Treas. Reg. §1.1502-77 is the backdrop against which a tax allocation agreement is written and to be interpreted. Thus, that relationship exists, unless the agreement changes it. Far from changing it, the overwhelming evidence in this proceeding, like in *BSD Bancorp,* is that the parties did not intend to change that relationship. Zucker cites to various provisions in the Tax

Sharing Agreement in his attempt to prove that the Tax Sharing Agreement creates a debtor-creditor relationship, but his reading of the Agreement is incorrect.

For example, Zucker points to language in the Tax Sharing Agreement that provides that the Bank should receive a refund in an amount no less than the amount the Bank would have received if the Bank had filed separate returns, regardless of whether the Consolidated Group received a refund. (See Plaintiff's Motion at 20) Zucker asserts that this language transforms the relationship between the Holding Company and the Bank into that of debtor-creditor. Zucker's reading of the Tax Sharing Agreement is clearly wrong. This language simply ensures that the Bank will receive the same benefits that it would have received if it had filed its own separate tax return and that the Bank's tax refunds should not be used to pay the tax liability of other Members of the Consolidated Group. If the Bank is entitled to a refund, but the Consolidated Group is not, it necessarily means that the other members of the Consolidated Group had taxable income and would be obligated to make tax payments to the Holding Company. The Tax Sharing Agreement provides that the Holding Company, as agent, is to take the amounts received from the other Members as their separate tax liability, and pay it to the Bank. Thus, contrary to Zucker's argument, this right reinforces the existence of the agency relationship because it assures the Bank that it will receive exactly what it would have received if it had not joined in the filing of the consolidated return. There is nothing which would even suggest the Holding Company owns all amounts paid to it by either the Members or the IRS.

In fact, Zucker admits that the Bank would have generated the Tax Refund on its own if it had filed a separate tax return. (Compl. ¶ 15; Plaintiff's Responses to Request for Admissions Nos. 3, 4 and 5). Accordingly, the Bank is the owner of the Tax Refund and the Debtor/Holding Company (if it had even received possession of the Tax Refund which it did not) would have

received possession of the Refund only as agent for the Bank. As explained by the Ninth Circuit in *In re Bob Richards*, "Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent." 473 F.2d at 264. *See also Federal Deposit Ins. Corp. v. Brandt (In re Florida Park Banks, Inc.)*, 110 B.R. 986 (Bankr. M.D. Fla. 1990); *Capital Bancshares, Inc. v. Federal Deposit Ins. Corp.*, 957 F.2d 203 (5th Cir. 1992). In this case, the Tax Refund belongs to the FDIC as Receiver for the Bank because the Tax Refund was generated solely by the income and losses of the Bank and its subsidiaries.

Zucker also cites to section 9 of the Tax Sharing Agreement that permits the Holding Company, when prosecuting or settling any claim, to elect to receive the settlement by way of refund or credit against the tax liability of the consolidated group. (*See* Plaintiff's Motion at 21). Section 9 of the Tax Sharing Agreement is entitled "Procedural Matters" and simply appoints the Holding Company as "agent and attorney-in-fact" to undertake the procedural requirements of preparing and filing the Consolidated Group's tax return. The Holding Company is permitted to determine the manner in which the returns are filed, to request extensions to file returns, to contest and settle any deficiency assessed by the IRS and to prosecute and settle any claim the Consolidated Group may have against the IRS. None of these provisions even purport to bestow ownership of any Tax Refunds received by the consolidated group on the Holding Company.

The right of the Holding Company to elect to receive settlement of a tax refund as a credit, rather than a cash refund, is not "unfettered," as alleged by Zucker. This right simply authorizes the Holding Company in appropriate circumstances to elect the common practice of using a refund to offset the next estimated tax payment that is due. To the extent such estimated payment is attributable to estimated tax liability of the Bank, it has effectively received the

refund because, under the Tax Sharing Agreement, it will be offset against its obligation to make the estimated payment. Thus, whether a refund is obtained in cash, or as a credit, it is received by the Bank. The Holding Company has no "unfettered" right to adversely affect the Bank.

The simple fact is that the Tax Sharing Agreement treats the Holding Company as a collection and payment agent for the Members of the Consolidated Group, including itself. The collections and payments will zero out in its hands as agent. All payments received from Members as tax obligations, are either payable by the Holding Company to the IRS as tax liability, or to other Members as benefits of consolidation. Similarly, all payments received from the IRS as Tax Refunds are payable to Members of the Consolidated Group, which may include the Holding Company as a Member, but only as a Member.

