## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:                                       :
                                             :
NETBANK, INC.,                               :      Case No. 3:07-bk-04295-JAF
                                             :
                                             :      Chapter 11
                 Debtor.                     :
                                             :
                                             :
_____             :
                                             :
CLIFFORD ZUCKER, in his capacity             :      Adversary Proceeding
as Liquidating Supervisor for                :      No. 3:08-ap-00346-JAF
NETBANK, INC.,                               :
                                             :
                 Plaintiff,                  :
                                             :
v.                                           :
                                             :
FEDERAL DEPOSIT INSURANCE                    :
CORPORATION,[1]                              :
                                             :
                 Defendant.                  :
                                             :
_____             :

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT FEDERAL DEPOSIT INSURANCE
## <u>CORPORATION'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, Clifford Zucker, in his capacity as liquidating supervisor (hereinafter,

"Plaintiff" or "Liquidating Supervisor") for NetBank, Inc. (the "Debtor"), files Plaintiff's

Response in Opposition to Defendant Federal Deposit Insurance Corporation's Motion for

Summary Judgment (the "Response") and states the following:

_____

[1] As discussed in Plaintiff's Motion for Summary Judgment [Adv. Pro. Docket No. 49] (the "Plaintiff's Motion"), the United States of America, acting through the Internal Revenue Service, has been dismissed from the instant adversary proceeding.

## I.    __INTRODUCTION__

In Defendant Federal Deposit Insurance Corporation's Motion for Summary Judgment

[Adv. Pro. Docket No. 46] (the "FDIC Motion"), the FDIC[2] bases its claim to the Tax Refund

essentially on the following unfounded assertions:

1.    Under applicable statutes, regulations and rules, the Debtor's status with respect to the Tax Refund is that of an agent/trustee that holds bare legal title to the refund in trust for the Bank, as principal/beneficiary.

2.    The designation of the Debtor as "agent and attorney-in-fact" for the other members of the Consolidated Group in Section 9 of the Tax Sharing Agreement creates an agent/trustee – principal/beneficiary relationship between the Debtor and the Bank with respect to the Tax Refund.

3.    The "economic reality" of the terms of the Tax Sharing Agreement is the creation of an agent/trustee – principal/beneficiary relationship between the Debtor and the Bank with respect to the Tax Refund.

4.    The Tax Refund is not property of the Debtor's estate because the estate is not in possession of the Tax Refund.

5.    Even if the relationship created under the Tax Sharing Agreement between the Debtor and the Bank with respect to the Tax Refund is a debtor – creditor relationship, such that the Debtor is the owner of the Tax Refund, this fact is irrelevant because, after the filing of the Debtor's chapter 11 case, the Tax Sharing Agreement was repudiated by the FDIC and rejected by the Debtor, rendering it null and void.

6.    Even if the relationship created under the Tax Sharing Agreement between the Debtor and the Bank with respect to the Tax Refund is a debtor – creditor relationship, such that the Debtor is the owner of the Tax Refund, the agreement is unenforceable because it is contrary to public policy as well as unfair and overreaching.

The assertions by the FDIC outlined above are without merit.  First, neither the Internal

Revenue Code (the "IRC") nor the regulations under the IRC address which members of a

consolidated group are entitled to receive the benefit of a consolidated tax refund.  Though the

regulations (26 C.F.R. § 1.1502-77) provide that the common parent is the agent for each

---

[2] Capitalized terms used in this Response have the meanings ascribed to them in the Plaintiff's Motion unless otherwise defined in this Response.

subsidiary in the consolidated group, this agency relationship is for the convenience and protection of the IRS only and has no bearing on to which member(s) of the consolidated group a refund belongs. Thus, absent fraud or overreaching, the members of a consolidated group may establish by agreement among themselves their relationships regarding tax refunds due the consolidated group. A tax sharing agreement that establishes a debtor – creditor relationship between a common parent and another member of a consolidated group with respect to tax refunds does not "convert"[3] the relationship from one of agent/trustee – principal/beneficiary to one of debtor – creditor, because the statutes and regulations governing consolidated tax reporting do not create an agent/trustee – principal/beneficiary relationship in the first place in regard to ownership of a tax refund.

Second, the designation of the Debtor in the Tax Sharing Agreement as "agent and attorney-in-fact" for the other members of the Consolidated Group is not dispositive of whether the relationship between the Debtor and the Bank with respect to tax refunds under the agreement is as agent/trustee – principal/beneficiary relationship or a debtor-creditor relationship. As the authorities cited in Part II(B) of this Response show, regardless of the purported designation of one party to an agreement as agent for another, the former does not become an agent/trustee for the latter unless it acts subject to the control of the latter with respect to the matter as to which agent/trustee status is alleged. Under the clear language of the Tax Sharing Agreement, the Debtor does not act subject to the control of the Bank with respect to tax refunds, and the relationship created is that of debtor-creditor, not agent/trustee – principal/beneficiary.