Significantly, Zucker ignores Section 10(a) of the Tax Sharing Agreement which provides that the Agreement is intended to allocate tax liability in accordance with the Interagency Policy Statement so that tax settlements "should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity." It is undisputed that if the Bank Affiliated Group had filed separately, it would receive and own the entire Tax Refund. That clear language disposes of any argument asserting an intent to create a debtor-creditor relationship.

In sum, none of the provisions of the Tax Sharing Agreement cited by Zucker transforms the relationship between the Holding Company and the Bank into a debtor-creditor relationship. Instead, as recognized by the court in *BSD Bancorp*, both the language and economic reality of the Tax Sharing Agreement demonstrate that the parties did not intend to abrogate the agent-trustee status of the Holding Company.

E.    The Interagency Policy Statement and 12 U.S.C. § 371c Prohibit a Debtor-Creditor Relationship Between Banks and Their Holding Companies.

Zucker states in his Motion for Summary Judgment that the Interagency Policy Statement "does not constitute a rule or regulation or have the force of law" and appears to imply that federally insured banks could simply ignore it. (Plaintiff's Motion at 22) However, as Zucker correctly points out, the Policy Statement provides that a bank's practice that is inconsistent with the statement may be viewed as an unsafe and unsound practice. In fact, the Tax Sharing Agreement expressly states that it is intended to comply with the Policy Statement. (Tax Sharing Agreement at Section 10(a)). Surely, Zucker is not implying that all of the Members of the Consolidated Group, by including Section 10(a) in the Tax Sharing Agreement expressly stating that the Agreement is intended to comply with the Policy Statement, were intentionally misleading the regulators.

Additionally, the Interagency Policy Statement does not "envision" a debtor-creditor relationship between a bank and its holding company as Zucker posits. In fact, the Policy Statement provides exactly the opposite:

> A parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members. Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

63 Fed. Reg. 64757.

The Court should not give credence to, much less permit Zucker to benefit from, an argument that the members of the Consolidated Group could intentionally mislead the bank regulators into thinking that the Tax Sharing Agreement was consistent with the Policy

Statement. Enforcement of such an agreement is against public policy and, in any event, unenforceable for all of the reasons stated in FDIC's Motion for Summary Judgment.

### III. The FDIC Did Not Violate the Automatic Stay in Filing Amended Tax Returns with the IRS and Repudiating and Withdrawing from the Tax Sharing Agreement.

In his Complaint and Motion for Summary Judgment, Zucker alleges that the FDIC violated the automatic stay of § 362 of the Bankruptcy Code when it prepared and filed amended tax returns on behalf of the Bank and repudiated the Tax Sharing Agreement, in its capacity of Receiver. First, this issue has no effect on the resolution of the issue in this proceeding. The allegedly offensive returns did not lead to the Tax Refund or any payment of it to the FDIC. The Tax Refund is being held in escrow by a mutually agreeable financial institution pending the resolution of this case.

Second, the central premise of Zucker's argument is that the FDIC violated § 362 because it attempted to "obtain possession" and "exercise control" over property of the estate – that is – the Tax Refund. This entire case is about the issue of whether the Tax Refund is property of the estate, which will be decided by this Court's ruling. If the Tax Refund is not property of the estate, as argued by the FDIC, the FDIC could not have violated the automatic stay by any failed attempt to take possession or exercise control over the Tax Refund.

Third, the FDIC has explicit authority to file tax returns with the IRS on behalf of a bank for which it is appointed receiver. Treasury Regulation 301.6402-7. Because the Tax Refund at issue was generated solely as a result of the Bank's income and losses, the Tax Refund is an asset of the Bank and properly administered by the FDIC. When it filed the necessary returns with the IRS to collect the Tax Refund, the FDIC was carrying out its statutory duty to collect the assets of the insolvent Bank in order to distribute them to the Bank's depositors and creditors.

Additionally, the FDIC did not violate the automatic stay when it repudiated and withdrew from the Tax Sharing Agreement pursuant to its authority under FIRREA.  12 U.S.C.§ 1821(d)(2)(A) and (B)  Again, the FDIC could not violate the stay if it was acting with regard to property outside of the Debtor's estate.  Also, the FDIC was acting in accordance with its role as Receiver of the Bank in repudiating a contract that was burdensome to the Bank.  In addition, the Debtor rejected the Tax Sharing Agreement pursuant to its confirmed plan.  Finally, even if the repudiation or withdrawal was a nullity, it does not change the results of this proceeding because the FDIC is entitled to prevail even if the Tax Sharing Agreement is enforceable.