Third, as is perfectly permissible under applicable law, the economic reality of the Tax Sharing Agreement is the establishment of a debtor – creditor relationship between the Debtor

---

[3] See FDIC Motion at p. 18.

and the Bank with respect to tax refunds to which the Bank Affiliated Group would have been entitled if it had filed separate income tax returns. Contrary to the FDIC's assertions, the Tax Sharing Agreement does not "allocate" tax refunds to the Bank. Under the agreement, in the event of an overpayment to the IRS, the Debtor has unfettered discretion to determine whether to seek a refund or have the overpayment applied to future tax obligations. Moreover, if the Bank Affiliated Group would have been entitled to a refund if it had filed separately, the Debtor is obligated to pay the Bank an amount equal to the amount to which the Bank Affiliated Group would have been so entitled, regardless of whether the Consolidated Group is receiving a refund. In short, with respect to amounts the Bank is entitled to be paid under the Tax Sharing Agreement as a result of the carryback of losses, the Debtor, not the IRS, is the obligor. The Debtor does not function as a collection agent for the Bank but owes the Bank any amounts to which the Bank is entitled under the agreement, regardless of (i) whether the Consolidated Group is receiving a refund or (ii) the amount of any refund received from the IRS.

Fourth, the fact that the Debtor is not in possession of the Tax Refund is not relevant to the issue of ownership. Though the FDIC mentions this fact in several places in the FDIC Motion, it does not explain why the fact purportedly is meaningful to the ownership determination. Notably, the Liquidating Supervisor does not base his claim of ownership by the estate of the Tax Refund on commingling of the funds with other funds of the Debtor and inability of the FDIC to trace in this case but rather on the debtor-creditor relationship established in the Tax Sharing Agreement between the Debtor and the Bank with respect to tax refunds. Therefore, the fact that the estate is not in possession of the refund is irrelevant. Otherwise, the turnover provisions of section 542 of the Bankruptcy Code would be superfluous. In addition, the fact that the estate currently is not in possession of the Tax Refund does not

affect the ownership analysis because (i) the Consent Order pursuant to which the refund was delivered to the FDIC to be placed into escrow provides that such actions will have no effect on the determination of ownership, and (ii) the only reason the estate is not in possession of the refund is that the FDIC acted in violation of the automatic stay to interdict receipt of the refund by the Debtor.  Finally, as demonstrated by Pan American World Airways, Inc. v. Shulman Transport Enter., Inc. (In re Shulman Transport Enter., Inc.), 744 F.2d 293 (2d Cir. 1984), discussed in Parts II(B) and II(D) of this Response, when a debtor-creditor relationship exists between two parties with respect to property at issue, the fact that the debtor party is not in possession does not affect its ownership of the property.

Fifth, it is apparent that the FDIC places little stock in its contentions about purported repudiation and rejection of the Tax Sharing Agreement.  It devotes approximately one page to this argument and cites not a single case in support of its position.  FDIC Motion at pp. 16-17. The Liquidating Supervisor will rely on his discussion of this issue in the Plaintiff's Motion at pages 24-38 and not repeat in this Response the reasons why the FDIC's assertions regarding this issue are without merit.

Sixth, applicable law indisputably permits the members of a consolidated group to establish by agreement their relationships among one another regarding tax refunds.  In conformity with such law, the Tax Sharing Agreement establishes a debtor-creditor relationship between the Debtor and the Bank with respect to amounts to which the Bank Affiliated Group would be entitled if the Bank Affiliated Group filed separately, necessarily signifying that the Debtor is the owner of any tax refunds that may be due from the IRS.  There is nothing unfair or overreaching about such an arrangement, which obligates the Debtor to pay the Bank, regardless of whether or not the Consolidated Group is receiving a refund from the IRS. Furthermore, far

from offending public policy, enforcement of the Tax Sharing Agreement will promote the strong policy underlying the bankruptcy laws of equality of distribution among similarly situated creditors.

## II. ARGUMENT

### A. The statutes and regulations governing consolidated tax returns do not establish an agent/trustee-principal/beneficiary relationship between a common parent taxpayer and a subsidiary that is a member of the consolidated group with respect to tax refunds attributable to the earnings history of the subsidiary.