**IV.     The Tax Sharing Agreement is Unenforceable as a Result of the FDIC's Repudiation and Withdrawal and the Debtor's Rejection of the Tax Sharing Agreement.**

The FDIC effectively repudiated the Tax Sharing Agreement pursuant to its authority under 12 U.S.C. § 1821(e) by way of the February 11, 2008 letter (attached to Plaintiff's Motion for Summary Judgment as Ex. "F").  As discussed in more detail in the FDIC's Motion for Summary Judgment (*see* FDIC Motion at 16-17), the FDIC is given the power to disaffirm or repudiate contracts of an insolvent bank that it deems burdensome.  18 U.S.C. § 1821(e)(1).  In addition, Section 10(e) expressly gives the FDIC (as receiver of the Bank) the right to withdraw from the Tax Sharing Agreement without cause on 30 days written notice.

Zucker argues that the FDIC's repudiation of the Tax Sharing Agreement was not valid because the Tax Sharing Agreement was not executory at the time of repudiation, and the FDIC may only repudiate executory contracts.  Similarly, Zucker argues that there was not a rejection of the Tax Sharing Agreement pursuant to its confirmed bankruptcy plan because the Tax Sharing Agreement was not executory on the Petition Date.

First, the Tax Sharing Agreement was executory at the time of petition and repudiation. The Tax Sharing Agreement determined the allocation of tax liability and refunds among members of the Consolidated Group, including the Bank and Holding Company. At the time the Tax Sharing Agreement was repudiated on February 11, 2008, neither the Bank, nor the Holding Company, had filed a tax return for tax year 2007, so the tax liability and/or refund as between the members of the Consolidated Group for tax year 2007 was yet to be determined. Additionally, both the Bank and the Holding Company filed amended tax returns after February 11, 2008 which resulted in an adjustment of the tax allocation between members of the Consolidated Group pursuant to the Tax Sharing Agreement. (*See* Ex. "H" and Ex. "I" to the FDIC's Motion for Summary Judgment.) Thus, Zucker is clearly wrong in arguing that there were no obligations left to perform under the Tax Sharing Agreement by any party and therefore the Agreement was not executory. Zucker even admits that the Holding Company had remaining obligations under the Tax Sharing Agreement. ("Debtor's . . . remaining obligation on [February 11, 2008] was the payment of a pre-petition debt to the Bank . . ." Plaintiff's Motion at 36-37)

In any event, the FDIC's repudiation powers are not limited to executory contracts. The plain language of 12 U.S.C. § 1821(e)(1) authorizes disaffirmance or repudiation of "any contract or lease. . . ," not "any contract or lease which is executory on both sides . . . ." The court in *Employees Retirement System of Alabama v. Resolution Trust Corp.*, 840 F. Supp. 972 (S.D.N.Y. 1993) expressly held that the FDIC may repudiate non-executory contracts stating,

> The statute [§ 1821], however, explicitly provides that the RTC as conservator or receiver "may disaffirm or repudiate *any* contract or lease" "to which the institution is a party." § 1821(e)(1)(A) (emphasis added). It thus contrasts markedly with the Bankruptcy Code, which gives a trustee in bankruptcy the power to "assume or reject any *executory* contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (emphasis added). Congress provided no such limitation here.

840 F. Supp. at 984.  *See also Morton v. Arlington Heights Fed. Sav. and Loan Ass'n*, 836 F. Supp. 477, 483-82 (N.D. Ill. 1993) ("Congress certainly had the bankruptcy model in mind, and it appears reasonable that Congress, well aware of the reference to executory contracts in the Bankruptcy Code, deliberately omitted it in FIRREA in order to avoid disputes over whether a given contract was executory."); *Hennessy v. Federal Deposit Ins. Corp.*, 58 F.3d 908, 919 (3d Cir. 1995) (also noting the absence of the word "executory" from FIRREA in "sharp contrast to the Bankruptcy Code . . . . Because Congress provided no such limitation here, we are unable to conclude that the FDIC's power of repudiation is limited only to executory contracts."); *Majeski v. Resolution Trust Corp.*, 1995 WL 115953 (D.D.C. 1995) (same).  The clear weight of authority holds that the FDIC's authority to repudiate contracts is not limited to only executory contracts.

In contrast, Zucker only cites dictum in one case in support of his assertion that the FDIC may not disaffirm or repudiate contracts which have been fully performed by one side: *Marsa v. Metrobank for Savings, F.S.B.*, 825 F. Supp. 658 (D.N.J. 1993), *aff'd without opinion*, 26 F.3d 122 (3d Cir. 1994).  The District Court in *Marsa* did no independent analysis of § 1821(e) but simply quoted from another case that admittedly did not decide the issue, *Fresca v. Fed. Deposit Ins. Corp.*, 818 F. Supp. 664, 666 (S.D.N.Y. 1993) (in discussing whether the FDIC could repudiate non-executory contracts, the court expressly declined to decide the issue: "However, this court also need not resolve this issue in order to dispose of the parties' motions.").