The FDIC erroneously characterizes the Liquidating Supervisor's position as an argument that the Tax Sharing Agreement "**converted** the Holding Company's relationship with the Bank with respect to the Tax Refund from agent/trustee-principal/beneficiary to debtor-creditor." FDIC Motion at p. 18. (emphasis added). This assertion by the FDIC is based on the flawed assumption that the laws and regulations governing consolidated tax reporting make a common parent taxpayer an agent/trustee for the subsidiary members of a consolidated group with respect to tax refunds, thereby relegating the parent to bare legal title to refunds due the group and vesting the beneficial interest in such refunds in the member or members of the consolidated group to whose earnings histories the refunds are attributable. On the contrary, however, as cases cited by the FDIC acknowledge, the designation in the applicable Treasury regulations of the common parent of a consolidated group as agent for each member of the group (see 26 C.F.R. § 1.1502-77(a)) is solely for the convenience and protection of the IRS and is not intended to affect the determination of the entity to which a tax refund belongs.

For example, in the Jump case (cited in the FDIC Motion at p. 14), the court observed:

> Preliminarily, we note that what entity is entitled to ultimately receive the benefit of a consolidated tax refund is a matter which is not addressed in the Internal Revenue Code. Though IRS regulations provide that the parent corporation is the agent for each subsidiary in the affiliated group, Treas. Reg. §

- 6 -

[1.1502-77], this agency relationship is for the convenience and protection of IRS only and does not extend further.

Jump v. Manchester Life & Cas. Mgmt. Corp., 579 F.2d 449, 452 (8th Cir. 1978); see also Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.), 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001), aff'd, 377 F.3d 209 (2d Cir. 2004) (the agency provided for under 26 C.F.R. § 1.1502-77(a)) "is purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S."). Thus, the designation of the Debtor as agent for the other members of the Consolidated Group under 26 C.F.R. § 1.1502-77 would not create a relationship of agent/trustee-principal/beneficiary between the Debtor and the Bank with respect to the Tax Refund even if the Tax Sharing Agreement did not exist.

Implicitly recognizing that neither the IRC nor regulations promulgated thereunder establish an agent/trustee-principal/beneficiary relationship between the Debtor and the Bank with respect to tax refunds, the FDIC seeks support for its position by reference to the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure (the "Policy Statement"), 63 Fed. Reg. 64757 (cited in the FDIC Motion at pp. 29-38), issued in 1998. The Policy Statement, however, is just that, a policy statement. It does not have the force of law and cannot override the debtor-creditor relationship created between the Debtor and the Bank under the terms of the Tax Sharing Agreement. See In re Seidman, 37 F.3d 911, 931-32 (3d Cir. 1994) (holding that an OTS "Statement of Policy," set forth at 12 C.F.R. § 571.7(b), was not "regulation or law"). In fact, the Policy Statement has even less force than the statement of policy in Seidman, since the Policy Statement, unlike the statement of policy in Seidman, was never set forth in the Code of Federal Regulations. See Krazalick v. Republic Title Co., 314 F.3d 875, 881 (7th Cir. 2002) ("A simple announcement is too far removed from the process by which courts interpret statutes to earn deference. A simple announcement is all we have here.

- 7 -

One fine day the policy statement simply appeared in the Federal Register. No public process preceded it …."), cert. denied, 539 U.S. 958 (2003); see also Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters–like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law–do not warrant Chevron-style deference."); Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n, 869 F.2d 719, 736 (3d Cir. 1989) (concluding that an agency's policy statement "is entitled to no greater deference than any other policy statement, i.e., none"); Vietnam Veterans of Am. v. Sec'y of the Navy, 843 F.2d 528, 537 (D.C. Cir. 1988) ("A binding policy is an oxymoron.").

The cases that hold that, in the absence of a tax allocation agreement creating a debtor-creditor relationship between a common parent and a subsidiary with respect to tax refunds, the subsidiary is entitled to a tax refund arising from its earnings history reach that conclusion based on the theory that, **in the absence of such a tax allocation agreement**, the parent would be unjustly enriched if it were permitted to retain the refund. See In re First Cent. Fin. Corp., 269 B.R. at 500 ("In the absence of a tax allocation agreement, the [regulator of the insolvent subsidiary] might be correct that retention of the Tax Refund would unjustly enrich the bankruptcy estate of [the parent corporation]"). They do not reach this conclusion based on a finding that the designation in 26 C.F.R. § 1.1502-77 of the parent as agent for the other members of a consolidated group makes the parent an agent-trustee for such members with respect to tax refunds. In short, a tax allocation agreement that creates a debtor-creditor relationship between a parent corporation and another member of a consolidated group with respect to tax refunds does not contravene the laws that govern consolidated income tax reporting.