Finally, and in any event, the FDIC's exercised the right of the Bank in Section 10(e) of the Tax Sharing Agreement to withdraw from the Tax Sharing Agreement without cause on 30 days notice by sending the notice on February 11, 2008.  Nothing in Section 10(e) limits or restricts that right.

Despite the fact that the FDIC properly repudiated and withdrew from the Tax Sharing Agreement and the Debtor rejected the Tax Sharing Agreement, Zucker argues that somehow the Holding Company is still entitled to the Tax Refund because its right to the Tax Refund had already "vested." Yet, FIRREA specifically provides that once the FDIC repudiates a contract, the other contracting party is limited strictly to compensatory damages, not specific performance of the contract. Section 1821(e)(3) states,

> (3) Claims for damages for repudiation
>
> (A) In general
>
> Except as otherwise provided in subparagraph (C) and paragraphs (4), (5), and (6), the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be--
>
> (i) limited to actual direct compensatory damages;

Thus, it is clear that even if the Holding Company's right to receive the Tax Refund had somehow "vested" prior to the FDIC's repudiation of the Tax Sharing Agreement, the Holding Company is limited to compensatory damages, not performance of the contract.

Similarly, the Debtor/Holding Company admits that it rejected the Tax Sharing Agreement through confirmation of its Chapter 11 Plan resulting in a breach of the Tax Sharing Agreement. (*See* Plaintiff's Motion at 35; 11 U.S.C. § 365(g)) By rejecting the Agreement, the Holding Company gave up the benefits of performance by the Bank, avoided the burden of performance by the estate and created a claim against the estate which is a non-administrative unsecured claim deemed to have arisen before the filing of the petition. *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 (11th Cir. 2007) As a result, the Holding Company is not entitled to performance of the Tax Sharing Agreement.

## V.    Conclusion

Zucker requests that this Court hold that the Tax Sharing Agreement converted the Holding Company from an agent-trustee to an owner-debtor with respect to the Tax Refund, thus depriving the creditors of the Bank in the receivership from receiving their rightful distribution of the Tax Refund.  However, the Tax Sharing Agreement effectuated no such conversion and the Tax Refund is clearly owned by the FDIC under the relevant case law, federal regulations and statutes, and the Tax Sharing Agreement.  Accordingly, the Tax Refund is not property of the bankruptcy estate.  In fact, the Holding Company never received the Tax Refund and never even had a possessory interest in it.  Nothing in the Tax Sharing Agreement, if enforceable, transforms the relationship between the Holding Company and the Bank from agent-principal to debtor-creditor; the Holding Company was only acting as an agent for the Bank and other members of the Consolidated Group in preparing and filing tax returns and receiving tax refunds.

Additionally, the FDIC did not violate the automatic stay when it filed amended tax returns after the bankruptcy filing date because the Tax Refund was not property of the estate, the filings were within the express powers of the FDIC, and the filings have no bearing on this proceeding. Similarly, the FDIC did not violate the stay when it repudiated and withdrew from the Tax Sharing Agreement because the Tax Refund was not property of the estate, the repudiation and withdrawal were within the express powers of the FDIC, and even if invalid, do not change the results of this proceeding.

Finally, the FDIC effectively repudiated and withdrew from the Tax Sharing Agreement and it was rejected by the Holding Company; therefore, under the weight of authority, the FDIC is entitled to the Tax Refund as Receiver for the Bank because the Bank generated all of the

income and losses that made the Tax Refund possible. FDIC respectfully requests that the Court deny Plaintiff's Motion for Summary Judgment, and enter final summary judgment in the FDIC's favor on all counts of the Complaint and on the Counterclaim.

Dated: January 29, 2010

Respectfully Submitted,

AKERMAN SENTERFITT

By: */s/ Raye Curry Elliott*
    David E. Otero
    Florida Bar No.: 651370
    Email: david.otero@akerman.com
    Raye Curry Elliott
    Florida Bar No.: 018732
    Email: raye.curryelliott@akerman.com
    50 North Laura Street, Suite 2500
    Jacksonville, FL 32202
    Telephone: (904) 798-3700
    Facsimile: (904) 798-3730

Attorneys for Federal Deposit Insurance Corporation
as Receiver for NetBank, f.s.b.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document was filed electronically with the Clerk of Court on January 29, 2010 using CM/ECF, which will send a Notice of Electronic Filing to the following counsel of record:

Todd C. Meyers, Esq.
Sameer Kapoor, Esq.
Shane G. Ramsey, Esq.
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4530

                                           */s/ Raye Curry Elliott*
                                           Attorney