US2008 1031270.4

**B.** **The designation of the Debtor as "agent and attorney-in-fact" for the other members of the Consolidated Group in Section 9 of the Tax Sharing Agreement does not create an agent/trustee-principal/beneficiary relationship between the Debtor and the Bank with respect to the Tax Refund.**

Though the Tax Sharing Agreement provides in Section 9 that each member of the Consolidated Group irrevocably appoints the Debtor as its "agent and attorney-in-fact" in connection with tax reporting and related matters for the Consolidated Group, it is clear that no true principal-agent relationship was created between the Bank and the Debtor under the agreement that would have limited the Debtor's interest in the Tax Refund to bare legal title held for the benefit of the Bank. Indeed, the appointment of the Debtor as "agent and attorney-in-fact" under Section 9 plainly was intended to enhance, not limit, the Debtor's rights and powers, including the right, in the Debtor's sole discretion, to determine whether claims in respect of tax attributes such as NOLs would be paid by way of refund from the IRS or, instead, credited against the tax liability of the Consolidated Group. Tax Sharing Agreement at p. 7, § 9(c).

Moreover, as shown in <u>Pan American World Airways, Inc. v. Shulman Transport Enter., Inc. (In re Shulman Transport Enter., Inc.)</u>, 744 F.2d 293 (2d Cir. 1984), the fact that an agreement describes one party as an agent for another is not determinative of whether a true agency relationship has been created, such that the putative agent is deemed to be acting in the capacity of a trustee for the benefit of the putative principal. In the <u>Shulman Transport</u> case, the debtor was an international freight forwarder. As a part of its business, the debtor received freight from shippers and arranged, under the shippers' respective names, for transportation of the freight by various air carriers, all of whom were members of a trade association, the IATA. The debtor collected the amounts charged the shippers for their shipments and received a commission out of the carrier rate so charged. <u>Id</u>. at 294. The debtor remitted to the air carriers on a monthly basis. <u>Id</u>. at 295.

- 9 -

The debtor and the IATA were parties to a "Cargo Agency Agreement" pursuant to which the debtor arranged for the transportation of freight by the air carriers with whom it did business. The Cargo Agency Agreement described the debtor as the agent of the carriers. It provided that all monies collected from the shippers by the debtor for transportation sold under the agreement constituted the property of the respective carriers. The Cargo Agency Agreement further provided, however, that the debtor would be responsible for monies due the carriers for their services whether or not the monies were collected from the shippers. Id. at 296.

After the debtor filed for relief under chapter 11, it sought court approval of a post-petition financing facility with its pre-petition lender under which the post-petition advances would be secured by a security interest in, among other things, the debtor's accounts receivable. In response, one of the carriers, Pan Am, on its own behalf and on behalf of other members of IATA who did business with the debtor under the Cargo Agency Agreement, objected, arguing that collections on the debtor's accounts receivable arising from the transportation services provided by the carriers were the carriers' property under the terms of the Cargo Agency Agreement and that, therefore, such accounts receivable could not be included in the security interests granted to the lender. Id. at 294.

The district court rejected Pan Am's contention that the accounts receivable and collections thereon belonged to the carriers and were not property of the debtor. The court of appeals affirmed. In affirming the decision below, the court of appeals held that the substance of a transaction determines whether a true agency relationship has been created between parties to a contract whether or not one of the parties to the contract is described in the contract as an agent of the other.

US2008 1031270.4

> Pan Am contends that the IATA agreement created an agency relationship between [the debtor] and IATA members and that, under established law and the express terms of the agreement, all monies collected by [the debtor] for the transportation it sold became the property of the transporting carrier. The "Cargo Agency Agreement" under which [the debtor] operated did indeed describe [the debtor] as the agent of the IATA members. However, the district court was not bound by that terminology. Even though a person is termed an agent, he may, in fact, act as such in some matters but not in others.
>
> * * *
>
> A debtor does not become the agent of his creditor simply because he is called an agent.
>
> * * *
>
> Where the relative rights of a bankrupt's creditors are at issue, it is particularly important that substance not give way to form. The district court, therefore, correctly examined *into* the substance of the relationship between [the debtor] and the carriers to ascertain whether the money that [the debtor] collected was held by it in the fiduciary capacity of an agent. Furthermore, the district court did not err in holding that the money was not so held.
>
> * * *
>
> "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Restatement (Second) of Agency* § 1(1) (1958). An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control. *Restatement (Second) of Agency, supra,* § 1(1) comment b. § 14. Absent the critical element of control by Pan Am over [the debtor's] collection and handling of funds, [the debtor] cannot be said to have acted as Pan Am's agent for receipt of transportation charges.

Id. at 295. (footnotes and citations other than to the Restatement omitted) (emphasis in original).

Accord First Cent. Fin. Corp., 269 B.R. at 497 ("An essential characteristic of an agency

relationship is that the agent acts subject to the principal's direction and control.").

Indeed, though perhaps not appreciating the significance for this case of doing so, the

FDIC effectively acknowledges that the status of agent-trustee is not created when the control

element is missing. In this regard, it quotes from the Restatement (Second) of Agency § 14B

(1958) as follows:

"One who has title to property which he agrees to hold for the benefit **and subject to the control of another** is an agent-trustee and is subject to the rules of agency."

FDIC Motion at p. 21. (emphasis added). The clear implication of this statement is that no agent-trustee status arises when the control element is absent.

As in the <u>Shulman Transport</u> and <u>First Cent. Fin. Corp.</u> cases, the essential element of control is not present in this case. Under the Tax Sharing Agreement, the Debtor does not act subject to the direction and control of the Bank with respect to any matters, much less with respect to the collection of tax refunds. On the contrary, under the agreement, the Debtor acts "[i]n its sole discretion" in managing the tax affairs of the Consolidated Group, including determining whether amounts refundable by the IRS shall be credited against the tax liability of the Consolidated Group or received by way of refund. Tax Sharing Agreement at p. 7, § 9. Moreover, as the court found significant in the <u>Shulman Transport</u> case (744 F.2d at 296), the Debtor is obligated under the Tax Sharing Agreement to pay the Bank regardless of whether the Debtor is receiving a refund from the IRS. Tax Sharing Agreement at pp. 6, 8, §§ 4(e) and 10.

In sum, neither the use of the term, "agent," in 26 C.F.R. §1.1502-77 nor the use of that term in Section 9 of the Tax Sharing Agreement imposes on the Debtor the status of an agent-trustee with respect to the Tax Refund. Instead, the substance of the Tax Sharing Agreement determines the nature of the relationship between the Debtor and the Bank with respect to the refund. That substance mandates the conclusion that the relationship is a debtor-creditor relationship.

**C.** **The economic reality of the Tax Sharing Agreement is the establishment of a debtor-creditor relationship between the Debtor and the Bank with respect to the Tax Refund and the establishment of the Tax Refund as property of the estate.**

In its motion for summary judgment, the FDIC employs the device of creating straw men it can topple by attributing positions to the Liquidating Supervisor that the Liquidating Supervisor has not taken. First, the FDIC asserts that the Liquidating Supervisor's position is based on the assumption that "the mere existence of the Tax Sharing Agreement converts the status in which the parent company receives refunds from that of an agent-trustee to an owner-debtor." FDIC Motion at p. 17. In fact, the Liquidating Supervisor has never taken the position that the mere existence of a tax sharing agreement creates a debtor-creditor relationship between a common parent and a subsidiary with respect to tax refunds attributable to the earnings history of the subsidiary. Rather, it is the Liquidating Supervisor's position that, under applicable law, it is permissible for a tax sharing agreement to establish a debtor-creditor relationship between a common parent and a subsidiary in respect of tax refunds and that the economic reality of the arrangement provided for in such an agreement determines whether such a relationship has been established or whether an agent/trustee – principal/beneficiary relationship has been established instead.

Next, the FDIC attributes to the Liquidating Supervisor the argument that the Tax Sharing Agreement represents an agreement by the Bank to lend the Debtor all refunds to which it is entitled, thereby creating a debtor-creditor relationship between the Debtor and the Bank. FDIC Motion at p. 18. Having introduced this red herring into the mix, the FDIC then launches an attack based on 12 U.S.C. §371c, asserting that the loans, which are figments of its imagination, are prohibited under that statutory provision. FDIC Motion at pp. 24, 31. This argument by the FDIC has no basis in fact. The Liquidating Supervisor has never taken the

position that tax refunds due the Consolidated Group based on the earnings history of the Bank

Affiliated Group constitute deemed loans from the Bank to the Debtor. The Liquidating

Supervisor's position is that, under the Tax Sharing Agreement, the Debtor, not the IRS, is the

obligor to the Bank with respect to amounts to which the Bank would have been entitled if the

Bank Affiliated Group had filed separately. The Debtor is obligated under the terms of the

agreement to pay the Bank an amount equal to the amount to which the Bank would have been

entitled if the Bank Affiliated Group had filed separately, regardless of whether the Consolidated

Group is receiving a refund or of the amount of any refund actually received. It is this

obligation, indisputably set forth in the Tax Sharing Agreement, that creates the debtor-creditor

relationship between the Debtor and the Bank and confirms the Debtor's ownership of the Tax

Refund.

    The FDIC contends that certain provisions of the Tax Sharing Agreement, namely,

Sections 3(d), 3(e)(ii), 4(d), 4(e) and 10(a)(iii), "allocate" tax refunds to the Bank and that, based

on such "allocation," the Bank is the beneficial owner of the Tax Refund. FDIC Motion at pp.

15, 22-24, 29, 33. Contrary to the FDIC's position, however, these provisions, by their terms, do

not "allocate" tax refunds to the Bank but rather obligate the Debtor to make payments to the

Bank in the amounts the Bank Affiliated Group would receive if filing separately, regardless of

whether a refund is ultimately forthcoming from the IRS or of the amount that might be

forthcoming from the IRS. The timing of the payments required to be made by the Debtor to the

Bank under these provisions is not governed by receipt of a refund from the IRS, as evidenced

by, among other things, the Debtor's obligation to make the payments regardless of whether the

Consolidated Group is receiving any refund at all. Thus, the Debtor does not function, under the

Tax Sharing Agreement, as a collection agent for the Bank with respect to tax refunds but has an

independent obligation to pay the Bank such amounts, if any, as it owes the Bank under the sections of the agreement referenced by the FDIC.

As acknowledged by the FDIC, these provisions require that the Debtor make immediate payment to the Bank (FDIC Motion at p. 33), without awaiting receipt of a refund from the IRS, a refund that (i) might never be forthcoming because the Consolidated Group might not be entitled to a refund, (ii) might be delayed for a substantial period of time because of a disagreement between the Debtor and the IRS, or (iii) might be substantially less than the amount owed by the Debtor to the Bank. The FDIC asserts that, if the economic reality of this arrangement is the establishment of a debtor-creditor relationship between the Debtor and the Bank (which it surely is), the Bank has received "no consideration" for the arrangement. FDIC Motion at p. 34. This assertion is meritless. An undertaking by the Debtor to pay the Bank regardless of whether a refund is actually received from the IRS clearly constitutes good consideration for affording to the Debtor beneficial ownership of any refunds actually received from the IRS.

The propriety of adopting a structure in the Tax Sharing Agreement resulting in the creation of a debtor-creditor relationship between the Debtor and the Bank with respect to tax refunds is actually confirmed in the Policy Statement itself, which provides in relevant part:

> An institution incurring a loss for tax purposes should record a current income tax benefit and receive a refund **from its parent in an amount no less than the amount** the institution would have been entitled to receive as a separate entity. The refund should be made to the institution within a reasonable period following the date the institution would have filed its own return, **regardless of whether the consolidated group is receiving a refund**.

63 Fed. Reg. at 64758 (Nov. 23, 1998). (emphasis added).

The debtor-creditor relationship created between the Debtor and the Bank under the Tax Sharing Agreement pursuant to the sections identified above, and the clear benefits afforded to

the Bank thereunder, were perfectly satisfactory to the FDIC as long as the Debtor was solvent. Now that the Debtor is bankrupt, the FDIC would like to recharacterize the arrangement at the expense of the Debtor's general unsecured creditors and effectively obtain a priority with respect to the Tax Refund. The FDIC wrongly asserts that the Liquidating Supervisor "admits that, but for [the Debtor's] bankruptcy case, the Tax Refund would go to the Bank." FDIC Motion at p. 15. The Liquidating Supervisor admits no such thing. If the Debtor had not become insolvent, in accordance with the Tax Sharing Agreement, it would have (i) paid the Bank the amount to which the Bank Affiliated Group would have been entitled had it filed a separate tax return, and (ii) retained the Tax Refund as owner, if and when it was paid by the IRS. The intervention of bankruptcy does not change the fact that the Tax Refund belongs to the Debtor. It simply places the FDIC in the same position as the Debtor's other general unsecured creditors with respect to the payment the Debtor owes the Bank based on the Bank Affiliated Group's earnings history.

A determination that the Tax Refund belongs to the Debtor and is property of the estate would not be at odds with BSD Bancorp, Inc. v. FDIC, Case No. 93-12207-A11 (S.D. Cal. 1995), a case upon which the FDIC heavily relies.[4] In that case, the court held that a determination of the effect of a tax sharing agreement should not turn on dictionary definitions of terms such as "reimburse." Rather, the question whether a tax sharing agreement was intended to create a debtor-creditor relationship should be decided based on the "economic reality" of the transaction. Id. at 10-11. The court in BSD Bancorp found that the tax allocation guidelines in the tax allocation agreement at issue in that case were "extremely vague." Id. at 8. Moreover, based on the provisions of the agreement described in the opinion, it does not appear that the agreement authorized the parent corporation, in its sole discretion, to decide whether to seek a refund from the IRS or, instead, have the amount of an overpayment applied as a credit against

---

[4] A copy of the BSD Bancorp case is attached to the FDIC Motion as Exhibit O.

US2008 1031270.4

the tax liability of the consolidated group.  Finally, there is no indication in the opinion that the tax allocation agreement explicitly required payment by the parent to the subsidiary regardless of whether the consolidated group was receiving a refund.

In contrast, the provisions of the Tax Sharing Agreement that establish the debtor-creditor relationship between the Debtor and the Bank are not vague.  In view of these provisions, the economic reality under the Tax Sharing Agreement is that the Debtor has the power to decide whether even to seek a refund or, instead, to have an overpayment applied as a credit to the tax liability of the Consolidated Group.  Whether or not the Debtor seeks a refund, and whether or not the Debtor receives a refund, it is obligated to pay the Bank an amount equal to the amount the Bank would have received if the Bank Affiliated Group had filed a separate return.  The economic reality of this transaction is that the Debtor, not the IRS, is the Bank's obligor and that a debtor-creditor relationship was created between the Debtor and the Bank under the Tax Sharing Agreement with respect to the tax attributes of the Bank Affiliated Group.  Thus, if the "economic reality" test espoused in BSD Bancorp is applied in this case,  the Tax Refund belongs to the Debtor and is property of the estate.

> **D.** **The fact that the Tax Refund has not yet been paid to the Debtor does not affect the Debtor's ownership of the Tax Refund.**

At several places in its motion, the FDIC refers to the fact that the Debtor is not in possession of the Tax Refund as a fact favorable to the FDIC.  FDIC Motion at pp. 12, 15, 16, 19, 29.  For the most part, the FDIC offers no explanation why this fact should affect the analysis of the ownership issue.  As best the Liquidating Supervisor is able to discern from the FDIC Motion, the FDIC contends that the fact that the Debtor is not in possession of the Tax Refund distinguishes this case from Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav.

Corp.), 159 B.R. 9 (Bankr. D. Kan. 1993), aff'd, 182 B.R. 859 (D. Kan. 1995), a case the FDIC correctly perceives to be detrimental to its position. FDIC Motion at pp. 19, 29.

Though noting this factual distinction, the FDIC never explains why, in its view, the distinction is meaningful to the ownership analysis in this case. If the court in the Franklin Savings Corporation case had grounded its decision in favor of the debtor parent on (i) commingling by the debtor of the tax refunds at issue in that case, and (ii) an inability of the Resolution Trust Corporation to trace the tax refunds into the commingled funds, the FDIC could argue that the Franklin Savings Corporation case is meaningfully distinguishable from this case. The court in Franklin Savings Corporation, however, based its decision in favor of the debtor parent on its finding that, under the terms of the tax agreements at issue, the tax refunds belonged to the debtor parent and a debtor-creditor relationship existed between the debtor parent and the subsidiary financial institution with respect to tax refunds. Id. at 29. The court did not consider commingling or tracing issues but grounded its decision solely on its interpretation of the operative tax agreements. Therefore, the factual distinction noted by the FDIC between the Franklin Savings Corporation case and this case is not meaningful and does not undermine that case as strong support for the Liquidating Supervisor's position.

Additional reasons support the irrelevance of possession of the Tax Refund to the ownership analysis. First, the Consent Order pursuant to which the Tax Refund was delivered by the IRS to the FDIC to be held in escrow [Adv. Pro. Docket No. 35] provides that neither the delivery of the Tax Refund to the FDIC nor the deposit of the Tax Refund into escrow will have any effect on the determination of ownership of the Tax Refund. Second, the reason the Debtor is not in possession of the Tax Refund is that, after the filing of the Debtor's chapter 11 case, the FDIC took action, without obtaining relief from the automatic stay, to interdict the receipt by the

Debtor of the Tax Refund.  These actions, more particularly described in the Plaintiff's Motion at pages 24 through 25, constituted, at a minimum, acts to obtain possession of property of the estate and to exercise control over property of the estate in violation of the automatic stay of section 362(a) of the Bankruptcy Code.  11 U.S.C. § 362(a)(3).  The FDIC cannot be permitted to gain an advantage over the Debtor's estate by violating the automatic stay.

Finally, if, as the Liquidating Supervisor vigorously contends, the Tax Sharing Agreement creates a debtor-creditor relationship between the Debtor and the Bank with respect to the tax attributes of the Bank Affiliated Group, there is no logical basis for the matter of possession to affect the ownership analysis.  This point is well-illustrated by the Shulman Transport case, discussed at some length at pages 9 through 12 of this Response.  In that case, the Second Circuit Court of Appeals held that accounts receivable of a freight forwarder (the debtor) and the proceeds thereof constituted property of the estate, in which the debtor could grant a security interest to its post-petition lender.  The court of appeals reached this conclusion notwithstanding the facts that the accounts receivable were generated by the transport by air carriers of freight for the debtor's customers under a "Cargo Agency Agreement" among the debtor and the carriers that described the debtor as the carriers' agent and provided that the collections from the debtor's customers for the services performed by the carriers were the property of the carriers.  Obviously, at the time the debtor sought to grant the post-petition lender a security interest in its accounts receivable and their proceeds, the accounts receivable had yet to be collected.  The proceeds, of which the carriers claimed ownership, thus were not in the possession of the Debtor.  Yet, the court had no trouble finding that these rights to payment and the proceeds expected to be collected thereon constituted property of the estate in which a security interest could be granted to the lender, because, despite the characterization of the debtor

- 19 -

as the agent of the carriers in the Cargo Agency Agreement, the debtor did not act subject to the control of the carriers in collecting the accounts receivable and, therefore, was not an agent-trustee for the carriers. In the instant case, for the reasons discussed above, the Debtor likewise does not act as agent-trustee for the Bank with respect to tax refunds under the terms of the Tax Sharing Agreement. Under the rationale of the <u>Shulman Transport</u> case, the Tax Refund constitutes property of the estate regardless of whether it is in the Debtor's possession. It must be turned over to the Liquidating Supervisor pursuant to section 542 of the Bankruptcy Code. 11 U.S.C. § 542(a).

      **E.**     **The Tax Sharing Agreement does not offend public policy and is not unfair or overreaching.**

      There is no merit to the FDIC's position that, if the Tax Sharing Agreement creates a debtor – creditor relationship between the Debtor and the Bank with respect to tax refunds, it is unenforceable because it is contrary to public policy and unfair and overreaching. As discussed previously in this Response, the Tax Sharing Agreement offends no statute, regulation or other rule of law, and applicable law permits the members of a consolidated group to establish by agreement their relationships among one another regarding tax refunds. The Policy Statement heavily relied on by the FDIC is just that, a policy statement. It does not have the force of law and cannot render ineffectual an agreement that applicable law permits. Moreover, and ironically, the very provisions of the Tax Sharing Agreement that underscore the debtor – creditor nature of the relationship between the Debtor and the Bank thereunder with respect to refunds, namely, the provisions that require payment by the Debtor to the Bank regardless of whether the Debtor is receiving a tax refund, actually are recommended for inclusion in tax allocation agreements by the Policy Statement. These same provisions also demonstrate the fairness of the Tax Sharing Agreement to the Bank Affiliated Group.

US2008 1031270.4

Far from offending public policy, enforcement of the Tax Sharing Agreement will promote the strong public policy underlying the bankruptcy laws of equality of distribution among similarly situated creditors. If, as advocated vigorously by the Liquidating Supervisor, the relationship established between the Debtor and the Bank under the Tax Sharing Agreement with respect to refunds is found to be a debtor – creditor relationship, it is fair and appropriate for the FDIC to be subject to the same structure and process that applies to the Debtor's other general unsecured creditors in presenting and receiving distributions on their claims. The FDIC is seeking to leap-frog the Debtor's other general unsecured creditors. Its attempt should be rejected.

For the reasons set forth in the Plaintiff's Motion and this Response, the FDIC's Motion for Summary Judgment should be denied, and the Plaintiff's Motion for Summary Judgment should be granted.


Dated: January 29, 2010.


KILPATRICK STOCKTON LLP

By:＿＿＿/s/ Todd C. Meyers＿＿＿＿＿＿＿＿
　　　　Todd C. Meyers
　　　　Georgia Bar No. 503756
　　　　Alfred S. Lurey
　　　　Georgia Bar No. 461500
　　　　Sameer K. Kapoor
　　　　Georgia Bar No. 407525
　　　　1100 Peachtree Street, Suite 2800
　　　　Atlanta, GA 30309
　　　　(404) 815-6500 (Telephone)
　　　　(404) 815-6555 (Facsimile)
　　　　tmeyers@kilpatrickstockton.com

AND

US2008 1031270.4

ROGERS TOWERS, P.A.
    Betsy C. Cox
    Florida Bar No. 307033
    1301 Riverplace Blvd., Ste. 1500
    Jacksonville, FL 32207
    (904) 398-3911 (Telephone)
    (904) 396-0663 (Facsimile)
    bcox@rtlaw.com

Attorneys for Plaintiff, Clifford Zucker, in his capacity as the Liquidating Supervisor for NetBank, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2010, a true and correct copy of the foregoing document was filed electronically with the Court's CM/ECS filing system which in turn will generate an electronic notice of filing to all those who have requested or consented to electronic service in this adversary proceeding. In addition, I hereby certify that on January 29, 2010, a true and correct copy of the foregoing document was served on the following persons via first class United States mail, postage prepaid, upon the following parties:

Federal Deposit Insurance Corporation
c/o David E. Otero, Esq.
Akerman Senterfitt
50 North Laura Street, Suite 2500
Jacksonville, Florida 32202

Miriam G. Suarez, Esq.
Office of the United States Trustee
135 West Central Blvd., Suite 620
Orlando, Florida 32801

/s/ Sameer K. Kapoor
Sameer K. Kapoor
Attorney